UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EQUAN YUNUS,

                    Plaintiff,

      -against-

ANDREW CUOMO, Governor of the State of New
York, and ANTHONY J. ANNUCCI, Acting
Commissioner of the New York State Department
of Corrections and Community Supervision, in
their official capacities; JOAN LEWIS-
ROBINSON, Parole Officer, DEREK JONES,
Bureau Chief, RODNEY YOUNG, Regional
Director, RODNEY SMITH, Senior Parole Officer,
DENISE GRANNUM, Senior Parole Officer, and
YOLANDA VAZQUEZ, Parole Officer—in their
individual and official capacities,

                    Defendants.

No. 17-CV-5839 (AJN)(BCM)


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCION**


Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES ....................................................................................iii-vi

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND........................................................................................2

LEGAL STANDARD..................................................................................................7

ARGUMENT...............................................................................................................7

I.      MR. YUNUS HAS ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS
ON THE MERITS ..............................................................................................7

       A.    Mr. Yunus's Designation as a Sex Offender Violates His Procedural Due
Process Rights Because He Has Not Had the Opportunity to Challenge
That Designation in an Adversarial Proceeding ............................................7

       B.    SORA Violates Substantive Due Process As Applied to Persons Who
Have Not Committed Sexual Offenses  But Must Automatically Register
as Sex Offenders ..........................................................................................12

       C.    Many Special Parole Conditions Imposed on Mr. Yunus are Facially
Unconstitutional or Unrelated to his Prior Conduct .....................................14

               1.    The Conditions Imposed on Mr. Yunus's Residency Are Both
Unconstitutionally Vague and Have Been Applied to Him in an
Arbitrary and Capricious Manner ......................................................15

                       a.    SORA's Requirement That Registrants Reside Further than
1,000 Feet from School Grounds is Unconstitutionally
Vague ..................................................................................15

                       b.    Mr. Yunus's  Special Parole Condition that he "not enter or
be within 300 yards of places where children congregate" is
Unconstitutionally Vague. .....................................................18

                       c.    Mr. Yunus has been Effectively Forced to Live in a Shelter
and that Condition is Arbitrary and Unrelated to his Prior
Conduct ................................................................................19

               2.    Special Parole Conditions Restricting Mr. Yunus's Use of a Cell
Phone and Computer Both Violate his First Amendment Rights
and Are Unrelated to his Prior Conduct.............................................20

i

a.    Restrictions Barring Access to Cell Phones and Computers are Effectively a Social Media Ban ......................................20

b.    The Restrictions on Mr. Yunus's Cell Phone and Computer Use Are Overly Broad and Not Related to his Prior Conduct ..................................................................................21

3.    Mr. Yunus's Special Parole Conditions Barring Him from Visiting or Communicating with Minor Family Members Violate his Constitutional Rights .........................................................................22

4.    Mr. Yunus's Special Parole Conditions Requiring Him to Inform any Person with whom he Establishes a "Relationship" that he is a Sex Offender is both Unconstitutionally Vague and Unrelated to his Prior Conduct ....................................................................24

5.    Mr. Yunus's Special Parole Conditions Banning Him from Operating or Riding as a Passenger in a Motor Vehicle Are Unnecessarily Broad .........................................................................25

II.    AT A MINIMUM, THERE IS A SERIOUS QUESTION ON THE MERITS AND THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN MR. YUNUS'S FAVOR. ......................................................................25

III.    ABSENT AN INJUNCTION, MR. YUNUS WILL SUFFER IRREPARABLE HARM.......................................................................................26

IV.    GRANTING MR. YUNUS AN INJUNCTION IS IN THE PUBLIC INTEREST ..27

CONCLUSION.......................................................................................27

TABLE OF AUTHORITIES

**Cases**

*ACLU of NM v. City of Albuquerque*,
   139 N.M. 761 (N.M. 2006) ........................................................................................ 13

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010) ...................................................................................... 26

*Coleman v. Dretke*,
   395 F.3d 216 (5th Cir. 2004) ............................................................................. 10, 11

*Connecticut Dep't of Pub. Safety v. Doe*,
   538 U.S. 1 (2003) ................................................................................................... 11

*Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y.*,
   660 F.3d 612 (2d Cir. 2011) ................................................................................ 16, 17

*Doe v. Lima*,
   270 F. Supp. 3d 684 (S.D.N.Y. 2017) ...................................................................... 23

*Doe v. Pataki*,
   3 F. Supp. 2d 456 (S.D.N.Y. 1998) .................................................................... passim

*Doe v. Snyder*,
   101 F. Supp. 3d 672 (E.D. Mich. 2015) .................................................................... 16

*Doe v. Strange*,
   No. 2:15-CV-606 (M.D. Ala. Mar. 18, 2016) ........................................................... 17

*Does #1-5 v. Snyder*,
   834 F.3d 696 (6th Cir. 2016) .................................................................................... 14

*Does 1-5 v. Cooper*,
   40 F. Supp. 3d 657 (M.D.N.C. 2014) ....................................................................... 18

*Gwinn v. Awmiller*,
   354 F.3d 1211 (10th Cir. 2004) ............................................................................... 10

*Hardy v. Fischer*,
   701 F. Supp. 2d 614 (S.D.N.Y. 2010) ...................................................................... 27

*Hyser v. Reed*,
   318 F.2d 225 (D.C. Cir. 1963) ................................................................................. 26

*Jacobs v. Ramirez*,
   400 F.3d 105 (2d Cir. 2005) .................................................................................... 19

*Jennings v. Owens*,
  602 F.3d 652 (5th Cir. 2010) .......................................................................... 10

*Johnson v. United States*,
  135 S. Ct. 2551 (2015) ................................................................................... 19

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir. 1996) ............................................................................. 27

*Kentucky Dep't of Corr. v. Thompson*,
  490 U.S. 454 (1989) ......................................................................................... 7

*Kirby v. Siegelman*,
  195 F.3d 1285 (11th Cir. 1999) ..................................................................... 10

*Kurzon v. Democratic Nat'l Comm.*,
  197 F. Supp. 3d 638 (S.D.N.Y. 2016) ........................................................... 27

*LoFranco v. U.S. Parole Comm'n*,
  986 F. Supp. 796 (S.D.N.Y. 1997)* .............................................................. 15

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ......................................................................... 27

*Meza v. Livingston*,
  No. 09-50367 (5th Cir. Oct. 19, 2010) .......................................................... 19

*Mitchell v. Cuomo*,
  748 F.2d 804 (2d Cir. 1984) ........................................................................... 27

*Molinari v. Bloomberg*,
  564 F.3d 587 (2d Cir. 2009) ........................................................................... 12

*Moore v. City of E. Cleveland*,
  431 U.S. 494 (1977) ....................................................................................... 23

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
  No. 17-3585 (2d Cir. Feb. 23, 2018) ............................................................... 7

*Neal v. Shimoda*,
  131 F.3d 818 (9th Cir. 1997) ...................................................................... 9, 10

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) ................................................................................... 21

*People v. Knox*,
  12 N.Y.3d 60 (N.Y. 2009) .............................................................................. 13

*People v. Mingo*,
    12 N.Y.3d 563 (2009) ................................................................................................. 12

*Price v. Edwards*,
    No. 17-10601 (E.D. Mich. Feb. 8, 2018) ...................................................................... 17

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) .................................................................................................... 23

*Robinson v. New York*,
    No. 1:09-CV-0455 (N.D.N.Y. Mar. 26, 2010) .............................................................. 15

*Singleton v. Doe*,
    210 F. Supp. 3d 359 (E.D.N.Y. 2016) .................................................................. 15, 22

*Spiteri v. Russo*,
    No. 12-CV-2780, 2013 (E.D.N.Y. Sept. 7, 2013) ......................................................... 12

*State v. Reine*,
    No. 19157 (Ohio Ct. App. Jan. 10, 2003) ................................................................... 13

*State v. Robinson*,
    873 So.2d 1205 (Fla. 2004) ......................................................................................... 12

*United States v. Diaz*,
    854 F.3d 197 (2d Cir. 2017) ......................................................................................... 13

*United States v. Holm*,
    326 F.3d 872 (7th Cir. 2003) ....................................................................................... 22

*United States v. Myers*,
    426 F.3d 117 (2d Cir. 2005) ......................................................................................... 23

*United States v. Peterson*,
    248 F.3d 79 (2d Cir. 2001) .................................................................................... 21, 25

*United States v. Reeves*,
    591 F.3d 77 (2d Cir. 2010) ........................................................................................... 24

*United States v. Sofsky*,
    287 F.3d 122 (2d Cir. 2002) ......................................................................................... 21

*Valmonte v. Bane*,
    18 F.3d 992 (2d Cir. 1994) ............................................................................................. 8

*Wills v. U.S. Parole Comm'n*,
    882 F. Supp. 2d 60 (D.D.C. 2012) ............................................................................ 8, 10

*Wolff v. McDonnell,*
    418 U.S. 539 (1974)........................................................................................................ 8

**Rules and Regulations**

N.Y. Exec. Law § 259-c(15)........................................................................................................ 27

## PRELIMINARY STATEMENT

This motion seeks to enforce the simple axiom underlying our criminal justice system: the punishment should fit the crime.  Equan Yunus served the punishment that fit his crime—fifteen years in prison for kidnapping-for-ransom.  Now released on parole, Mr. Yunus is being punished in ways that far exceed—and have nothing whatsoever to do with—his crime.  As a parolee, he is subject to daily restrictions and conditions suitable for a high-risk sex offender, when his crime had nothing to do with sex, and there is no allegation of sexual misconduct of any sort on his part.

It is undisputed that Mr. Yunus's crime of conviction had no sexual component, and the state judge tasked with assessing his dangerousness found that he has not, and never will, commit a sexual offense.  Yet New York law requires that Mr. Yunus be designated a "sex offender," a false and stigmatizing characterization he has never been given the opportunity to challenge.  Indeed, in New York, being labeled a sex offender is more than a legal designation and a Scarlet Letter; it carries with it parole conditions that impose significant burdens on Mr. Yunus's everyday life.  As applied to Mr. Yunus, this blanket designation violates the constitutional requirements of procedural and substantive due process and must be removed until Mr. Yunus is given an opportunity to contest it in an adversarial proceeding.

Quite apart from the constitutional infirmities attendant to Plaintiff's mandatory designation, if Mr. Yunus has an appropriate designation as a "sex offender," it is that of a Level-One offender, the least dangerous designation New York provides.  Because the trial judge was a required to assign plaintiff some Level, he imposed Level-One status.  Nonetheless, Mr. Yunus's Parole Officers have ignored the purpose of the state's differentiating sex offenders based on their prior behavior and dangerousness, and have imposed the conditions of a high-risk (Level-Three) offender on Mr. Yunus without regard to his individual circumstances.

1

This unwarranted imposition of extreme conditions has hamstrung Mr. Yunus's reentry into free society.  These conditions and the arbitrary manner in which his Parole Officers have implemented them have, among other things, forced Plaintiff to live in a homeless shelter, denied him access to his family, denied him access to a cell phone or computer except in the most limited circumstances, and forced his misleading "sex offender" label to be widely disseminated. These irrational conditions have impeded Mr. Yunus's attempts to obtain an education, maintain a job, and reintegrate himself into the community.  Making matters worse, many of these conditions are unduly vague, forcing Mr. Yunus to over-police himself and surrender more of his already-restricted freedom than is required.

The harm to Equan Yunus is constant and immediate.  Each day, his liberty to live and lead his life is circumscribed in ways that are unfair and unconstitutional, even for a felony parolee—all because of broad, indiscriminate parole conditions and the actions of his Parole Officers that bear no relevance to his prior conduct.  This arbitrary punishment is antithetical to the policies our criminal system seeks to promote, and a mandatory injunction is necessary to ensure Mr. Yunus is able to exercise the narrow freedom he has for his remaining year on parole.

## FACTUAL BACKGROUND

Sixteen years ago, Equan Yunus pled guilty to the crime of kidnapping-for-ransom. Declaration of Equan Yunus in Support of Motion for Preliminary Injunction ("Yunus Decl.") ¶ 2.  One of his victims was under seventeen years old.  The kidnapping arose in the context of Plaintiff's involvement in the drug trade; it had no sexual component.  Yunus Decl. Ex. A, at 20. Mr. Yunus was sentenced to eighteen years of incarceration.  Yunus Decl. ¶ 2.  At his plea colloquy, Mr. Yunus was not informed that, despite his crime having no relation to sex, New

2

York's Sex Offender Registration Act ("SORA") would still require him to register as a sex offender upon release.  Yunus Decl. ¶ 3; *See* N.Y. Correct. Law § 168-a.

During his 15 years behind bars, Mr. Yunus reformed his life.  In addition to developing skills as an informal "jailhouse lawyer" (Mr. Yunus successfully represented himself in a challenge to the conditions of his confinement that went to the Appellate Division, Third Department), he attained a 4.0 average as an inmate-student at Bard College, received three trade certificates, and taught an investment course to other prisoners.  Yunus Decl. ¶ 4.  Mr. Yunus has been drug free for seventeen years.  Yunus Decl. ¶ 5.  He was never so much as charged with sexual misconduct of any sort.  Yunus Decl. Ex. A, at 20.

Mr. Yunus was released on parole in July of 2016.  Shortly before his release, the Honorable Michael J. Obus, the judge who had sentenced him years earlier, conducted a SORA-mandated hearing to assess what risk level Mr. Yunus should be assigned as a sex offender: Level One (low-risk), Level Two (moderate-risk) or Level Three (high-risk).  Judge Obus noted that he was "very familiar" with Mr. Yunus's case having presided over the criminal proceedings, Yunus Decl. Ex. A, at 20, and he observed that there is "not only . . . no allegation of sexual abuse in this case, but . . . also no suggestion of any history of sexual misconduct on the part of the Defendant at all . . . [n]or is there any indication of any propensity on the part of the defendant for sexual misconduct."  *Id.* at 21-22.  Judge Obus concluded that he was "satisfied that there is virtually no likelihood that [Mr. Yunus] will commit a sex crime ever" and designated him as a Level-One sex offender.  *Id* at 22.

Upon his release, Plaintiff was assigned Special Parole Conditions by Parole Officer ("PO") Defendant Rodney Smith.  Yunus Decl. ¶ 9.  Ignoring Mr. Yunus's Level-One designation, PO Smith assigned Mr. Yunus forty-eight highly restrictive special conditions of

parole.  *See* Yunus Decl. Ex. B.  Among countless other restrictive conditions, Mr. Yunus was forbidden from: (i) being present within three-hundred yards of any place where children "congregate;" (ii) using a cell phone or computer without his PO's permission; (iii) communicating with any minor (including his own family members); and (iv) driving or riding in a motor vehicle.  Yunus Decl. Ex. B. ¶¶ 4,15,17, 31,32, 35,39.  Mr. Yunus was also told that, in the presence of his PO, he would have to inform any person with whom he entered into a "relationship" that he is a sex offender.  *Id.* ¶ 14.  When Mr. Yunus protested that these conditions bore no relation to his prior conduct, PO Smith told him that these are the conditions that he gives every sex offender regardless of designated risk level, and that Mr. Yunus would need to "man up" and deal with it.  Yunus Decl. ¶ 9.  Both of Plaintiff's subsequent POs— Defendants Yolanda Vazquez and Joan Lewis-Robinson—informed him that all sex offenders are assigned the same conditions irrespective of their assigned risk level.  Yunus Decl. ¶ 11.

These restrictions have had a devastating effect on Mr. Yunus's efforts to reenter his community and restart his life outside of prison.  First, Mr. Yunus has been effectively confined to the homeless shelter that the Department of Corrections ("DOCCS") assigned him to upon release.  Yunus Decl. ¶¶ 14-28.  By virtue of his sex offender designation, Mr. Yunus is subject to a mandatory parole condition that he cannot reside within 1,000 feet of any "school grounds." Yunus Decl. Ex. B ¶ 4.  This restriction, coupled with the special parole condition of not being able to live within three-hundred yards of any place "where children congregate" covers virtually all of New York City.   Even with these restrictive conditions, Mr. Yunus, working with  his criminal defense attorney, used Google Maps to identify two locations—the residences of Mr. Yunus's fiancée, and his uncle—that would not run afoul of the "set-back" restrictions.  Yunus Decl. ¶¶ 15, 19.  POs Vazquez and Lewis-Robinson nonetheless rejected these proposals,

claiming that they were less than 1,000 feet from a school without any explanation as to why the measurements that Mr. Yunus and his attorney secured were incorrect.  Yunus Decl. ¶¶ 18-19.

Undeterred by these arbitrary rejections, Mr. Yunus proposed that he live at the apartment of his fiancée's sister, Lisa Blake.  Yunus Decl. ¶ 20.  Mr. Yunus gave PO Lewis-Robinson Ms. Blake's address and phone number.  Yunus Decl. ¶ 20.  PO Lewis-Robinson took no action on the request for nearly *nine months* despite two follow-up letters from Ms. Blake. Yunus Decl. ¶¶ 21-23.  When she finally called Ms. Blake, she proposed a date for a site visit on which Ms. Blake was unavailable.  Yunus Decl. ¶ 24.  Ms. Blake proposed an alternative date but, rather than attempt to find a mutually agreeable time, PO Lewis-Robinson declared that Ms. Blake was being "uncooperative" and thus forbade Mr. Yunus from moving in with her.  Yunus Decl. ¶ 25.  PO Lewis-Robinson has since stated on multiple occasions that it is easier for her to monitor her parolees when they are all in the shelter, and nearly every one of the approximately 150-200 parolees under her control reside in the shelter.  Yunus Decl. ¶ 27.

Other special parole conditions have restricted Mr. Yunus's life and work as well, all without justification.  The rule restricting him from having a cell phone or computer has hindered his ability to pursue his education[1] and to find a suitable job.  Likewise, he is subject, on the basis of PO Lewis-Robinson's say-so, to a scaled-back curfew of 8:00 a.m. to 8:00 p.m.; PO Lewis-Robinson has offered no justification other than that Mr. Yunus "is a sex offender." Yunus Decl. ¶¶ 41-43.  The result has been that Mr. Yunus has had to turn down full-time job at Access-a-Ride and take a lower-paying seasonal position at a tax-preparation firm.  Yunus Decl. ¶¶ 44, 46, 47.  Faced with his protests, PO Lewis-Robinson has reiterated that she does not care

---

[1] After a prolonged negotiation, Mr. Yunus has been granted permission to use a cell phone and the computers located at his school (but not his personal computer) only for academic purposes and to communicate with counsel. He still is banned from using a computer or a cell phone for any other purpose.

about parolees' employment or schooling, but only that they undergo drug and/or sex counseling. Yunus Decl. ¶ 32.

The special parole conditions attendant to Plaintiff's status as a sex offender have similarly impacted his ability to reintegrate into his family.  Mr. Yunus has two siblings, both of whom have minor daughters; Mr. Yunus is forbidden from visiting with them.  Yunus Decl. ¶¶ 33-35.  This restriction not only prevents him from developing a relationship with his nieces, but largely prevents him from seeing his siblings, who must make alternative child care arrangements to see him.  Yunus Decl. ¶¶ 35-36.  Mr. Yunus is also very close to his uncle—his closest living family on his mother's side of his family.  His uncle has invited for Mr. Yunus to live with him, his wife, and his grandchildren.  Yunus Decl. ¶ 37.  But Mr. Yunus has been unable to even meet his young cousins or spend time meaningful time with his uncle and aunt. Yunus Decl. ¶¶ 37-38.  For example, when Mr. Yunus asked PO Lewis-Robinson if he could attend his uncle's Thanksgiving dinner, he was told that he could, but he would be put in jail if there were children there.  Along the same lines, PO Lewis-Robinson has informed all of her parolees at weekly meetings that they will be "locked up" if they interact with any children, including family members.  Yunus Decl. ¶¶ 39-40.

Building new relationships in his community has likewise been made unduly burdensome by Plaintiff's parole conditions.  Mr. Yunus was forced to disclose his designation as a sex offender to his fiancée, and, in light of his curfew and cell phone/computer restrictions, is barely permitted to see or even communicate with her.  Yunus Decl. ¶¶ 49-50.  Mr. Yunus's various POs have also disclosed his sex offender status to others persons at the shelter and administrators at his school, causing him unnecessary communal stigma and putting his education in jeopardy. Yunus Decl. ¶ 13.

**LEGAL STANDARD**

A party seeking a preliminary injunction must show 1) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; 2) irreparable harm; and 3) that a preliminary injunction is in the public interest. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, No. 17-3585, 2018 WL 1021223, at *37 (2d Cir. Feb. 23, 2018). Because Mr. Yunus seeks a mandatory injunction he must demonstrate a "clear or substantial likelihood of success on the merits." *Id.* (citation omitted).

**ARGUMENT**

**I.     MR. YUNUS HAS ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS**

Mr. Yunus's designation as a sex offender violates his constitutional rights to both procedural and substantive due process. Moreover, many of the special conditions of Plaintiff's parole are either unconstitutionally vague, bear no relationship to his prior conduct, or both.

**A.     Mr. Yunus's Designation as a Sex Offender Violates His Procedural Due Process Rights Because He Has Not Had the Opportunity to Challenge That Designation in an Adversarial Proceeding**

Procedural due process claims proceed in two steps. "The first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). It is well settled that a reputational injury—such as a stigmatizing public designation or status—coupled with the "impairment of some additional interest" is a sufficient deprivation of liberty to come within the Due Process Clause's protections. *Doe v. Pataki*, 3 F. Supp. 2d 456, 467 (S.D.N.Y. 1998) (Chin, J.) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)).

Mr. Yunus has satisfied this "stigma plus" test to illustrate that his liberty interests have been infringed upon.  His designation as a sex offender, coupled with the special parole conditions that accompany it, both harm Mr. Yunus's reputation, and impair "compelling additional interests," such as his right to be free from onerous registration requirements, to visit with his family, to pursue a career, and to obtain an education.  Courts both in New York (addressing SORA specifically) and in other jurisdictions (addressing similar laws) have agreed that the requirement to register as a sex offender, and its accompanying restrictions and notification requirements, clear the first hurdle of the procedural due process "stigma-plus" test: they represent a "liberty interest interfered with by the state."  *See Doe*, 3 F. Supp. 2d at 467 (implementation of SORA's registration requirements creates "a protected liberty interest that entitles [offenders] to procedural due process"); *Wills v. U.S. Parole Comm'n*, 882 F. Supp. 2d 60, 75 (D.D.C. 2012) (collecting cases from five federal circuit courts for the proposition that there is a "protected liberty interest in avoiding at least those stigmatizing consequences arising jointly from sex offender classification or labeling and its corresponding conditions").

On the instant facts, the second step of the procedural due process analysis is also satisfied:  Mr. Yunus has not had any opportunity to challenge this designation in an adversarial proceeding.  *See Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (holding that "some kind of hearing" is required before a person may be deprived of his liberty interest).  Mr. Yunus has received two adversarial adjudications leading up to his current designation—(1) the criminal process leading up to his guilty plea for kidnapping; and (2) a post-conviction, pre-release hearing to assess what level sex offender he ought to be designated—but where "not a sex offender at all" was not an option within the judge's power.  Yunus Decl. Ex A, at 20-22.  For a person whose crime of conviction had nothing whatsoever to do with sex—and for whom there

8

has been a judicial finding that "there is virtually no likelihood that [he] will commit a sex crime," Yunus Decl. Ex. A, at 22—such process is constitutionally inadequate.

The specific question at issue here—whether a parolee whose crime of conviction had nothing to do with sex is entitled to a hearing as to *whether* he should be deemed a sex offender at all—has not been addressed by the Second Circuit.  Many federal courts of appeals have considered this issue, however, and the cases are legion that *some sort* of hearing on this foundational issue is required in order to satisfy procedural due process.

The Ninth Circuit's decision in *Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997), is instructive.  In *Neal*, the Ninth Circuit considered whether Hawaii's designation of two men— one of whom had been convicted of attempted rape, and the other of whom had been convicted of robbery, kidnapping and attempted murder—as sex offenders without a hearing violated their due process rights.  *Id.* at 821.  The Ninth Circuit held that these two men were not alike because one was convicted of an offense involving sex, while the other was not.  For the man who had been convicted of attempted rape, the court concluded that no further process was necessary because his crime of conviction was "obviously a sex offense" and "an inmate who has been convicted of a sex crime in a prior adversarial setting"—the criminal trial—and thus "has received the minimum protections required by due process."  *Id.* at 831.  For the man convicted of robbery, kidnapping and attempted murder, however, the court explained that it was "equally clear . . . that [he] did not receive the minimum due process protections" as he "has never been convicted of a sex offense and has never had an opportunity to formally challenge the imposition of the 'sex offender' label in an adversarial setting."  *Id.*

Ultimately, the *Neal* court ruled that man convicted of robbery, kidnapping and attempted murder "must be afforded" a hearing on whether designating him a sex offender is appropriate.

*Id.* at 832.  On that basis, the court remanded to the district court with instructions to remove the

sex offender label until the he had received appropriate process.  *Id.*  Numerous other circuit

courts have reinforced *Neal*'s reasoning, and have required persons convicted of non-sexual

offenses to receive a hearing before being deemed sex offenders.  *See Coleman v. Dretke*, 395

F.3d 216, 221 (5th Cir. 2004); *Gwinn v. Awmiller*, 354 F.3d 1211, 1218 (10th Cir. 2004); *Kirby

v. Siegelman*, 195 F.3d 1285, 1292 (11th Cir. 1999); *see also Wills*, 882 F. Supp. 2d at 77–78; *cf.

Jennings v. Owens*, 602 F.3d 652, 658 (5th Cir. 2010) (drawing distinction between parolee who

stipulated to facts indicating sexual nature of kidnapping as part of his plea and parolees who had

had been convicted of kidnapping a minor with no sexual component).

Just like the inmate in *Neal*, Mr. Yunus "has never had an opportunity to formally

challenge the imposition of the 'sex offender' label in an adversarial setting." 131 F.3d at 831.

Mr. Yunus's criminal conviction does not satisfy due process in and of itself, because he was not

convicted of a sexual offense and he was never advised at the time he pled guilty that his

conviction would result in his designation as a sex offender.  Plaintiff's SORA hearing is

likewise insufficient, as the judge at that hearing made a factual finding that there is "virtually no

likelihood" that Mr. Yunus will ever commit a sex crime, even as he was obligated by state law

to impose a sex offender risk level on Mr. Yunus.[2]  Mr. Yunus is entitled to a hearing where he is

---

[2] Mr. Yunus had no additional avenue to challenge his designation in the state system.  Sex offender risk level
determinations are not subject to a direct appeal and cannot be challenged through Article 78 of the CPLR.  *Doe v.
Pataki*, 3 F. Supp. 2d 456, 477 (S.D.N.Y. 1998).

given a fair chance to challenge his sex offender designation, and that designation must be removed until he has that opportunity.[3]

The Supreme Court's decision in *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003), does not compel otherwise.  In *Doe*, the petitioner had been convicted of a sex offense, and argued that he was entitled to a separate hearing to assess whether or not he was "dangerous" before he could be branded a sex offender.  *Id.* at 6.  The Supreme Court disagreed, reasoning that because the relevant state law deemed a person a sex offender by virtue of his conviction  of sex-related crime—irrespective of dangerousness—the process attendant to the criminal conviction was sufficient to satisfy procedural due process.  *Id.* at 8.  Here of course, Plaintiff was not convicted of a sex-related crime, or indeed any sex-related misconduct at all.

*Doe*'s holding—that states are free impose the "sex offender" label on those convicted of sexual crimes without any additional process irrespective of whether they are still "dangerous"— does not control this case.  Unlike the circumstances in *Doe*, Mr. Yunus has never been convicted of a sexual offense and has a judicial finding to the contrary.  Mr. Yunus's claim has nothing to do with whether he is entitled to a hearing on his present "dangerousness" in light of undisputed prior sexual misconduct, but whether his prior conduct is sufficient to brand him a sex offender at all.  *See Coleman*, 395 F.3d at 224 n.30 ("The *Doe* Court, however, far from holding that a liberty interest is not implicated where sex offender conditions are imposed on those not convicted of a sex offense, noted that the registration law applied only to those with sex offense convictions . . . [b]ecause the present case deals with a petitioner who never had the

---

[3]  Even accepting his designation, the manner in which Mr. Yunus's POs have disregarded his status as a Level-One offender makes a mockery of the little process that he did receive.  In *Doe v. Pataki*, 3 F. Supp. 2d 456 (S.D.N.Y. 1998), Judge Chin thoughtfully weighed the various interests at play in a risk-level classification hearing and determined the procedures necessary to  satisfy sex-offender parolees' right to procedural due process.  *Id.* at 470 While Level-One offenders like Mr. Yunus technically receive the process Judge Chin laid out in that they have the formality of a hearing, that process is meaningless when Parole Officers openly disregard its result and impose the same suffocating special conditions irrespective of the judicially-determined offense level.

original procedurally safeguarded opportunity to contest [his sex offender label], we do not believe *Doe* provides much guidance.").

> **B.**     **SORA Violates Substantive Due Process As Applied to Persons Who Have Not Committed Sexual Offenses  But Must Automatically Register as Sex Offenders**

In addition to violating procedural due process, Mr. Yunus's designation as a sex offender violates substantive due process.  Courts in this Circuit have applied a rational basis test to challenges of a sex offender designation, *see, e.g.*, *Spiteri v. Russo*, No. 12-CV-2780, 2013 WL 4806960, at *27 (E.D.N.Y. Sept. 7, 2013).  Here, Mr. Yunus must demonstrate that "there is no rational relationship between the legislation and a legitimate legislative purpose." *Molinari v. Bloomberg*, 564 F.3d 587, 606 (2d Cir. 2009).  Plaintiff satisfies even this lenient standard, as there is no viable reason why a person who received a judicial finding that he never has and near certainly never will commit a sexual offense must nonetheless register as a sex offender.

The purpose underlying SORA is to "to protect the public from sex offenders." *People v. Mingo*, 12 N.Y.3d 563, 574 (2009).  In achieving this goal, the New York Court of Appeals has explained that "an accurate determination of the risk a sex offender poses to the public is the paramount concern." *Id.*  Labeling Mr. Yunus as a sex offender bears no relation whatsoever to this purpose.  Far from being an "accurate determination" of the risk Mr. Yunus poses to the public, the sex-offender label as applied to Plaintiff is misleading, as Mr. Yunus poses no risk of committing future sexually-based offenses, as Justice Obus found.  As the Florida Supreme Court recognized in a similar context, even assuming the registration of some kidnappers as sex offenders is reasonable, "the application of [the sex offender designation] to a defendant whom the State concedes did not commit a sexual offense is not" reasonable.  *State v. Robinson*, 873 So.2d 1205, 1215 (Fla. 2004); *see also ACLU of NM v. City of Albuquerque*, 139 N.M. 761, 772 (N.M. 2006); *State v. Reine*, No. 19157, 2003 WL 77174 (Ohio Ct. App. Jan. 10, 2003); Steven

12

J. Costigliacci, *Protecting Our Children from Sex Offenders: Have We Gone Too Far?*, 46 Fam. Ct. Rev. 180, 185-186 (2008) (discussing hypothetical scenarios illustrating the absurdity of labeling all persons convicted of kidnapping minors as sex offenders without any regard for the facts of their case).[4]

While the New York Court of Appeals reached the opposite conclusion in *People v. Knox*, 12 N.Y.3d 60, 64 (N.Y. 2009), this court is not bound by that court's rulings on questions of federal constitutional law, *see United States v. Diaz*, 854 F.3d 197, 208 (2d Cir. 2017). Plaintiff urges this Court to adopt the more persuasive reasoning of the courts cited above. The New York Court of Appeals gave two rationales for why SORA's automatic registration requirement satisfies rational basis review. First, the Court reasoned that, because studies reflect that many kidnapped children are sexually assaulted, there was a rational basis to conclude that in most cases, a kidnapped child is in danger of being assaulted. *Knox*, 12 N.Y.3d at 68–69. Maybe so, but that hypothetical danger did not materialize in this case, and there is "virtually no likelihood" Mr. Yunus will ever commit a sexual crime.

Second, the New York court minimized the interests of persons in Mr. Yunus's position because, even if the Legislature were to take away the misleading label of "sex offender" and instead label those convicted of kidnapping as "child predators," they would have no basis to protest the designation. *Id.* at 69. In light of this perceived minor difference in title, the court claimed it was rational for the Legislature to adopt a "hard and fast rule, with no exceptions," avoiding the administrative burdens of assessing whose kidnapping crime had a sexual component and whose did not and avoiding the risk of a sexually-based kidnapper being mischaracterized. *Id.* In other words, the Court of Appeals held that, because the burden of

---

[4]  For example, the author of the cited note provides the hypothetical of a grandmother who kidnaps her grandchild because she suspects the child is being abused by her parents. *Id.*  Under New York's one-size-fits-all approach, this grandmother would be legally mandated to be branded as a sex offender.

being labeled a "sex offender," as opposed to something else connoting a danger to children, is modest, it was rational for the legislature to prioritize administrative ease over ensuring that all persons labeled "sex offenders" had actually committed a sexual offense.

This reasoning ignores the power of the term "sex offender."  As the Sixth Circuit recently noted, sex offender registries frequently "brand registrants as moral lepers," *Does #1-5 v. Snyder*, 834 F.3d 696, 705 (6th Cir. 2016), and this court has acknowledged that a sex offender designation is "likely to carry with it shame, humiliation, ostracism, loss of employment and decreased opportunities for employment, perhaps even physical violence, and a multitude of other adverse consequences."  *Doe*, 3 F. Supp. 2d at 467–68.  While it is possible some other name would carry similar stigma, this is an untested guess, whereas the heinous image of a "sex offender" has been ingrained in our society for decades.  The Court of Appeals unfairly minimized what is, in reality, the tremendous burden associated with being branded a "sex offender;" when the weight of that stigma is considered, it was irrational for the legislature to simply dismiss its effects in the name of bureaucratic ease.  *See Robinson*, 873 So. 2d at 1215; *City of Albuquerque*, 139 N.M. at 772.

### C.   Many Special Parole Conditions Imposed on Mr. Yunus are Facially Unconstitutional or Unrelated to his Prior Conduct

Many conditions of Mr. Yunus's parole are both unconstitutionally vague and irrational under the circumstances of his case.  To be sure, the state has significant discretion in imposing conditions of parole.  But such conditions will violate a parolee's right to due process if they are "[not] reasonably related to a parolee's past conduct[,] . . . [are] arbitrary and capricious, and . . . [are not] designed to deter recidivism and prevent future offenses."  *Robinson v. New York*, No.

14

1:09-CV-0455, 2010 WL 11507493, at *3 (N.D.N.Y. Mar. 26, 2010); *see also Singleton v. Doe*, 210 F. Supp. 3d 359, 372–73 (E.D.N.Y. 2016).[5]

       1.    <u>The Conditions Imposed on Mr. Yunus's Residency Are Both</u>
                <u>Unconstitutionally Vague and Have Been Applied to Him in an Arbitrary</u>
                <u>and Capricious Manner</u>

As a sex-offender parolee, plaintiff is subject to two primary residency restrictions.  First, as a mandatory condition under SORA, he may not reside on or enter into "school grounds," which includes "areas within one-thousand feet of the real property boundary line" of any school.  Yunus Decl. Ex. C. ¶ 4.  Second, as a special condition of his parole, Plaintiff may "not enter or be within 300 yards of places where children congregate, such as toy stores, parks, pet stores, schools, playgrounds, video galleries, malls, bike trails, skating rinks, amusement parks, bowling parks, bowling alleys, pool halls, etc. . . ." —which is effectively a second restriction on where he can live.  *Id.* ¶ 17.  Both of these conditions are unconstitutionally vague and irrational as they have been applied to Mr. Yunus.

       a.    *SORA's Requirement That Registrants Reside Further than 1,000*
              *Feet from School Grounds is Unconstitutionally Vague*

A parole condition is unconstitutionally vague if "a person of common knowledge must guess at its meaning."  *LoFranco v. U.S. Parole Comm'n*, 986 F. Supp. 796, 808 (S.D.N.Y. 1997*), aff'd*, 175 F.3d 1008 (2d Cir. 1999).  "Simply stated, parolees must know what actions a special condition prohibits in order to avoid due process violations."  *Id.*  Turning first to the restriction that Mr. Yunus not reside within 1,000 feet of "school grounds,"  the Second Circuit has held that that regulations providing general guidance of what is prohibited, but not the terms

---

[5] While acknowledging that cases involving federal probation conditions are subject to "slightly more stringent" standards than state parole conditions, courts frequently look to cases involving federal probation for guidance when assessing the constitutionally of special conditions of state parole.  *See, e.g.*, *Singleton*, 210 F. Supp. 3d at 376.

of measurement that allow for the demarcation of boundaries, are too vague to satisfy due

process. *Cunney v. Bd. of Trustees of Vill. of Grand View*, *N.Y.*, 660 F.3d 612 (2d Cir. 2011).

In *Cunney*, the Circuit considered whether an ordinance banning the building of

structures "over two stories tall or four and one-half feet above the easterly side of River Road"

was void for vagueness. *Id.* at 619.   The court reasoned that while the restriction "affords a

reasonable person adequate notice of what it generally prohibits (e.g., three-story buildings will

be in violation), it is remarkably unclear with respect to how the four and a half foot limitation is

defined." *Id.* at 621.   The statute's fatal flaw was that it failed to identify how to make the

required measurement of "four and one-half feet above the easterly side of River Road." *Id.*

District courts apply the same reasoning in assessing the constitutionally of "1,000 feet"

restrictions for sex offenders.  In *Doe v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015), a

federal district applied the Second Circuit's vagueness analysis from *Cunney* to strike down a

"1,000 feet from a school" requirement.  *Id.* at 685.   The court held that, because there is no

guidance as to how the 1,000 foot distance should be measured, the law in question did not

"provide sufficiently definite guidelines for registrants and law enforcement to determine from

where to measure the 1,000 feet distance used to determine the exclusion zones." *Id.* at 684.

The *Snyder* court elaborated that, even assuming there was a uniform system of measurement,

"registrants would still be unable to reasonably determine the boundaries of the exclusion

zones," because the state did not provide affected parolees with maps of the relevant exclusion

zones or a list of school properties. *Id.*

Notably, in reaching this result, the court strongly rejected the state's argument that

internet tools such as Google Maps were sufficient to assist those affected by the restrictions.

Such tools, it held, "can provide helpful estimates," but they "would not provide a registrant with

16

the necessary detail to determine whether a property that is close to 1,000 feet away from a

school property line falls within an exclusion zone." *Id.*  Accordingly, the Court held the

restriction unconstitutionally vague, as it forced offenders to "choose between limiting where

they reside . . . to a greater extent than is required by law or risk violating [Michigan's] SORA."

*Id.* at 684-685.

       This decision has been followed by subsequent district courts in Michigan, *see Price v.*

*Edwards*, No. 17-10601, 2018 WL 802025, at *5 (E.D. Mich. Feb. 8, 2018), *report and*

*recommendation adopted sub nom,* No. 17-10601, 2018 WL 1316161 (E.D. Mich. Mar. 14,

2018), and its reasoning has been employed  by a federal district court in a case challenging an

analogous requirement in Alabama.  *See Doe v. Strange*, No. 2:15-CV-606, 2016 WL 1079153,

at *9 (M.D. Ala. Mar. 18, 2016) ("registrants face a virtually insurmountable hurdle of

determining the location of qualifying schools, childcare facilities, or resident camp facilities

without accurate data of current land use within the state").

       Like the ordinance in *Cunney*, New York's "1,000 feet from school grounds" condition

provides general guidance as to what is prohibited (i.e. a registered sex offender cannot live next

door to a school) but provides little explanation as to how 1,000 feet should be measured.  While

the law provides that the measurement should occur from the "real property boundary line" of a

school, the state provides no guidance on how a parolee can assess where that "boundary" line is

or to what point it should be measured at the other end for purposes of assessing a proper

residence.  Further, New York, like Michigan, makes no effort to provide parolees with a list of

schools or maps indicating restricted areas.  In a place like New York City, with atypical and

constantly evolving land use, it is nearly impossible for even the most resourceful parolee to

accurately assess his limitations without more guidance as to what falls within a restricted area.

Moreover, even if this restriction is not void-for-vagueness on its face, it is unduly vague as applied to Mr. Yunus.  Mr. Yunus consulted with an attorney and, using Google Maps, located two addresses that appeared to be more than 1,000 feet from any school zone.  Nonetheless, these proposed addresses were rejected by his PO, Defendant Lewis-Robinson, as being too close to a school.  The PO offered no explanation as to why the mapping system available to Plaintiff was inaccurate or unreliable.  Without any further explanation, and with the mapping tools available to him seemingly discredited, Mr. Yunus has no ability to accurately assess where he can live without violating SORA's restrictions, and is forced to "choose between limiting where [he] reside[s] . . .  to a greater extent than is required by law or risk violating [SORA's restriction]."  *Snyder*, 101 F. Supp. 3d at 684–85.

> b.  *Mr. Yunus's  Special Parole Condition that he "not enter or be within 300 yards of places where children congregate" is Unconstitutionally Vague.*

Mr. Yunus's special parole condition that he cannot be "within 300 yards of places where children congregate" is unconstitutional for all of the same reasons.  The state provides no guidance at all as to the point from which "300 yards" should be measured, nor does it provide any data to assist parolees in locating all qualifying establishments—a nearly impossible task in a city like New York.  This restriction is even harder to comprehend as there is no clear definition of what it means to be a place "where children congregate."  *See Does 1-5 v. Cooper*, 40 F. Supp. 3d 657, 684 (M.D.N.C. 2014) (holding "any place where minors gather for regularly scheduled educational, recreational, or social programs" is unconstitutionally vague*).*

Although Mr. Yunus has been provided with a list of the types of establishments where children could "congregate," this list contains establishments that are not geared specifically towards children (i.e., malls, pool halls) intertwined with those specifically intended for children's entertainment (i.e., playgrounds).   Given that the locations on this list are dissimilar, it

18

is impossible to discern what threshold of child attendance constitutes a place where children "congregate." For example, would a public tennis court or driving range qualify? One could imagine children "congregating" there for purposes of an athletic lesson, but the majority of participants likely would not be children. Because this non-exhaustive list of places provides little discernible guidance, it only adds to the restriction's vagueness. *See Johnson v. United States*, 135 S. Ct. 2551, 2558 (2015). Accordingly, "a person of common knowledge" would have to "guess" as to what locations qualify, and this restriction is unduly vague.

c.   *Mr. Yunus has been Effectively Forced to Live in a Shelter and that Condition is Arbitrary and Unrelated to his Prior Conduct*

While the SORA-based and special-condition residency restrictions should be struck down as vague altogether, they are unconstitutional for another reason: they have also been applied in manner that confines Mr. Yunus to a DOCCS-designated shelter—a condition that is not reasonably related to his prior conduct. When assessing the reasonableness of parole conditions, courts look beyond the condition as written and assess how the condition is carried out in practice. *See Jacobs v. Ramirez*, 400 F.3d 105, 107 (2d Cir. 2005); *Meza v. Livingston*, No. 09-50367, 2010 WL 6511727, at *2 (5th Cir. Oct. 19, 2010).

Mr. Yunus provided his POs with multiple SORA-compliant addresses where he had secured housing; all of these proposals were rejected as non-complaint—without any explanation as to how that was determined. Yunus Decl. ¶¶ 16-19. Even more egregious is the frustration of Mr. Yunus's efforts to live with his fiancée's sister, Ms. Blake. There, the PO acknowledged that the apartment was SORA-compliant, but simply failed to do her diligence before baselessly rejecting the proposal. Yunus Decl. ¶¶ 24-25.

Under these circumstances, where Mr. Yunus's POs either rejected his proposed residences as non-compliant despite evidence to the contrary, or refused to perform the

19

investigation necessary for him to move, the residency restrictions imposed on Mr. Yunus

amount to a special parole condition that he must live in a shelter designated by DOCCS.  This

condition is unprecedented, arbitrary, and bears no relationship to his crime of conviction.  This

effective condition must be removed, and, at the very least, Mr. Yunus's POs must be enjoined to

perform a good faith assessment of any proposed residency Mr. Yunus submits moving forward.[6]

> 2.    Special Parole Conditions Restricting Mr. Yunus's Use of a Cell Phone
> and Computer Both Violate his First Amendment Rights and Are
> Unrelated to his Prior Conduct

Mr. Yunus's past criminal conduct did not involve the use of a cell phone or a computer.

Nevertheless, he has had special conditions of parole imposed barring his use of either device

without his PO's consent.  Yunus Decl. Ex. C. ¶¶ 35, 39.  Mr. Yunus has negotiated to be able to

use a cell phone and school-owned computers in limited academic circumstances, but he is

otherwise barred from using either a phone or a computer.  Yunus Decl. ¶¶ 30-31.  These

restrictions must be struck down as unconstitutional abridgements of Mr. Yunus's First

Amendment rights and, in any event, are baseless in light of his prior conduct.

> a.    *Restrictions Barring Access to Cell Phones and Computers are
> Effectively a Social Media Ban*

Just last term, the Supreme Court held that a state law categorically barring sex offenders

from accessing social media violated those offenders' First Amendment rights.  *Packingham v.*

*North Carolina*, 137 S. Ct. 1730, 1737 (2017).  Because most social media networks, including

those discussed in *Packingham*, such as Facebook, Twitter, and LinkedIn, may only be accessed

through the devices Mr. Yunus is prohibited from using except for academic purposes, these

---

[6] It is also worth noting that the shelter where Mr. Yunus is housed is directly across the street from a family shelter where children reside.  This proximity to children further supports that it is PO Lewis-Robinson's desire to keep all of her parolees conveniently in one place, not any concern as to the danger Mr. Yunus may pose to children, motivating her refusal to allow him to move out of the shelter.  Yunus Decl. ¶ 28.

conditions are, in effect, social media bans that cannot withstand First Amendment scrutiny.  *Id.*  As such, they are unconstitutional.

Mr. Yunus is also subject to an explicit, mandatory condition of parole banning him from accessing "any commercial social networking website."  N.Y. Exec. Law § 259-c(15).  This blanket requirement is likewise unconstitutional in light of *Packingham*.

> b.    *The Restrictions on Mr. Yunus's Cell Phone and Computer Use Are Overly Broad and Not Related to his Prior Conduct*

The restrictions limiting Mr. Yunus's cell phone and computer use are unrelated to his prior conduct.  Just as they are an effective ban on social media use, these restrictions are functionally a ban on accessing the internet at all.  As early as 2001, the Second Circuit observed that "[c]omputers and Internet access have become virtually indispensable in the modern world of communications and information gathering" and struck down a condition of supervised release restricting computer ownership and internet access as unrelated to a defendant's prior bank larceny and incest.  *United States v. Peterson*, 248 F.3d 79, 83 (2d Cir. 2001).  The Circuit held that "the fact that a computer with Internet access offers the possibility of abusive use for illegitimate purposes does not . . . justify so broad a prohibition."  *Id.*;  *see also, e.g.*, *United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002) (supervised release condition banning all computer and internet use too broad for person convicted of downloading child pornography over the internet); *United States v. Holm*, 326 F.3d 872, 879 (7th Cir. 2003) (describing ban on internet use as "the early 21st century equivalent of forbidding all telephone calls, or all newspapers"); *Singleton*, 210 F. Supp. 3d at 376 (relying on *Sofsky* and *Peterson* when assessing condition banning cell phone use and concluding a state parole condition is impermissible if it "functions as an overbroad ban on an item simply because Plaintiff could use its functions to commit a future lewd act").

If computers and the internet were "indispensable to modern life" in 2001, their importance to a person trying to reintegrate into society in 2018 cannot be overstated.  Unlike the defendants that the Second Circuit has held must be allowed to access to a computer and the internet, here, there is no evidence that Mr. Yunus used any of the prohibited devices in carrying out his prior crime.  These debilitating restrictions severely hinder Mr. Yunus's ability to participate in modern society and serve no purpose beyond acting as exactly the sort of "overbroad ban" that courts have consistently struck down.  *Singleton*, 210 F. Supp. 3d at 376.

> 3.   Mr. Yunus's Special Parole Conditions Barring Him from Visiting or Communicating with Minor Family Members Violate his Constitutional Rights

Mr. Yunus's special parole conditions require that he not be refrain from contact with any minor unless approved by his PO.  Yunus Decl. Ex. C. ¶ 15.  His PO has enforced this condition as applied to minor *family members*, stating that she will "lock [Mr. Yunus] up" if she sees him around kids, and that he could not attend his uncle's Thanksgiving dinner if there would be children present.  Yunus Decl. ¶¶ 34-40.  This is a violation of Plaintiff's constitutional rights; it cannot be allowed to continue.

The Supreme Court has long recognized that the Due Process Clause creates a "private realm of family life which the state cannot enter" and has found state actions that interfere with private family relationships to violate the Constitution.  *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Moore v. City of E. Cleveland* 431 U.S. 494, 499 (1977) (collecting cases).  In the context of parole conditions separating parents from their children, both the Second Circuit and the district courts within it have held that conditions that interfere with these protected familial relationships must satisfy strict scrutiny.  *United States v. Myers*, 426 F.3d 117 (2d Cir. 2005); *Doe v. Lima*, 270 F. Supp. 3d 684, 702 (S.D.N.Y. 2017).

Such protections must extend to relationships between a parolee and his extended family members.  In *Moore*, the Supreme Court recognized that due process protections do not end at the "arbitrary boundary" of the nuclear family, and held that relationships with extended family members—including aunts, uncles, cousins, and grandparents—are "equally deserving on constitutional recognition." *Id.* at 502-04.  In reaching this holding, the Supreme Court emphasized that "[e]specially in times of adversity . . . the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life." *Id.* at 505.

Mr. Yunus's relationship with his nieces, nephews, and cousins is entitled to this constitutional protection.  The situation here is exactly what is contemplated in *Moore*, as Mr. Yunus's "broader family" would like to "come together for mutual sustenance" and to "rebuild" a secure life for him. *Id.*  In order to deprive Mr. Yunus of this ability to gather with his family, the state must satisfy strict scrutiny—a test it cannot meet. *Lima*, 270 F. Supp. 3d at 702.

To satisfy strict scrutiny, a special parole condition must be narrowly tailored to Mr. Yunus's specific circumstances. *Id.* at 703.  Here, no such narrow tailoring occurred; instead, Plaintiff is subject to a blanket ban on contact with minors.  Mr. Yunus faces possible imprisonment if he has contact with members of his family who are children.  Had Plaintiff's individualized circumstances been considered, it would have been crystal clear to any fair-minded viewer that Mr. Yunus poses no threat to minors within his own family, or indeed any minors at all.  The indiscriminate ban on contact with minor family members—imposed with no evidentiary backing—deprives Mr. Yunus of his right to gather with his family, and is unconstitutional.  Immediate injunctive relief is necessary to ensure this condition is removed or modified to allow Mr. Yunus to visit with his nieces and cousins.

4.    Mr. Yunus's Special Parole Conditions Requiring Him to Inform any Person with whom he Establishes a "Relationship" that he is a Sex Offender is both Unconstitutionally Vague and Unrelated to his Prior Conduct

An additional special parole condition requires that Mr. Yunus, as soon as he "establish[es] a relationship with a consenting adult," must first inform his parole officer of the relationship, and then inform this "consenting adult" that he is a sex offender in the presence of his parole officer.  Yunus Decl.  Ex. C. ¶ 24.  This condition is unconstitutionally vague, as it is impossible to know what is meant by a "relationship with a consenting adult."

In *United States v. Reeves*, 591 F.3d 77 (2d Cir. 2010), the Second Circuit was presented with a condition requiring a defendant to inform the parole department whenever he entered into a "significant romantic relationship." *Id.* at 79.  The Second Circuit struck down the condition as unduly vague, explaining that the  phrase "significant romantic relationship" did not provide meaningful guidance as, depending on factors such as generation, region, or religion, the phrase could mean things as divergent as "the exchange of gifts such as flowers or chocolates," "physical intimacy" or "a promise of exclusivity." *Id.* at 81.

The same is true here.  The phrase "establish a relationship with a consenting adult" has no universal meaning.  For example, if Mr. Yunus were to go on a first date, would that constitute the "establishment" of a "relationship"?  Would it become a "relationship" on a second date?  If he brought a gift?  These are exactly the sort of questions that "can be the subject of endless debate that varies across generations, regions, and genders" and cannot be conditions of parole absent further guidance. *Id.*  While Mr. Yunus is engaged and has disclosed his offender status to his fiancée, this condition is not facially limited to romantic relationships, and, even if it were, Mr. Yunus is entitled to have this burden removed in case circumstances were to change.

24

Equally critically, this restriction is wholly unrelated to Mr. Yunus's prior criminal conduct. Mr. Yunus is a "sex offender" in name only, and a judge has agreed that he likely never will commit a sexual offense. This condition serves no purpose beyond causing Mr. Yunus embarrassment and making it more difficult for him to integrate back into the community.

     5.    <u>Mr. Yunus's Special Parole Conditions Banning Him from Operating or Riding as a Passenger in a Motor Vehicle Are Unnecessarily Broad</u>

Lastly, the special parole conditions that bar Mr. Yunus from driving or riding in a motor vehicle should be invalidated or tailored. *See* Yunus Decl. Ex. C. ¶¶ 31-32. Although Mr. Yunus used a car when committing a kidnapping almost twenty years ago, it is excessive to prevent him from using a vehicle in any capacity. In *United States v. Peterson*, 248 F.3d 79 (2d Cir. 2001), the Second Circuit rejected a computer ban even though it bore some relation to the defendant's crime, explaining that an improper use of a common societal tool cannot justify an outright ban on that tool as a condition of parole. *Id.* at 83 ("Although a defendant might use the telephone to commit fraud, this would not justify a condition of probation that includes an absolute bar on the use of telephones.").

Likewise here, Mr. Yunus's single bad act using a motor vehicle cannot justify preventing him from setting foot in a motor vehicle and substantively limiting his ability to navigate around New York City. While a more narrow restriction (i.e. he cannot drive a car with children as passengers) may be appropriate, this indiscriminate ban goes too far and must be invalidated or modified to relate to Mr. Yunus's prior conduct.

## II.    AT A MINIMUM, THERE IS A SERIOUS QUESTION ON THE MERITS AND THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN MR. YUNUS'S FAVOR.

While Mr. Yunus satisfies the "clear likelihood of success" on the merits standard, the issues raised above at the very least create a "serious question" on the merits, and the balance of the hardships tip decidedly in Mr. Yunus's favor. *See Citigroup Glob. Markets, Inc. v. VCG*

*Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-36 (2d Cir. 2010).  Mr. Yunus is trying

to use his limited freedom to rehabilitate his life, yet he is stifled at every turn by vague and

arbitrary restrictions.  Given his PO's unwillingness to engage *at all* with the Mr. Yunus's

individual situation, an injunction is his only path to clearing these roadblocks.

     The Defendants, on the other hand, will suffer little hardship if Mr. Yunus is granted an

injunction.  Mr. Yunus does not dispute that he is only entitled to "limited freedom" as a parolee,

*Hyser v. Reed*, 318 F.2d 225, 250 (D.C. Cir. 1963), and seeks an injunction for only the most

oppressive and arbitrary of the close to fifty parole conditions he is subject to.  DOCCS's interest

in maintaining supervision over him would hardly be impeded as Mr. Yunus would still be

subject to conditions, among many others, that require him to remain within the five boroughs,

report for regular meetings, and impose other significant restrictions on his privacy.  Where only

a small subset of the most restrictive and unnecessary special conditions are at issue, the balance

of hardships tip decidedly in Mr. Yunus's favor.

## III.   ABSENT AN INJUNCTION, MR. YUNUS WILL SUFFER IRREPARABLE HARM

     "When an alleged deprivation of a constitutional right is involved, most courts hold that

no further showing of irreparable injury is necessary."  *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d

Cir. 1984) (citation omitted).  *See also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).  This

presumption is even stronger when the alleged constitutional violations are ongoing and

"unlawful deprivations of liberty . . . constitute quintessential irreparable harm."  *Hardy v.

Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010).  Mr. Yunus alleges multiple ongoing

constitutional violations, including deprivations of his liberty, and an injunction is warranted to

prevent further irreparable damage.

## IV.      GRANTING MR. YUNUS AN INJUNCTION IS IN THE PUBLIC INTEREST

When all of the other injunction factors are satisfied, the injunction should be granted so long as "the public interest will not be disserved by an injunction." *Kurzon v. Democratic Nat'l Comm.*, 197 F. Supp. 3d 638, 644 (S.D.N.Y. 2016).  There is a strong public interest in the protection of constitutional rights against government infringement.  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights.").  Thus, granting Mr. Yunus an injunction is in the public interest and, at a minimum, does not "disserve" any public interest.

### CONCLUSION

For the foregoing reasons, Mr. Yunus is entitled to a preliminary injunction: (1) relieving him of his sex offender designation; (2) removing his vague residency restrictions and allowing him to move in with his fiancée at 2068 Daily Avenue, Bronx, New York 10460; (3) relieving him of restrictions on his cell phone and computer use; (4) allowing him to visit and be in contact with minor family members; (5) relieving him of his obligation to inform any person with whom he enters into a "relationship" of his status as a sex offender; and (6) relieving him of or tailoring his ban on driving or riding in a private vehicle.[7]

---

[7] By letter dated March 22, 2018, Plaintiff requested a five-page extension of the Court's 25-page limit for memoranda of law.  Defendants consented to Plaintiff's request. Should the Court later deny this request, Plaintiff will submit a supplemental Memorandum of Law limited to 25 pages in length.

Dated:    March 26, 2018
          New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                          & ABADY LLP

                                        By:            /s/
                                        Andrew G. Celli
                                        David Berman
                                        600 Fifth Avenue
                                        New York, New York 10020
                                        (212) 763-5000

                                        *Attorneys for Plaintiff Equan Yunus*