UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ____6/29/18__

EQUAN YUNUS, SR., aka DAMON
VINCENT,

              Plaintiff,

     -against-

J. LEWIS ROBINSON, et al.,

              Defendants

17-CV-5839 (AJN) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. ALISON J. NATHAN**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff in this action is a registered sex offender who, insofar as the record reveals, has never committed any sexual misconduct. After pleading guilty in 2002 to two counts of kidnapping, plaintiff learned that he would be required to register as a sex offender for a minimum of 20 years, because one of his victims was under the age of 17 at the time of the crime, rendering it a "sex offense," and plaintiff a "sex offender," as those terms are defined in New York's Sex Offender Registration Act (SORA), N.Y. Correct. Law (CL) § 168-a, *et seq*. Prior to plaintiff's release on parole in 2016, a state court judge found that there was "virtually no likelihood that [he] will commit a sex crime ever," and classified him as a level one (low risk) offender. Since then, notwithstanding his low risk classification, plaintiff has been denied permission to move out of the men's shelter where he was placed by his parole officer and remains subject to a variety of other restrictive conditions, including some that are required by New York's sex offender laws and others that are not made mandatory by statute but are nonetheless – he alleges – applied indiscriminately to all registered sex offenders without regard for their individual circumstances.

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, claiming that his designation as a sex offender violates his procedural and substantive due process rights and that certain of his parole conditions are unconstitutionally vague, violate his free speech rights, interfere with his right to

intimate family relations, or were imposed in an arbitrary and capricious manner not reasonably related to his past conduct.

Now before me for report and recommendation are (a) defendants' motion to dismiss all of plaintiff's claims with prejudice, made pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1) (Dkt. No. 59), and (b) plaintiff's motion for a preliminary injunction, made pursuant to Fed. R. Civ. P. 65(a) (Dkt. No. 43). Defendants contend that the Second Amended Complaint (SAC) (Dkt. No. 54) fails to state any claim upon which relief may be granted and that certain of plaintiff's claims are barred by the *Rooker-Feldman* doctrine. Plaintiff contends that this Court should issue a mandatory injunction relieving him of his "sex offender designation" and freeing him from a number of the parole conditions to which he is currently subject.

For the reasons that follow I respectfully recommend that defendants' motion to dismiss be granted with respect to plaintiff's First Claim for Relief, as well as portions of the Third, Fourth, Fifth, and Sixth Claims for Relief, and otherwise denied. I further recommend that plaintiff's motion for a preliminary injunction be granted to the extent that defendants be enjoined from subjecting plaintiff to the registration and notification provisions applicable to "sex offenders" under SORA or the mandatory parole conditions prescribed for registered sex offenders, and that they rescind any discretionary parole conditions imposed on him solely by virtue of his designation as a "sex offender." In the alternative, I recommend that certain specific parole conditions be rescinded.

## I.      OVERVIEW OF APPLICABLE LAWS AND REGULATIONS

### A.      Sex Offender Registration Act

SORA was enacted in 1995 to protect the public from "the danger of recidivism posed by sex offenders," 1995 N.Y. Sess. Laws ch. 192, § 1 (effective Jan. 21, 1996). The Legislature also noted that the statute would bring New York into conformity with the federal Jacob Wetterling

Act, passed as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, 2038 (Sept. 13, 1994), which "conditioned certain federal funding on states' enactment of legislation requiring the registration of sexually violent offenders and people who committed crimes against children." *People v. Knox*, 12 N.Y.3d 60, 67, 875 N.Y.S.2d 828, 832 (2009). Under SORA, a "sex offender" is anyone convicted of a "sex offense" or "sexually violent offense" as those terms are defined in the statute. CL § 168-a(1). Kidnapping in the first or second degree, in violation of N.Y. Penal Law (PL) § 135.25 or § 135.20, is a "sex offense" whenever the victim of the kidnapping "is less than seventeen years old and the offender is not the parent of the victim." CL § 168-a(2)(a)(i).[1] In *Knox*, the New York Court of Appeals upheld the constitutionality of this provision against a substantive due process challenge brought by appellants who – like plaintiff Yunus – were convicted of kidnapping or related crimes with no proof of "any sexual act or sexual motive." 12 N.Y.3d at 64, 875 N.Y.S.2d at 830. Upon conviction of a "sex offense," the court "shall certify that the person is a sex offender." CL § 168-d(1)(a).

 Under SORA, all sex offenders must register with the New York State Division of Criminal Justice Services (Division). Among the consequences of sex offender registration are:

> [T]he registrant's name, address, photograph and fingerprints remain on file with the Division; the registrant must verify his address annually to the Division, and must appear periodically at a law enforcement agency to provide a current photograph; local law enforcement agencies are notified when a registrant moves into their jurisdiction; and any caller inquiring about a named individual will be told if that person is a registered sex offender.

*Knox*, 12 N.Y.3d at 65, 875 N.Y.S. 2d at 831 (citations omitted).

---

[1] SORA has been amended many times over the past two decades, and the list of crimes defined as "sex offenses" has grown over that period. Since its original enactment, however, SORA has included both first-degree and second-degree kidnapping as "sex offenses" if the victim was less than 17 years old. *See* 1995 N.Y. Sess. Laws ch. 192, § 2.

Failure to register as required is a felony under state law and, under certain circumstances, a felony under federal law. *See* CL § 168-t; 18 U.S.C. § 2250(a).

Before a sex offender is released or paroled from prison, the Board of Examiners of Sex Offenders (Board) must assess "the risk of a repeat offense by such sex offender and the threat posed to the public safety," CL § 168-*l*(5), and make a recommendation to the sentencing court, based on "the degree of the risk of re-offense." *Id*. § 168-*l*(6).[2] The court must then hold a "SORA hearing" to classify the person as a level one, level two, or level three sex offender. *Id*. § 168-n(2); *Francis*, 30 N.Y.3d at 744, 71 N.Y.S. 3d at 399. Level one offenders, for whom "the risk of a repeat offense is low," must register annually for 20 years. CL §§ 168-*l*(6)(a),168-h(1). Level two (moderate risk) and level three (high risk) offenders must register for life. *Id*. §§ 168-*l*(6)(b), 168-*l*(6)(c), 168-h(2). Law enforcement officials may disseminate "relevant information" about a registered sex offender "to any entity with vulnerable populations related to the nature of the offense committed by such sex offender." *Id*. § 168-*l*(6)(a), (b), (c).[3] Only level two and level three offenders are pictured in the on-line Sex Offender Registry maintained by the Division. *Id*. §§ 168-*l*(6)(b), 168-*l*(6)(c), 168-q. However, information about level one offenders is available to members of the public by calling a toll-free number maintained by the Division. *Id*. §168-p(1).

The court is not required to accept the Board's recommendation as to the appropriate risk classification of a sex offender. *See* CL § 168-n(2); *Francis*, 30 N.Y.3d at 744, 71 N.Y.S. 3d at

---

[2] The Board makes its recommendations using an "assessment instrument" under which points are assessed for various factors believed to correlate with a higher risk of sexual recidivism. *See generally People v. Francis*, 30 N.Y.3d 737, 744, 71 N.Y.S. 3d 394, 399 (2018).

[3] Disclosable information includes the registrant's name and photograph, "exact address, background information including the offender's crime of conviction, mode of operation, type of victim targeted, the name and address of any institution of higher education at which the sex offender is enrolled, attends, is employed or resides and the description of special conditions imposed on the offender." CL § 168-*l*(6)(a).

744 (the SORA court has "the ultimate responsibility of designating the offender's risk level"). However, departures from the Board's recommendations are "the exception, not the rule." *People v. Johnson*, 11 N.Y.3d 416, 421, 872 N.Y.S.2d 379, 382 (2008) (affirming level two classification where appellant "never asked" the sentencing court "to use its discretion to depart from the Board's recommendation").

There is no provision in the statute for the SORA court to consider whether the "sex offender" coming before it is in fact a sex offender. In most cases – including this one – persons convicted of crimes defined as sex offenses by the New York Legislature become sex offenders automatically, by operation of law, upon conviction. CL § 168-d(1)(a).[4]

After the initial SORA hearing, either the sex offender or the district attorney may petition the court for "an order modifying the level of notification." CL §§ 168-o(2), (3). However, there is no provision in the statute for a sex offender to challenge his designation as such. Nor, under current law, is there any statutory avenue for a level one sex offender to seek relief from the registration requirement at any time during the 20 years he is required to register. *See Doe v. Cuomo*, 755 F.3d 105, 112-13 (2d Cir. 2014).[5]

---

[4] In some cases, the court in which the offender is convicted must hold an additional hearing to determine the age of the victim before concluding that the crime of conviction meets the definition of a sex offense. For example, patronizing a prostitute in the third degree, in violation of PL § 230.04, is a "sex offense" under SORA if "the person patronized is in fact less than seventeen years of age." CL § 168-a(2)(i). When a defendant is convicted under PL § 230.04, the court is required to hold a separate hearing, at which the state must prove the victim's age by clear and convincing evidence, before that defendant is certified as a sex offender. CL § 168-d(b). No such hearing is required in kidnapping cases.

[5] When SORA was first enacted in 1996, CL § 168-o permitted any registered sex offender to petition the sentencing court to "be relieved of any further duty to register." In 1999, that provision was revised by 1999 N.Y. Sess. Laws 1999 ch. 453, § 18 (effective January 1, 2000), which among other things specified, in what became CL § 168-o(1), that a sex offender must have been registered "for a minimum period of ten years" before he may petition for relief. As a practical matter, this eliminated the petition right for level one and level two sex offenders, who at that time were only required to register for ten years, but preserved it for level three offenders, who – in the absence

5

### B.      New York Executive Law

Registration aside, sex offenders on parole are subject to a number of conditions not ordinarily imposed on other parolees. All level three sex offenders, and all sex offenders whose victims were under the age of 18 (regardless of risk level), *must* be prohibited from:

> using the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under the age of eighteen, and communicate with a person under the age of eighteen when such offender is over the age of eighteen, provided that the board may permit an offender to use the internet to communicate with a person under the age of eighteen when such offender is the parent of a minor child and is not otherwise prohibited from communicating with such child.

N.Y. Exec. Law (EL) § 259-c(15). This prohibition applies regardless of the nature of the underlying crime, and regardless of whether the internet played any role in that crime.

In addition, pursuant to New York's Sexual Assault Reform Act (SARA), 2000 N.Y. Sess. Laws ch. 1, § 8 (effective Feb. 1, 2001), parolees convicted of certain offenses (including kidnapping) who are level three sex offenders, or whose victims were under the age of 18 (regardless of risk level), *must* be prohibited from "knowingly entering into or upon any school grounds, as that term is defined in [PL § 220.00(14)], or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present," EL § 259-c(14), unless the parolee is a student, an employee, or family member of a student at the school and has the "written authorization of his or

---

of judicial relief – were required to register for life. The statute was amended again by 2002 N.Y. Sess. Laws ch. 11, § 22 (effective March 11, 2002), which expressly limited the petition right to level three offenders, and only if they had been registered for a minimum of 13 years. Most recently, in 2006, in 2006 N.Y. Sess. Laws 2006, ch. 1, § 3 (effective January 18, 2006), the Legislature increased the registration period for level one sex offenders from 10 to 20 years, increased the registration period for level two offenders from ten years to life, and further revised CL § 168-o(1) to eliminate the de-registration (or "de-classification") petition right for all sex offenders other than level two offenders who had been registered for a minimum of 30 years.

her parole officer and the superintendent or chief administrator of such facility, institution or grounds." *Id*. The term "school grounds," as defined in PL § 220.00(14), was expanded in 2005 to include "any area accessible to the public located within one thousand feet of the real property boundary line" of the school. *Id*. § 220.14(b). Thus, a parolee subject to EL § 259-c(14) "is unable to reside within 1,000 feet of a school." *People v. Diack*, 24 N.Y.3d 674, 682, 3 N.Y.S.3d 296, 302 (2015).

The 1,000-foot rule does not appear to be vigorously enforced outside of the housing context, *see Diack*, 24 N.Y.3d at 682, 24 N.Y.S.3d at 302 (noting trial court decisions that "have interpreted section 220.00(14) as creating a residency restriction"), and as a practical matter may be impossible to enforce as written, particularly in dense urban areas. *See State v. Floyd Y.*, 56 Misc. 3d 271, 273, 50 N.Y.S.3d 848, 849 (N.Y. Sup. Ct. N.Y. Co. 2017) ("since most 'publicly accessible areas' [in New York City] are within 1,000 feet of some kind of school or child care institution," law enforcement agencies have "focused on prohibiting residences which violate the 1,000 foot rule"). By its express terms, however, EL § 259-c(14) places a parolee at risk of being reincarcerated for knowingly "entering into or upon" any publicly-accessible area within 1,000 feet of the property line of a school. *See Williams v. Dep't of Corr. & Community Supervision*, 136 A.D.3d 147, 149, 24 N.Y.S.3d 18, 20 (1st Dep't 2016), *appeal dismissed*, 29 N.Y.3d 990, 53 N.Y.S.3d 257 (2017) ("In accordance with SARA, the granting of petitioner's parole was subject to mandatory conditions that restrict both the location of his residency and his knowing travel to no closer than 1000 feet of school grounds."); *see also Floyd Y.*, 56 Misc. 3d at 273, 50 N.Y.S.3d at 849 (interpreting EL § 259-c(14) as a residency restriction "is clearly not in conformity with the statute's language").

### C.      Special Parole Conditions

Beyond the conditions made mandatory by the Executive Law, a paroled sex offender, like every other parolee in New York, is required to comply with a set of standard release conditions, *see* 9 N.Y.C.R.R. § 8003.2, and must "fully comply with the instructions of his parole officer and obey such special additional written conditions as he, a member of the Board of Parole or an authorized representative of the Division of Parole, may impose." *Id*. § 8003.2(*l*). The only regulatory limit upon the "special conditions" is that "[t]he releasee shall be provided with a written copy of each special condition imposed." *Id*. § 8003.3.

## II.      PROCEDURAL HISTORY

Plaintiff commenced this action on August 1, 2017, by filing a hand-written *pro se* Complaint (Dkt. No. 2) naming as defendants Andrew Cuomo, the Governor of New York; Anthony J. Annucci, the Acting Commissioner of the New York Department of Corrections and Community Supervision (DOCCS); and Parole Officers (POs) Joan Lewis-Robinson, Derek Jones, Rodney Smith, Denise Grannum, and Yolanda Vasquez (collectively the Parole Officer Defendants).[6] On January 22, 2018, plaintiff filed a *pro se* preliminary injunction motion (Dkt. No. 25), and on February 13, 2018, in response to defendants' initial motion to dismiss (Dkt. No. 22), he filed an Amended Complaint. (Dkt. No. 33.)

---

[6] All defendants have been served. (Dkt. Nos. 8-13, 34, 68.) However, plaintiff advises the Court that he is "no longer pursuing his claims" against Governor Cuomo because "the relevant injunctive relief he seeks can be obtained from Defendant Annucci." Def. MTD Opp. Mem. (Dkt. No 69), at 1. Upon submission of an appropriate notice or stipulation of dismissal, I respectfully recommend that Governor Cuomo be dismissed from this action and that the caption be amended accordingly.

Thereafter, *pro bono* counsel appeared on plaintiff's behalf. Through counsel, plaintiff filed his revised preliminary injunction motion, followed by his SAC, to which defendants responded with their revised motion to dismiss. These are the motions now before the Court.[7]

Your Honor referred this action to me for general pretrial management (Dkt. No. 15) and for report and recommendation on the pending motions. (Dkt. No. 62.) I heard oral argument on the motions on May 8, 2018, *see* Tr. of May 8, 2018 Hr'g (Oral Arg. Tr.) (Dkt. No. 77), and now submit my report and recommendation (Report).

## III.   FACTS

The facts concerning plaintiff's crime, his plea, his SORA hearing, and his parole conditions are largely undisputed. On April 10, 2002, plaintiff (then known as Damon Vincent) pleaded guilty in New York State Supreme Court, New York County, to two counts of "kidnapping for ransom," for which he was sentenced to 18 years in prison. SAC ¶ 22; Yunus Decl. (Dkt. No. 45) ¶ 1.[8] One of the victims was a boy less than 17 years old who was not plaintiff's child. SAC ¶ 24. There was no "sexual component" to the crime, SAC ¶ 23; Yunus Decl. ¶ 3. Nor has plaintiff ever committed, or been accused of, any sexual misconduct. SAC ¶¶ 3, 29; Yunus Decl. ¶ 6. However, the district attorney later told the SORA judge (and plaintiff did not deny) that plaintiff abducted his 14-year-old kidnapping victim at gunpoint, drove him to Philadelphia in handcuffs, held him hostage in a closet, and "finally only returned him when he received money and drugs." Yunus Decl. Ex. A (SORA Tr.) (Dkt. No. 45-1), at 8:20-9:2.

---

[7] On April 18, 2018, I dismissed the parties' earlier motions as moot. (Dkt. No. 61.)

[8] According to defendant Lewis-Robinson, plaintiff's current PO, plaintiff was convicted of "kidnapping in the first degree." Lewis-Robinson Decl. (Dkt. No. 56), ¶ 4. According to the New York Appellate Division, however, he was convicted of kidnapping in the second degree in violation of PL § 135.20. *People v. Vincent*, 15 A.D.3d 311, 789 N.Y.S.2d 883 (1st Dep't 2005).

After exhausting his options on direct appeal, making an unsuccessful motion to vacate the judgment under N.Y. C.P.L. § 440.10, and filing an unsuccessful *habeas corpus* petition in this Court,[9] plaintiff served fifteen and a half years in prison, during which time he completed substance abuse programs and took college courses. SAC ¶¶ 26-28; Yunus Decl. ¶ 4; SORA Tr. at 3:11-22. Insofar as the record discloses, none of the claims made in this § 1983 action were raised or litigated on appeal or in plaintiff's prior lawsuits.

### A.    Plaintiff's SORA Hearing

On June 24, 2016, in anticipation of plaintiff's release to parole, he appeared before Justice Michael Obus – the same judge who sentenced him – for a "sex offender assessment proceeding" pursuant to CL § 168-n(2); Yunus Decl. ¶ 7; *see also* SAC ¶ 30; SORA Tr. at 2:15-16. The district attorney acknowledged that "there was not a sexual offense in this case," SORA Tr. 8:11, but asked the court to classify plaintiff as a level two offender – as recommended by the Board – in light of the violent nature of the underlying kidnapping, the use of a weapon, plaintiff's prior criminal record, and his substance abuse history. SORA Tr. at 8:9-16:7. Plaintiff, through counsel, argued for a downward departure to level one, arguing among other things that "a level one designation is really the only appropriate designation in a case like this, where [there] is no sexual misconduct." *Id*. at 18:17-19. Ruling from the bench, Justice Obus granted the downward departure, stating:

> Under the circumstances presented here, I am satisfied that there is virtually no likelihood that [plaintiff] will commit a sex crime ever.

---

[9] *See Vincent v. Smith*, 2010 WL 23324, at *3-4 (S.D.N.Y. Jan. 5, 2010). In each of these proceedings plaintiff argued, unsuccessfully, that PL § 135.20 was unconstitutional as applied to him because Congress had occupied the field of interstate kidnapping with the passage of the Federal Kidnapping Act, 18 U.S.C. § 1201. *See Smith*, 2010 WL 23324, at *2-4 (describing the appeal and the § 440.10 motion in detail, and ultimately denying plaintiff's *habeas* petition).

> Recognizing that a level one assessment will still involve substantial oversight of [plaintiff] . . . I believe that a level one assessment is more than sufficient for the purpose of these proceedings.
>
> So I will grant the downward departure, notwithstanding the seriousness of this case, to a level one assessment.  And I will simply mark the papers accordingly, so that [plaintiff] would have an order.  And the People will have an order if they wish to seek review.

*Id*. at 22:14-23:1. Neither party appealed Justice Obus's SORA assessment.

### B.        Plaintiff's Parole Conditions

Plaintiff was released to parole on July 14, 2016. SAC ¶ 39; Yunus Decl. ¶ 9. His "supervision maximum," meaning the expiration of his parole supervision, is February 13, 2019. Yunus Decl. Ex. B (Dkt. No. 45-2), at ECF page 2. Upon his release, plaintiff was informed that he was subject to numerous restrictions, including those set forth in EL § 259-c(14), prohibiting him from knowingly entering into or upon any "school grounds," defined to include any publicly-accessible area within 1,000 feet of a school. *Id*. at ECF pages 2-3. Plaintiff was initially directed to reside at the Redemption Center in Brooklyn, *id*. at ECF page 4, where he was given a 9:00 p.m. to 7:00 a.m. curfew. *Id*. He was further instructed that he could "not reside at any residence that has not been approved by [his] PO." *Id*. He cannot leave New York City, even temporarily, without the prior approval of his PO. *Id*.

On July 19, 2016, PO Smith assigned plaintiff "forty-eight of the most restrictive special conditions of parole," printed on a six-page document entitled "Special Conditions of Release to Community Supervision for Sex Offenders." SAC ¶ 41; Yunus Decl. ¶ 9 &. Ex. B at ECF pages 5-11.[10] Smith told plaintiff that he gives "all sex offenders" the same restrictions. SAC ¶ 42; Yunus

---

[10] For ease of reference, this Report will refer to the "Special Conditions of Release to Community Supervision for Sex Offenders" (collectively the Sex Offender Conditions) by number, as "Special Condition No. __."

Decl. ¶ 9. As relevant here, the Sex Offender Conditions include Special Condition No. 4, which incorporates the "1,000-foot rule" required by EL § 259-c(14), and Special Condition No. 17, which separately prohibits plaintiff from being "within 300 yards of places where children congregate, such as toy stores, parks, pet stores, schools, playgrounds, video galleries, malls, bike trails, skating rinks, amusement parks, bowling parks, bowling alleys, pool halls, etc., without the prior approval of [his] parole officer."

Special Condition No. 15 prohibits plaintiff from having any "contact with any children under the age of eighteen (18)," including family members, unless he has prior approval from his PO and "a responsible adult over the age of twenty-one (21) is present." Nos. 18, 19, and 20 bar him from possessing children's toys or clothes, keeping puppies or kittens, or having children's names, addresses, or photographs in his possession.

Other provisions of the Sex Offender Conditions restrict plaintiff's access to telephones, computers, and the internet. Special Condition No. 35 prohibits him from owning a cell phone without permission of his PO, and specifies that even with permission he may not "possess one that is video or photo-capable." No. 39 states that he may possess "only one computer and/or laptop," at his residence, and only if approved in advance by his PO. No. 39 requires plaintiff to obtain permission to use any "services that provide access to the internet, or any public or private computer network." No. 12 prohibits him from engaging in any computer service that "involves the exchange of electronic messages," which would seem to prohibit email communication. A separate provision, Special Condition No. 48, prohibits him from using the internet to "access a commercial social networking site." As written, Nos. 12 and 48 appear to be absolute.

Special Condition No. 24 requires plaintiff to notify his PO when he "establish[es] a relationship with a consenting adult." He must also "inform the party of [his] prior criminal history

concerning sexual abuse, <u>in the presence of [his] parole officer</u>." Further, plaintiff must inform his PO "**HOW** and **WHEN** this person can be contacted" and must provide contact information for the "consenting adult." (All emphases in the original.)

Plaintiff's ability to travel within New York City is restricted as well. Special Condition No. 32 states that he may not own or operate a motor vehicle, may not possess or apply for a driver's license, and may not "rent operate, or be a passenger in any vehicle" without the prior approval of his PO.

In the fall of 2016, plaintiff's supervision was transferred to PO Vasquez, and then to PO Lewis-Robinson, his current supervisor. SAC ¶¶ 44-50; Yunus Decl. ¶ 10. Both of these POs "enforced the same restrictive conditions of parole originally enforced by PO Smith," telling him that all sex offenders were treated alike, regardless of their risk level. SAC ¶¶ 46, 52; Yunus Decl. ¶ 11. In October 2016, plaintiff was given an updated set of written parole conditions, including another copy of the six-page, 48-item Sex Offender Conditions. Yunus Decl. ¶ 11 & Ex. C (Dkt. No. 45-3), at ECF pages 4-10. At this point, some of plaintiff's parole conditions were made even more restrictive. For example, his curfew (Special Condition No. 30) was expanded, requiring him to be inside between 8:00 p.m. and 8:00 a.m. According to plaintiff, PO Lewis-Robinson told him that she changed the curfew "because I am a sex offender." SAC ¶¶ 106-07; Yunus Decl. ¶¶ 41-42. According to PO Lewis-Robinson, she changed the curfew because plaintiff had been moved from the Redemption Center in Brooklyn to the Willow Avenue Men's Shelter in the Bronx, where "all shelter residents" have the same curfew. Lewis-Robinson Decl. ¶ 25. At the same time, Lewis-Robinson added a new special condition, prohibiting plaintiff from engaging in "Internet enabled gaming activities to include Pokemon Go." *Id.* Ex. F (Dkt. No. 56-6).

Other conditions, however, were seemingly made less restrictive. For example, Special Conditions No. 6-10, concerning compliance with "sex offender treatment," were marked "N/A" in the document given to plaintiff in October 2016, presumably meaning that he is not required to attend such treatment. *See* Yunus Decl. Ex. C, at ECF page 5. No. 38, requiring the parolee to cooperate with GPS monitoring, was also marked "N/A." *Id.* at ECF page 8.

## C.    Modification of Parole Conditions

Many of the Sex Offender Conditions, as noted above, are not absolute; they bar the conduct described therein only if the parolee has failed to obtain the advance permission of his PO. The parties dispute the extent to which PO Lewis-Robinson has been willing to provide the necessary permissions, particularly with regard to the conditions that most significantly impact plaintiff's life, which he identifies as the restrictions on where he may live, the limits on his phone, computer, and internet use, and the rules prohibiting him from seeing his minor nieces and cousins.

### 1.    Residence Restrictions

Plaintiff has made several efforts to move out of the shelter system. In July and August of 2016, he sought permission to move to the residence of his fiancée or his uncle, but PO Vasquez "rejected both addresses, stating they were within 1,000 feet of a school." SAC ¶ 65; Yunus Decl. ¶ 18. She did not explain how she had measured the distance, or why plaintiff's own calculations, assisted by Google Maps, were incorrect. SAC ¶¶ 66-7; Yunus Decl. ¶ 18. In November 2016 plaintiff submitted the same addresses to PO Lewis-Robinson, who also rejected them as non-compliant with the 1,000-foot rule. SAC ¶ 70; Yunus Decl. ¶ 19.

PO Lewis-Robinson explains that DOCCS uses software called the Critical Infrastructure Response Information System (CIRIS) to determine whether a proposed address is within 1,000 feet of a school, and that the first two addresses proposed by plaintiff were too close to multiple schools. Lewis-Robinson Decl. ¶¶ 8-13 & Exs. A-B.

Beginning in December 2016, plaintiff requested permission to move to the residence of his fiancée's sister-in-law, Lisa Blake. SAC ¶¶ 72-77; Yunus Decl. ¶¶ 20-25. Ms. Blake's address was "SARA-compliant," Lewis-Robinson Decl. ¶ 14, but plaintiff was not given permission to move. According to plaintiff, his PO ignored the request for months before finally contacting Ms. Blake in the fall of 2017, only to "reject[ ] my proposed move on the ground that Ms. Blake was being 'uncooperative,'" SAC ¶¶ 74-77; Yunus Decl. ¶¶ 20-25, simply because she was unavailable for an appointment on the date that Lewis-Robinson suggested. Yunus Decl. ¶¶ 24-25. According to PO Lewis-Robinson, however, Ms. Blake "refused to permit a site inspection of the property." Lewis-Robinson Decl. ¶ 18.[11]

Ms. Blake largely supports plaintiff's version of these events, attesting that she did not hear from PO Lewis-Robinson until September 2017 and that after an appointment was arranged for September 20, 2017, it was PO Lewis-Robinson who "cancelled" it "without any explanation." Declaration of Lisa Blake dated April 30, 2017 (Dkt. No. 72), ¶¶ 3-11. PO Lewis-Robinson then ignored Ms. Blake's efforts to reschedule the appointment. *Id*. ¶ 12.

Plaintiff complains that his forced residence at the Willow Avenue Men's Shelter, together with his 8:00 p.m. to 8:00 a.m. curfew, interferes with his ability to find employment. SAC ¶¶ 106-118. In particular, he attests that he could not accept a full-time job at Access-A-Ride, which would have required him to leave the shelter residence at 7:00 a.m. Yunus Decl. ¶ 44. He has therefore been relegated to lower-paying part-time or seasonal jobs. *Id*. ¶ 46. PO Lewis-Robinson counters that she has approved numerous requests to adjust plaintiff's curfew, for example,

---

[11] In her declaration, PO Lewis-Robinson also notes that Ms. Blake's lease states that no unrelated persons are permitted to reside at the property. Lewis-Robinson Decl. ¶ 19. However, as defendants conceded at oral argument, this issue was not raised in 2017 and was not a basis for her denial of plaintiff's request to move. *See* Oral Arg. Tr. at 62:1-11.

permitting him return as late as 10:30 p.m. on days when he has evening classes at the Borough of Manhattan Community College (BMCC). Lewis-Robinson Decl. ¶ 26-27 & Exs. H-I. She also approved requests from plaintiff to participate in an internship at the Fortune Society and to work at H&R Block. *Id*. ¶¶ 28-29 & Ex. J.

### 2.     Cellphone, Computer, and Internet Restrictions.

As noted above, Special Condition No. 35 states that plaintiff may not own a cell phone without permission of his PO. Even if given permission, may not "possess one that is video or photo-capable." Similarly, No. 39 requires him to obtain the permission of his PO to possess or use a computer or to access the internet, while No. 48 prohibits him – even with PO permission – from accessing any "commercial social networking website."

On May 21, 2017, plaintiff was "found to be in possession of an unapproved smart phone and a personal laptop." Lewis-Robinson Reply Decl. (Dkt. No. 73-1) ¶ 12. As a result, plaintiff was incarcerated on a parole violation until July 26, 2017. *Id*. ¶14. Thereafter, Lewis-Robinson gave plaintiff permission to possess a smartphone, to use the computers at BMCC "for work and school related use," and to create a LinkedIn account. Lewis-Robinson Decl. ¶¶ 22-24. However, she never allowed him to possess a personal computer or to access social media generally (the LinkedIn account, he says, was part of a project for a marketing class), and he is "rarely able" to use the BMCC computers because his curfew requires him to leave campus as soon as his classes end. SAC ¶¶ 81-92; Yunus Decl. ¶ 31.

On April 11, 2018, plaintiff was once again charged with a parole violation, this time on the allegation that he refused to participate in a mental health evaluation. *See* Pl. Ltr. dated April 13, 2018 (Dkt. No. 57); Oral Arg. Tr. at 4:10-13. Plaintiff prevailed at his preliminary hearing and was released. Oral Arg. Tr. at 4:1-4, 42:1-3. Shortly thereafter, however, his PO rescinded his authorization to possess a smartphone. Yunus Reply Decl. (Dkt. No. 71), ¶¶ 14-15 & Ex. A.

According to plaintiff, his PO told him that he would be locked up if she "sees me with any phone, not just a smart phone." *Id.* ¶ 16. According to PO Lewis-Robinson, plaintiff is still "allowed to possess a cellular phone as long as it does not possess video or picture capabilities." Lewis-Robinson Reply Decl. ¶ 29.[12] She adds that he has not yet submitted a request for a compliant phone. *Id.*

### 3.    Restrictions on Contact with Minor Family Members

The parties agree that Special Condition No. 15 prohibits plaintiff from having any contact with children under eighteen, including his own "nieces, nephews, and cousins." Lewis-Robinson Decl. ¶ 21. Plaintiff has two nieces, but – due to his parole restrictions – has never met one of them, and has not seen the other since he has been on parole. SAC ¶¶ 94-98; Yunus Decl. ¶ 35. Because he cannot have contact with his nieces, it is also difficult for plaintiff to see their mothers, who are his sisters. SAC ¶ 99; Yunus Decl. ¶ 36.

Plaintiff is close to his uncle, who is his closest living relative on his mother's side of the family, and in 2017 he requested permission to attend his uncle's Thanksgiving dinner. SAC ¶¶ 100-04; Yunus Decl. ¶¶ 37-39. His PO told him that he could go but "would be 'locked up' if there were any children there." SAC ¶ 104-05; Yunus Decl. ¶ 39. Plaintiff's uncle lives with his wife and minor grandchildren (plaintiff's cousins). SAC ¶ 101; Yunus Decl. ¶ 37. Since "there would obviously be children" present at Thanksgiving, Yunus was not able to celebrate the holiday with his family. Yunus Decl. ¶ 40. PO Lewis-Robinson does not deny these events.

---

[12] According to the Merriam-Webster Online Dictionary, a "smartphone" is a cell phone equipped with "additional software functions" such as "e-mail or an internet browser." *See* https://www.merriam-webster.com/dictionary/smartphone (last visited June 29, 2018). However, defendants read plaintiff's most recent parole condition as permitting an internet-enabled phone but prohibiting one that can take photos or videos. *See also* Oral Arg. Tr. at 42:3-11 (agreeing that the "smartphone" restriction refers to whether the phone has "[a] camera or video"). According to counsel, the new restriction was imposed because, during the April 2018 parole violation hearing, non-sexual pictures of minors were found on plaintiff's prior phone. *Id.* at 44:8-23.

### 4.      Plaintiff's Pre-Litigation Efforts to Obtain Relief

Plaintiff alleges in general terms that he frequently protested his parole restrictions to his POs and their supervisors – defendants Jones, Young, and Grannum – without success. *See*, *e.g.*, SAC ¶¶ 46-47 (Vasquez and her supervisor, Grannum, told plaintiff that they "did not care" if his parole conditions related to his prior conduct and refused to modify them); *id.* ¶¶ 52-53 (Lewis-Robinson likewise told plaintiff that all sex offenders get the same special conditions, and that she "was not interested in his prior conduct"); *id.* ¶ 54 (Lewis-Robinson's supervisors Jones and Young told plaintiff that he would remain subject to whatever conditions Lewis-Robinson imposed). *See also* Yunus Decl. ¶ 12 (all three supervisors told plaintiff that his parole conditions were "at the discretion of [his] parole officer"). At one point, after plaintiff submitted a "written complaint" to Senior PO Young, Young suggested that plaintiff "get relief in court" if he had a problem with his parole conditions. SAC ¶ 136; Yunus Decl. ¶ 12.

## IV.   PLAINTIFF'S CLAIMS

In his First Claim for Relief, plaintiff alleges that his designation as a sex offender violates his Fourteenth Amendment right to procedural due process because he had no opportunity to challenge that designation in an adversarial hearing. SAC ¶¶ 139-45. In his Second Claim, plaintiff challenges the same designation on substantive due process grounds, asserting that requiring him to register as a sex offender bears no rational relationship to any legitimate legislative purpose. *Id.* ¶¶ 146-51. Both of these claims are asserted only against Acting Commissioner Annucci in his official capacity, and both seek only prospective injunctive relief.

Plaintiff's Third and Fourth Claims, brought against all defendants, challenge specific conditions of his parole and seek both damages and injunctive relief. The Third Claim alleges that Special Conditions No. 4 (prohibiting him from knowingly entering into or upon any "school grounds," defined to include any area accessible to the public and within 1,000 feet of the school's

property line) and No. 17 (prohibiting him from entering or being within 300 yards of "places where children congregate") are void for vagueness, as is Special Condition No. 24, which mandates various disclosures when plaintiff enters into a "relationship" with a "consenting adult." SAC ¶¶ 152-58. The Fourth Claim contends that the ban on social media (Special Condition No. 48), along with related restrictions on plaintiff's cellphone and computer access, violate his rights under the First Amendment. *Id.* ¶¶ 159-63.

The Fifth Claim, brought against defendants Lewis-Robinson, Young, and Jones, alleges that the refusal of these defendants to permit plaintiff to see his own nieces and minor cousins interferes with his private family relationships in violation of the Due Process Clause. SAC ¶¶ 164-69. This claim also seeks both damages and injunctive relief.

Finally, in his Sixth Claim for Relief, plaintiff alleges that the Parole Officer Defendants refused to "consider alternative proposed residences in good faith," thereby effectively creating an "arbitrary" requirement that he remain in a DOCCS-designated homeless shelter. SAC ¶¶ 171-172. In addition, the Sixth Claim alleges that nine of plaintiff's parole conditions (some of which he previously challenged on other grounds) violate the Due Process Clause because they are "arbitrary" and "unrelated" to his crime of conviction or any of his prior conduct. *Id.* ¶ 173. The challenged Special Conditions are Nos. 35 and 39 (limiting his access to cellphones and computers), No. 24 (governing his relationships with consenting adults), Nos. 31 and 32 (restricting his ability to own, drive, or ride in automobiles), No. 22 (preventing him from possessing photo or video equipment), No. 14 (prohibiting him from reading or viewing sexually explicit materials), No. 19 (barring him from pet ownership) and No. 37 (prohibiting him from renting a post office box). *Id.* ¶¶ 173-75. Once again, plaintiff seeks both damages and injunctive relief.

Plaintiff's preliminary injunction motion is only slightly narrower than his complaint. He principally seeks an order relieving him of his sex offender designation altogether. *See* Pl. Not. of Mot. for Prelim. Inj. at 1. In the alternative (or perhaps in an abundance of caution, fearing that some of the same Special Conditions would be re-imposed even if he is no longer considered a sex offender), plaintiff asks this Court to lift the "vague residency requirements" that prevent him from moving in with his fiancée; permit him to use cellphones and computers; allow him to visit minor family members; lift the obligation that he disclose his "relationships" to his PO (and disclose his nonexistent history of "sexual abuse" to his partners); and "tailor" the automobile ban. *Id*. at 1-2.

## V.  ANALYSIS

### A.  Subject-Matter Jurisdiction

Before considering the merits of plaintiff's due process claims, I must consider whether this Court is divested of jurisdiction to do so by the *Rooker-Feldman* doctrine, which bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).[13] According to defendants, plaintiff's "challenges to his sex offender registration and associated parole conditions" are barred by *Rooker-Feldman* because the injuries of which he complains flow from the 2016 state court judgment classifying him a level one offender. Def. MTD Mem. at 5-6. Plaintiff's "avenue for review of that determination," they say, "was through an appeal or an Article 78 petition in state court, with federal review through an eventual petition for certiorari to

---

[13] *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983).

the United States Supreme Court, not through this collateral challenge to the state court's determination." *Id*. at 6.[14]

Defendants misconceive the reach of the doctrine on which they rely. Following *Exxon-Mobil* – which reminded the lower federal courts that *Rooker-Feldman* occupies a "narrow ground," 544 U.S. at 284 – the Second Circuit held in *Hoblock v. Albany Cty. Bd. of Elections* that the doctrine deprives the federal courts of subject-matter jurisdiction only in "suits that are, in substance, appeals from state court judgments." 422 F.3d 77, 84 (2d Cir. 2005). *Hoblock* laid out four requirements that must be met before a federal court may dismiss an action under the *Rooker-Feldman* doctrine:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced" – i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Id*. at 85 (quoting *Exxon-Mobil,* 544 U.S. at 284) (alterations in the original); *accord McKithen v. Brown*, 481 F.3d 89, 97 (2d Cir. 2007); *Spiteri*, 2013 WL 4806960, at *12 (holding that *Rooker-*

---

[14]   I understand defendants to argue that the *Rooker-Feldman* doctrine bars plaintiff's First and Second Claims for Relief, which challenge his designation as a sex offender on procedural and substantive due process grounds, respectively. *Cf.* Def. Prelim. Inj. Opp. Mem. (Dkt. No. 55), at 13-14 (seemingly raising *Rooker-Feldman* as a bar to plaintiff's substantive due process claim only); Def. MTD Reply Mem. (Dkt. No. 73), at 3 (arguing that plaintiff's "substantive" due process claim fails under *Rooker-Feldman*). I do not understand defendants to rely on *Rooker-Feldman* with respect to plaintiff's claims challenging the Parole Officer Defendants' post-designation decisions imposing (or refusing to lift) various parole conditions not made mandatory by statute. Nor could they colorably press such an argument. It is well-settled that the *Rooker-Feldman* doctrine does not bar "judicial review of executive action, including determinations made by a state administrative agency" such as DOCCS. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 644 n.3 (2002); *see also Spiteri v. Russo*, 2013 WL 4806960, at *13 (E.D.N.Y. Sept. 7, 2013) (*Rooker-Feldman* does not apply to decisions of the Board of Examiners of Sex Offenders), *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir. 2015).

*Feldman* did not bar plaintiff's federal challenge to his designation as a sex offender in New York after being convicted in California of unlawful sex acts on a minor).

In my view, the present action is clearly not – in either form or substance – an appeal from the outcome of plaintiff's 2016 SORA hearing, which classified plaintiff as a level one sex offender. First, and perhaps most obviously, plaintiff did not lose at his SORA hearing. *See Hoblock*, 422 F.3d at 85 ("First, the federal-court plaintiff must have lost in state court."). Throughout that hearing plaintiff consistently sought a level one classification – the lowest available – which his counsel characterized as "the only appropriate designation here." SORA Tr. at 5:19-22. *See also id*. at 6:21-8:5 (arguing that since nothing in the record indicates a "likelihood of sexual recidivism," which is "the issue and purpose in this case," plaintiff "should, therefore, be designated a level one"); *id*. at 18:17-19 (arguing that "a level one designation is really the only appropriate designation in a case like this, where there is no sexual misconduct"). The district attorney disagreed, urging the court to assess plaintiff as a level two offender in accordance with the recommendation of the Board, *id*. 8:9-10:20, and arguing vigorously against any "downward departure in this case." *Id*. at 16:3-4. Justice Obus rejected that argument, held that "there is virtually no likelihood that [plaintiff] will commit a sex crime ever," and "grant[ed] the downward departure, notwithstanding the seriousness of this case, to a level one assessment." *Id*. at 22:14-24. Plaintiff therefore cannot be characterized as "state court loser." *Exxon Mobil*, 544 U.S. at 281.[15]

---

[15] For this reason alone, the case at bar is distinguishable from *Zuneska v. Cuomo*, 2013 WL 431826 (E.D.N.Y. Feb. 1, 2013), in which a level one sex offender petitioned a New York County Court to "declassify" him, lost that case (because, as noted *supra* at n.5, SORA contains no avenue for a level one offender to file such a petition), and then filed a federal suit in which he argued that the state court erred in holding that "New York State does not allow for the de-classification of a registrant as a matter of law." 2013 WL 431826, at *2. Noting that the County Court decision "was a loss" for Zuneska, *id*. at *4, the district went on to consider the remaining *Hoblock* factors and ultimately concluded that Zuneska was "attempting to . . . re-construe a state court appeal as a federal cause of action." *Id*. at *5.

Second, the injuries of which plaintiff complains were not "caused by" the decision at his SORA hearing. *See Exxon-Mobil*, 544 U.S. at 284; *Hoblock*, 422 F.3d at 87 (Plaintiffs "are not subject to the *Rooker–Feldman* bar unless they *complain of an injury* caused by a state judgment. Indeed, this is the core requirement from which the others derive.") (emphasis in the original). As defendants implicitly acknowledge, plaintiff became a "sex offender," by operation of law, long before his classification hearing. *See* Def. MTD Mem. at 3 ("Because Plaintiff pled guilty to the crime of kidnapping a victim under the age of 17 who was not his child, he was *statutorily* classified as a sex offender.") (emphasis added); *see also* CL § 168-d(1)(a) (upon conviction, the court "shall certify that the person is a sex offender"). The purpose of the hearing was simply to determine "the level of notification" to be given to the public of that status. CL § 168-n(2); *see also Spiteri*, 2013 WL 4806960, at *13 (holding *Rooker-Feldman* inapplicable because "the issue" at Spiteri's SORA hearing "was Plaintiff's risk level classification, not whether he was required to register as a sex offender").[16] CL 168-*l*(8) makes this point crystal clear: even if the court fails to hold a SORA hearing or "render a determination" as to the offender's risk level, that failure "shall not affect the obligation of the sex offender to register."

As the Second Circuit explained in *McKithen*, "a party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed *prior* in time to the state-court proceedings, and so could not have been 'caused by' those proceedings." 481 F.3d at 97-98 (emphasis in the original). Here, the injury of which plaintiff

---

[16] Elsewhere in its analysis, the *Spiteri* court relied on *Rooker-Feldman* to dismiss a narrow subset of plaintiff's claims challenging various evidentiary and procedural rulings made during his SORA hearing, including defendants' failure to grant him a continuance to seek exculpatory evidence. 2013 WL 4806960, at *19-20. Plaintiff here makes no comparable claims.

complains – his designation as a sex offender – occurred prior to, and independently of, his 2016 SORA hearing, such that this action cannot be barred by *Rooker-Feldman*.

For similar reasons, the present suit cannot fairly be characterized as seeking "review and rejection" of the judgment entered at plaintiff's SORA hearing. *Exxon-Mobil*, 544 U.S. at 284; *Hoblock*, 422 F.3d at 85. At that hearing, plaintiff neither requested nor obtained a ruling as to the constitutionality of the statute under which he was classified.[17] He requested exactly what he got – a level one classification – and he makes no argument here that he should be re-classified. Nor does he contend that the state court erred in any other way. *Cf. Zuneska*, 2013 WL 431826, at *4 (dismissing federal action where the state court "denied Plaintiff's request to be relieved from the registration requirements of SORA" and he then filed a federal complaint attacking the state court's "holding that that [SORA] does not provide for de-classification"). Rather, he challenges "the statutory premise Justice Obus was bound by – that Plaintiff must register as a sex offender." Pl. Prelim. Inj. Reply Mem. (Dkt. No. 70) at 3. Such a challenge "attacks an alleged defect of state . . . legislation rather than adjudication," *Hachamovitch v. DeBuono*, 159 F.3d 687, 694 (2d Cir. 1998), and thus does not come within the bar of *Rooker-Feldman*.[18]

---

[17] To the contrary: although plaintiff's counsel expressly referenced *People v. Kno*x at the outset of his presentation, he did so not to challenge its holding but to acknowledge, candidly, that "the Court of Appeals did uphold this provision." SORA Tr. at 6:9-12. Counsel then argued, relying in part on *Knox* itself, that "a level one is all but required" where the offense was not itself sexual. *Id*.; s*ee also id*. at 17:18-22 (*Knox* "support[s] our position" as to classification); *id*. at 18:15-19 (*Knox* "indicate[s] that . . . a level one designation is really the only appropriate designation in a case like this, where there is no sexual misconduct").

[18] It may well be, as defendants urged at oral argument, *see* Oral Arg. Tr. at 55:1-13, that plaintiff *could have* used his SORA hearing to make (and lose) a due process challenge to his designation as a sex offender, which *would have* permitted him to appeal that issue (unsuccessfully) through the state courts. *See*, *e.g*., *People v. Citron*, 13 Misc. 3d 833, 834 n.2, 827 N.Y.S.2d 445, 447 n.2 (N.Y. Sup. Ct. Bronx Co. 2006) (holding in consolidated proceedings, some of which "arose in the context of an original SORA determination," that the statute was not unconstitutional as applied to convicted kidnappers who did not sexually assault their victims), *aff'd*, 46 A.D.3d 353, 848 N.Y.S.2d 616 (1st Dep't 2007), *aff'd sub nom. People v. Knox*, 12 N.Y.3d 60, 875 N.Y.S.2d 828

Having failed to establish three of the four requirements for application of the *Rooker-Feldman* doctrine, defendants have not persuaded me that the Court lacks subject-matter jurisdiction. I therefore recommend, respectfully, that Your Honor proceed to the merits of plaintiffs' claims.[19]

### B.      Legal Standards

A civil action may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if the well-pleaded factual allegations contained in the plaintiff's complaint, accepted as true, fail to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Irrera v. Humpherys*, 859 F.3d 196, 198 (2d Cir. 2017). A claim is facially plausible when its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

---

(2009)). Had he done so, however, plaintiff would be barred from making the same challenge here as a matter of claim or issue preclusion – which must be asserted as an affirmative defense – not by the *Rooker-Feldman* doctrine. "*Exxon Mobil* teaches that the narrow *Rooker-Feldman* inquiry is distinct from the question whether claim preclusion (res judicata) or issue preclusion (collateral estoppel) will defeat a federal plaintiff's suit." *Hoblock*, 422 F.3d at 92. If a plaintiff seeks redress for a pre-existing injury in state court, and if that court "cho[oses] not to remedy the injury," *id.* at 88, *res judicata* may bar plaintiff's subsequent effort to litigate the same or a similar claim in federal court, but *Rooker-Feldman* does not. *Id.*

[19] In one of their briefs, defendants argue, in the alternative, that plaintiff's injuries flow "directly" from "his conviction of a crime designated a sex offense under state law," which this Court would need to "review and reject" in order to award any relief. Def. MTD Mem. at 6-7. I disagree. To be sure, plaintiff was the "loser" in his criminal case, and his conviction was a necessary predicate to his designation as a sex offender. But this action does not challenge that conviction. Plaintiff does not deny that he is guilty of kidnapping, and does not ask this Court to relieve him of his criminal conviction. The procedural due process question here is whether, having been convicted only of non-sexual conduct, plaintiff was entitled to a further hearing before being designated a sex offender. The substantive due process question is whether, having committed only non-sexual crimes, he may constitutionally be designated a sex offender. It is not clear whether or how either of those questions could have been raised on direct appeal from his criminal conviction. *See People v. Griffin*, 171 Misc. 2d 145, 151-52 & n.3, 652 N.Y.S.2d 922, 926 & n.3 (Sup. Ct. N.Y. Co. 1996) (rejecting incarcerated sex offender's challenge to various provisions of SORA as unripe because he had not yet completed his prison sentence, had his SORA hearing, or been required to register). In this case, they were not, and in any event are not barred by *Rooker-Feldman*.

678. The non-conclusory factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. If the plaintiff has not "nudged his claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

In this case, all of plaintiff's claims are brought pursuant to 42 U.S.C. § 1983, which requires a plaintiff to establish "(1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law." *Doe v. Lima*, 270 F. Supp. 3d 684, 710 (S.D.N.Y. 2017) (citing *West v. Atkins,* 487 U.S. 42, 48 (1988), and *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155-56 (1978)), *appeal filed sub nom. ABC v. DEF*, 17-3155 (2d Cir. Oct. 2, 2017). All of the defendants named herein "are state officials employed by DOCCS," Def. MTD Mem. at 22, and there is no dispute but that they were all acting under color of state law. Before a state official may be held liable in damages, however, the plaintiff must show that she was acting in her individual capacity – that is, performing discretionary functions – and was "personally involved in the deprivation of the federal right." *Lima*, 270 F. Supp. 3d at 712; *accord Farrell v. Burke*, 2004 WL 2813175, at *6 (S.D.N.Y. Dec. 8, 2004) (collecting cases).

"Even if an individual is personally involved in a constitutional violation, he may be protected by the doctrine of qualified immunity, which shields government officials from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Christian v. Warden of O.B.C.C.*, 2018 WL 1441401, at *2 (S.D.N.Y. Mar. 22, 2018) (quoting *Hassell v. Fischer*, 879 F.3d 41, 46 n.7 (2d Cir. 2018)). *See also Lima*, 270 F. Supp. 3d at 710 (a state official is entitled to qualified immunity "unless the facts show '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of challenged conduct'") (quoting *Ashcroft v. al-*

*Kidd,* 563 U.S. 731, 735 (2011)). When litigating qualified immunity under Rule 12(b)(6),

however, a defendant "must accept the more stringent standard applicable to this procedural route,"

meaning that "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only

those that support his claim, but also those that defeat the immunity defense." *Doe v. Annucci,*

2015 WL 4393012, at *12 (S.D.N.Y. July 15, 2015) (quoting *McKenna v. Wright,* 386 F.3d 432,

436 (2d Cir. 2004)).

The Eleventh Amendment bars claims for monetary relief against the State of New York,

and therefore – by extension – bars damages claims against state employees in their official

capacities. *See Washpon v. Parr*, 2007 WL 541964, at *1 (S.D.N.Y. 2007) ("the Eleventh

Amendment bar "extends to actions for damages brought against state officials in their official

capacities"). A private plaintiff may, however, sue such officials for declaratory or injunctive relief

where the underlying claim is based on an ongoing violation of federal law. *See Ex Parte Young*,

209 U.S. 123 (1908); *State Emps. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 95 (2d Cir.

2007) (under *Young*, "a plaintiff may sue a state official acting in his official capacity –

notwithstanding the Eleventh Amendment – for prospective, injunctive relief from violations of

federal law"). A parole condition may be challenged as "ongoing" not only when it is currently in

effect but also when it is "plausible" that the condition will be re-imposed. *Doe v. Annucci*, 2015

WL 4393012, at *15-17 (holding that sex offender parolee who was wrongfully deprived of contact

with his infant son could maintain a claim for injunctive relief even though the offending parole

conditions were modified, permitting plaintiff to live with his family, before he filed suit).

"Qualified immunity does not bar declaratory and injunctive relief." *Singleton v. Doe*, 210

F. Supp. 3d 359, 371 (E.D.N.Y. 2016) (granting summary judgment against plaintiff's claims for

damages arising out of his designation as a "discretionary sex offender" but denying summary

judgment "as to Plaintiff's claim seeking injunctive relief from the same"); *accord Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995). However, a plaintiff seeking a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) must do more than survive a motion to dismiss.  He must present evidence showing "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).  In this case, plaintiff seeks a mandatory injunction; that is, an injunction which alters rather than preserves the status quo. *N. Am. Soccer League,* 883 F.3d at 37. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks omitted)).

In the sections that follow, I first consider, as to each Claim for Relief, whether it plausibly alleges a violation of plaintiff's constitutional rights and, if so, whether plaintiff has adequately stated a claim for damages, injunctive relief, or both. If I conclude that plaintiff has pleaded a cognizable claim for injunctive relief, I next consider whether he has shown a "clear or substantial likelihood of success on the merits" as to that claim, as required for the mandatory injunctive relief he seeks. Once each Claim for Relief has been analyzed in this fashion, I address the remaining factors relevant to plaintiff's preliminary injunctive motion in Part V(I) of this Report, *infra*.

### C.  First Claim - Procedural Due Process

In his First Claim for Relief, plaintiff contends that he was deprived of procedural due process because he had no opportunity to challenge his designation as a "sex offender" in an adversarial proceeding. SAC ¶¶ 139-45. Procedural due process claims "are to be examined 'in

two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Doe v. Pataki*, 3 F. Supp. 2d 456, 466 (S.D.N.Y. 1998) (quoting *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted). Here, both elements are contested. For the reasons that follow I conclude that plaintiff possesses a cognizable liberty interest in not being required to register as a sex offender. However, clear Supreme Court and Second Circuit precedent compel me to conclude that, having been convicted of an offense requiring registration under state law, plaintiff is not entitled to any further process.

### 1.    Plaintiff's Liberty Interest

Because "reputation alone" is not a liberty or property interest "by itself sufficient to invoke the procedural protections of the Due Process Clause," *Paul v. Davis*, 424 U.S. 693, 701 (1976), procedural due process claims involving sex offender registration are ordinarily analyzed under the "stigma plus" doctrine, which requires a showing of reputational injury "plus" some additional, "tangible burden." *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994). *See*, *e.g.*, *Doe v. Pataki*, 3 F. Supp. 2d at 457 (holding, in action challenging certain provisions of SORA on procedural due process grounds, that the test is "whether plaintiffs have established damage to reputation and impairment of some additional interest").

The reputational prong of the test requires a showing that the challenged government action "will result in stigma, that is, in 'public opprobrium' and damage to [plaintiff's] reputation." *Valmonte*, 18 F.3d at 999-1000 ("[t]here is no dispute" that Valmonte's inclusion on the New York State Central Register of Child Abuse and Maltreatment "potentially damages her reputation by branding her as a child abuser"); *see also Pisani v. Westchester Cty. Health Care Corp.*, 424 F. Supp. 2d 710, 718 (S.D.N.Y. 2006) (plaintiff must prove "the utterance of a statement about him

that is injurious to his reputation, that is capable of being proved false, and that he or she claims is false") (internal quotations and citations omitted).

The "plus" prong requires a showing of some concrete, state-imposed burden beyond the "intangible deleterious effect that flows from a bad reputation." *Valmonte*, 18 F.3d at 1001 (holding that inclusion on the Central Register placed a "tangible burden" on plaintiff because child care providers were prohibited by law from hiring persons listed on the Central Register without providing a written explanation of the reason); *Pisani*, 424 F. Supp. 2d at 718 (plaintiff must demonstrate "some tangible and material state-imposed burden . . . in addition to the stigmatizing statement") (quoting *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005)).

More than 20 years ago, in *Doe v. Pataki*, the Hon. Denny J. Chin had no difficulty in concluding that a class of probationers and parolees, challenging their prospective inclusion on New York's sex offender registry, had "a protected liberty interest that entitled them to procedural due process." 3 F. Supp. 2d at 468.[20] The reputational prong was met because inclusion in the sex offender registry "will likely result in their being branded as convicted sex offenders who may strike again and who therefore pose a danger to the community." *Id*. at 467. As Judge Chin observed, the public identification of an individual as a "sex offender" "is likely to carry with it shame, humiliation, ostracism, loss of employment and decreased opportunities for employment, perhaps even physical violence, and a multitude of other adverse consequences. Thus, there is no genuine dispute that the dissemination of the information contemplated by [SORA] to the

---

[20] Judge Chin ultimately held that SORA (as originally enacted) provided inadequate procedures for determining sex offender risk levels. 3 F. Supp. 2d at 472-73. Consequently, the court entered an injunction preventing New York from classifying class members "at higher than risk level one" until the state provided each sex offender with (among other things) notice of the risk level recommended by the Board, followed by an adversary court hearing at which the offender could challenge the recommendation with the assistance of counsel. *Id*. at 478-79. Plaintiff Yunus had the benefit of these improved procedures at his SORA hearing.

community at large is potentially harmful to plaintiffs' personal reputations." *Id.* at 468. The "plus" factor prong was also met, Judge Chin held, because registration "place[s] a 'tangible burden' on plaintiffs, potentially for the rest of their lives." *Id.*

Since *Doe v. Pataki* was decided in 1998, both the tangible burdens and the reputational damage that come with sex offender registration have, if anything, intensified. Over that period the Legislature has steadily increased the legal restrictions applicable to registered sex offenders. For example, level one offenders were originally required to register for ten years, during which period they could petition for de-registration. *See* 1995 N.Y. Sess. Laws ch. 192, § 2. But under today's version of SORA, level one offenders must register for 20 years, with no opportunity for relief. CL §§ 168-h(1), 168-o. Similarly, when New York first created its sex offender registry there were no mandatory parole conditions prescribed for individuals required to register. But under today's version of SARA, certain sex offenders on parole or conditional release – including plaintiff Yunus – may not live or knowingly travel within 1,000 feet of a school or similar facility. EL 259-c(14); *Williams v. DOCCS*, 136 A.D.3d at 149, 24 N.Y.S.3d at 20. Thus, as the Appellate Division noted last year in *People v. Diaz*, even a convicted child murderer has a reputational interest in avoiding a "sex offender" designation, which "often results in the offender being subject to social ostracism and abuse, and impedes the person's ability to access schooling, employment, housing, and many other areas." 150 A.D.3d 60, 66, 50 N.Y.S.3d 388, 392 (1st Dep't), *leave to appeal granted*, 29 N.Y.3d 914, 63 N.Y.S.3d 4 (2017).[21]

---

[21] In 1989, Diaz shot and killed his 13-year-old half-sister, in Virginia, during an argument over drugs. He was convicted of first-degree murder and sentenced to 40 years in prison. Decades later, he was released from prison, whereupon he was required to register under Virginia's Sex Offender and Crimes Against Minors Registry Act, Va. Code Ann. §§ 9.1-900, *et seq*. Diaz then moved to New York, where the Board of Examiners of Sex Offenders required him to register as a sex offender pursuant to CL § 168-a(2)(ii), which generally requires registration in New York if the offender was "required to register as a sex offender in the jurisdiction in which the conviction

Defendants do not dispute the "tangible burdens" that plaintiff bears under SORA and SARA. Instead, relying on *Vega v. Lantz*, 596 F.3d 77, 82 (2d Cir. 2010), they argue that registration as a sex offender cannot harm his reputation because he *is* a sex offender, having been convicted of an offense defined as such by SORA. *See* Def. MTD Mem. at 7 ("there is no liberty interest implicated when a plaintiff has <u>correctly</u> been required to register as a sex offender under the pertinent state law"); Def. Prelim. Inj. Opp. Mem. at 11 ("the purportedly defamatory statement that plaintiff was convicted of an offense that is designated under SORA to require registration as a sex offender with attendant restrictions is <u>true</u>") (emphases in the original).

While it is of course true, in a tautological sense, that plaintiff was convicted of an offense that is defined as a sex offense under SORA, that syllogism, standing alone, cannot be a defense to the "liberty" element of his procedural due process claim. First, the argument is entirely circular. Using the same logic, the State of New York could define shoplifting as a sex offense, and then argue that requiring shoplifters to register as sex offenders does not implicate any protected liberty interest because they *are* sex offenders.

Second, the defamatory "statement" to which plaintiff objects is that he is a *sex* offender, and is therefore likely to be *sexually* dangerous, not the sanitized assertion that he "was convicted of an offense that is designated under SORA to require registration." Def. Prelim. Inj. Opp. Mem. at 11. *See Knox*, 12 N.Y.3d at 66-67, 875 N.Y.S.3d at 831-32 (defendants convicted of non-sexual kidnapping offenses "have a constitutionally-protected liberty interest . . . in not being required to register under an incorrect label"). Our Circuit made an analogous point in *Doe v. Dep't of Pub.*

---

occurred." The Appellate Division ultimately held that because his underlying crime had "no sexual component," and because his Virginia registration was "under a broader statute that covers both sex crimes and crimes against minors," Diaz could not be required to register as a "sex offender" in New York. 150 A.D.3d at 62-66, 50 N.Y.S.3d at 389-93.

*Safety ex rel. Lee*, 271 F.3d 38, 49 (2d Cir. 2001) (*Dep't of Pub. Safety*), *rev'd on other grounds sub nom. Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) (*Conn. v. Doe*), which held – as relevant here – that a convicted sex offender challenging Connecticut's registration law had a cognizable liberty interest at stake, notwithstanding his conviction, because the registry "implies that each person listed is more likely than the average person to be currently dangerous," which "stigmatizes every person listed on the registry. And the plaintiff claims that, as to him, it is false." *See also Vega v. Lantz*, 596 F.3d at 81-82 (although the Supreme Court reversed *Dep't of Pub. Safety* on other grounds, "it continues to be the case that wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest"). [22]

Outside of the Second Circuit, numerous courts have recognized that the "sex offender" label has such a powerful visceral impact that even an incarcerated felon has "a liberty interest in not being branded a sex offender." *Kirby v. Siegelman*, 195 F.3d 1285, 1291 (11th Cir. 1999) (holding that inmate convicted of attempted murder "has a right to due process before the state declares him to be a sex offender"); *see also Chambers v. Colorado Dep't of Corr.*, 205 F.3d 1237, 1242, 1243 (10th Cir. 2000) (holding that the sex offender label is "replete with inchoate stigmatization" and enjoining Colorado from categorizing inmate as sex offender without affording him "a hearing to challenge the label"); *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender").

---

[22] Since the Second Circuit has expressly reaffirmed this aspect of *Doe v. Dep't of Pub. Safety*, I am not persuaded by defendants' assertion that there is a "split" among the district courts within our Circuit as to whether sex offender designations "implicate a liberty interest." Def. Prelim. Inj. Mem. at 11. If there is such a split, it results from a misapprehension of controlling law.

*Vega v. Lantz* is not to the contrary. While serving a prison sentence for assault and kidnapping, Vega was given a "Sexual Offense Treatment Needs" (SOTN) score of "3," meant for individuals with a "current conviction, pending charge, or known history of sexual offenses involving physical contacts with the victim(s)." 596 F.3d at 80. Relying solely on the fact that he had been acquitted at trial of sexual assault in the first degree, Vega argued that his SOTN score barred him from certain prison jobs "without due process." *Id*. at 80, 81, The Second Circuit rejected the claim because Vega "did not allege falsity" of the reputation-tarnishing statement. *Id*. at 82. That is, Vega did not deny either the facts of the crime for which he was convicted or their sexual component: after an escalating pattern of violence against his teenaged girlfriend, he locked her a bedroom, "entered the bedroom, stabbed the victim, beat her and cut her nipple off of her right breast before forcing her to swallow it." *Id*. at 79. Not only was this undisputed conduct sufficient to meet the technical requirements for a SOTN score of "3" under the prison's classification manual (a "sexual offense" involving "physical conduct"); it was surely sufficient to earn Vega the label of "sex offender." *See id*. at 83 ("If Vega had not been convicted of amputating a part of a sixteen year old girl's body that is classified as a sexual organ under Connecticut law, this may well have presented a different case.").

The present action is "a different case." Plaintiff does not deny that he "was convicted of an offense that is designated under SORA to require registration," Def. Prelim. Inj. Opp. Mem. at 11, but he does deny that he is a "sex offender" as that term is commonly understood, *see* SAC ¶ 10 (plaintiff "has never committed sexual misconduct"). Thus, he squarely alleges that his designation as a sex offender is both false and injurious, *Pisani*, 424 F. Supp. 2d at 718. This case is more like *Dep't of Pub. Safety*, 271 F.3d at 49, in which the plaintiff admitted that he was convicted of a registrable offense but was stigmatized by the implication that that he was "currently

dangerous," which he denied. *See also Valmonte*, 18 F.2d at 1000-04 (plaintiff met the technical requirements for inclusion on the Central Register of Child Abuse and Maltreatment, but was stigmatized because the listing "brand[ed] her as a child abuser," which she denied).[23]

The courts, like the prison officials sued in *Vega v. Lantz*, are "under no constitutional obligation to blind themselves to reality." 596 F.3d at 84. In this case, the reality – alleged by plaintiff and undisputed by the State of New York – is that plaintiff has never been convicted of, charged with, or engaged in any sexual misconduct, but has nonetheless been branded a sex offender. Under these facts, in my view, plaintiff has adequately alleged a constitutionally protected liberty interest.

### 2.    Sufficiency of Process

The second step of the procedural due process analysis asks whether the procedures by which plaintiff was deprived of his liberty interest were "constitutionally sufficient.'" *Doe v. Pataki*, 3 F. Supp. 2d at 466. The parties agree that plaintiff has already had "two separate full-blown adversarial proceedings in court," Def. Prelim. Inj. Opp. Mem. at 12: his criminal prosecution, which ended in his 2002 kidnapping plea, and his 2016 SORA hearing, which ended in his level one classification. They disagree as to whether any further process is due.

Defendants rely on *Conn. v. Doe*, 538 U.S. at 7-9, and *Doe v. Cuomo*, 755 F.3d 105 (2d Cir. 2014), both of which held that a person who has been convicted of an offense requiring registration under SORA is not entitled to any additional hearing, either *ex ante* (in *Conn. v. Doe*) or *ex post* (in *Doe v. Cuomo*), to adjudicate his obligation to register. These cases, defendants

---

[23] Valmonte met the technical requirements for listing on the Central Register because she slapped her eleven-year daughter on the face, which led to a "child abuse hotline" complaint and "child protective proceedings," which were ultimately dismissed on the condition that the Valmonte family receive counseling. 18 F.3d at 997.

contend, require me to conclude that once plaintiff was convicted of a registrable offense– here, kidnapping an unrelated minor — "[t]here is no inquiry left to be made and no reason to require elaborate procedures to make it." *Doe v. Cuomo*, 755 F.3d at 113. I agree.

In *Conn. v. Doe*, the respondent was a "convicted sex offender" who challenged Connecticut's sex offender registration statute on procedural due process grounds, arguing that he was entitled to a pre-deprivation hearing to determine whether he was "currently dangerous." 538 U.S. at 5-6. The Court assumed, *arguendo*, that sex offender registration deprived respondent of a liberty interest, but rejected his claim because state law did not require that the offender be "dangerous" before he could be made to register, *id.* at 7 ("the law's requirements turn on an offender's conviction alone"), and "due process does not entitle him to a hearing to establish a fact that is not material under the Connecticut statute." *Id.* The Court held, in essence, that respondent's *procedural* due process rights were circumscribed by the express terms of the statutory test for sex offender registration. "Unless respondent can show that a *substantive* rule of law is defective (by conflicting with a provision of the Constitution), any hearing on dangerousness is a bootless exercise." *Id.* at 7-8 (emphasis in the original). Since the respondent did not raise any substantive due process challenge, the Court did not consider whether a state could constitutionally require sex offenders to register without any individualized dangerousness determination. *Id.* at 8.

A decade later, our Circuit applied the same rule in *Doe v. Cuomo*, brought by a New York resident who pled guilty in 1999 to a single misdemeanor count of attempted possession of child pornography. 755 F.3d at 108. Appellant Doe was sentenced to a term of probation and classified as a level one offender. After nearly 12 years on the sex offender registry, Doe sought relief in federal court pursuant to § 1983, arguing (among other things) that he had a procedural due process right to a hearing "to show that he was not a danger to the community." *Id.* at 113. Relying on

36

*Conn. v. Doe*, the Second Circuit rejected that claim, because in New York, as in Connecticut, actual dangerousness is irrelevant to sex offender registration:

> Although Doe contends that the State did not afford constitutionally adequate procedures in applying SORA to him, there was no fact that would require a protective *procedure* to determine. New York State has concluded – as it was constitutionally entitled to do – that the mere fact of conviction of certain sex offenses justifies the imposition of SORA's registration, notification, and other restrictions.

*Id.* (emphasis in the original).

Plaintiff distinguishes both of these cases on the ground that the offenders who filed them were convicted of sex crimes – that is, crimes that were "inherently sexual," Pl. Prelim. Inj. Reply Mem. at 2 – whereas he, having never been convicted of or even charged with sexual misconduct, should be afforded an opportunity to argue that he is "not a sex offender at all." *Id.* In the *procedural* due process context, however, this is a distinction without a difference. "Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme." *Conn. v. Doe*, 538 U.S. at 8. The fact that plaintiff Yunus seeks to establish – that there was no sexual component to his crimes – is not "relevant under the statutory scheme," *id.*, because New York has concluded that everyone convicted of kidnapping an unrelated minor must register as a sex offender. *See* CL §§ 168-a(1), 168-a(2)(a)(i). Plaintiff admittedly kidnapped an unrelated minor. Since "[a]ll of the facts necessary to conclude that SORA restrictions apply to [Yunus] are . . . known and unchallenged, *Doe v. Cuomo*, 755 F.3d at 113, "[t]here is no inquiry left to be made." *Id.*

Moreover, no principle of *procedural* due process prevents New York from applying SORA to those who, like plaintiff, kidnapped unrelated minors but did not sexually assault them. *See Conn. v. Doe*, 538 U.S. at 8. "Unless [plaintiff] can show that a *substantive* rule of law is defective," any hearing on whether there was a sexual component to his crime would be "a bootless

exercise." *Id.* at 7 (emphasis in the original). In short, plaintiff's claim "'must ultimately be analyzed' in terms of substantive, not procedural, due process." *Id.* (quoting *Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989) (plurality opinion)).

Since plaintiff's procedural due process claim cannot withstand the logic of *Conn. v. Doe* and *Doe v. Cuomo*, I respectfully recommend that his First Claim for Relief be dismissed.

### D.   Second Claim - Substantive Due Process

Neither the Supreme Court nor the Second Circuit has addressed the substantive due process issue presented in this action, which is whether New York may constitutionally include, among those required to register as sex offenders, a person who was convicted of kidnapping an unrelated minor but has never engaged in any actual or attempted sexual misconduct. The parties agree that since freedom from sex offender registration is not a "fundamental right," as that term is used in constitutional analysis, this Court must apply the "rational basis" test, which does not ask whether the statute is wise, nor even whether it is substantially related to an important governmental objective, but only whether it is "rationally related to a legitimate government interest." *Winston v. City of Syracuse*, 887 F.3d 553, 566 (2d Cir. 2018) (holding that city could not constitutionally terminate water service to tenants whose landlords failed to pay their water bills).

Although "[t]his form of review is highly deferential," *Winston,* 887 F.3d at 560, "it is not meant to be toothless." *Id.* (quoting *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013)). Even under the rational basis test, a state may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (invalidating city zoning ordinance that required special use permit to operate group home for the mentally retarded); *see also Diaz*, 150 A.D.3d at 65-66, 50 N.Y.S.3d at 392 (applying rational

basis review and concluding that a convicted child murderer whose crime had no sexual component could not be required to register as a sex offender under SORA because "the connection between defendant's crime and the legislative purpose behind SORA is too attenuated").

Defendants urge this Court to adopt the reasoning of *Knox*, which held that New York may constitutionally treat all child kidnappers as "sex offenders," whether or not there was any sexual component to their crimes. *See* Def. MTD Mem. at 9-10; Def. Prelim. Inj. Opp. Mem. at 14-15; Def. MTD Reply Mem. at 3-4. The parties agree, however, that a federal district court is not bound by the decision of a state court on a matter of federal constitutional law. *See* Pl. Prelim. Inj. Mem. at 13 (Dkt. No. 44); Def. Prelim. Inj. Opp. Mem. at 14; *United States v. Diaz*, 854 F.3d 197, 208 (2d Cir. 2017). Outside of New York, the state courts are split on the precise question presented here,[24] and neither side cited any federal precedent.[25] After carefully considering the arguments on both sides in light of the standards set by the Second Circuit – most recently in *Winston*, 887

---

[24] The Illinois and Wisconsin Supreme Courts have upheld the constitutionality of their states' sex offender registration statutes as applied to persons convicted of kidnapping unrelated minors, regardless of whether the criminal conduct was sexually motivated or included any sexual component. *People v. Johnson*, 225 Ill. 2d 573, 592, 870 N.E.2d 415, 426 (2007); *State v. Smith*, 323 Wis. 2d 377, 389-90, 780 N.W.2d 90, 96 (2010). The Florida and New Mexico Supreme Courts, applying the same rational relationship test, have held similar laws unconstitutional as applied to convicted kidnappers who did not commit any sexual misconduct. *State v. Robinson*, 873 So. 2d 1205, 1217 (Fla. 2004); *Am. Civ. Liberties Union of N.M. v City of Albuquerque*, 139 N.M. 761, 772, 137 P.3d 1215, 1226 (2006).

[25] The Court has identified one federal case addressing the question presented here. In *Cox v. Commonwealth of Kentucky*, 2010 WL 3909236, at *1, *6 (W.D. Ky. Sept. 30, 2010), the district court dismissed a *pro se* complaint filed in 2010 by a woman who was convicted in 1986 of kidnapping a minor "for the purpose of having an infant child." The Commonwealth allegedly conceded at her trial that there was "no evidence that she committed a sexual offense." *Id*. at *1. By the time the plaintiff completed her sentence, Kentucky law required lifetime registration for any person convicted of kidnapping a victim under the age of 18. *Id*. at *2. The *Cox* court reasoned that the legislature's "inclusion of kidnapping even where not sexually-motivated is rationally related to the Kentucky General Assembly's stated purpose of protecting minors from crime and potential sexual assaults," and consequently held that requiring plaintiff to register as a sex offender did not violate her substantive due process rights. *Id*. at *6.

F.3d at 566 – I conclude that plaintiff "plausibly alleges a violation of substantive due process," *id.*, and that no additional fact-finding is required to determine whether he is entitled to preliminary injunctive relief.

The purpose of SORA, as articulated in its enabling legislation, is to combat "the danger of recidivism posed by *sex offenders*, especially those *sexually violent* offenders who commit predatory acts characterized by repetitive and compulsive behavior," and to assist the criminal justice system "to identify, investigate, apprehend and prosecute *sex offenders*." 1995 N.Y. Sess. Laws ch. 192, § 1; *see also* 2006 N.Y. Sess. Laws ch. 1, § 1 (increasing length of registration periods to provide "better tracking and monitoring of *sex offenders*") (emphases added).[26] The question for this Court, therefore, is whether the statute is unconstitutional as applied to a person who – although convicted of a serious crime against a minor – did not engage or attempt to engage in the conduct that the statute was intended to combat.

In *Knox*, the Court of Appeals held that there is a rational connection between the purpose of SORA and the inclusion of certain non-sexual kidnappings as "sex offenses" requiring registration, because "a great many cases of kidnapping or unlawful imprisonment of children are indeed sex offenses." 12 N.Y.3d at 68. *Knox* cited, *inter alia*, a 2002 study reporting that in "46%

---

[26] Both state and federal courts routinely acknowledge these purposes. *See*, *e.g.*, *People v. Mingo*, 12 N.Y.3d 563, 574, 883 N.Y.S.2d 154, 161 (2009) (the "purpose underlying SORA" is to protect the public from "sex offenders"); *Diaz*, 150 A.D.2d at 65, 50 N.Y.S.3d at 391 (the "legislative purpose" of SORA is "protecting the public from sex offenders"); *Doe v. Pataki*, 481 F.3d 69, 70 (2d Cir. 2007) (SORA aims to protect the public from "sex offenders" by notifying vulnerable populations of "the presence of sex offenders in their communities," and to enhance the ability to "investigate and prosecute sex offenses"). In *Knox*, the Court of Appeals described the "governmental interest advanced by SORA" somewhat differently – but without citation – as the protection of the community against "people who have *shown themselves capable of* committing sex crimes." 12 N.Y.3d at 67 (emphasis added). To the extent this formulation means something different from "people who have committed sex crimes," it appears to go beyond the purpose articulated by the Legislature or previously understood by the courts.

of the nonfamily abductions studied, the perpetrator had sexually assaulted the child," *id.*,[27] and

reasoned that the Legislature "could rationally have found that the statistics understate the problem.

It could have found that sexual assault occurs in many cases where there is no direct evidence of

it – in cases where the victim is killed, or remains missing, or is unable or unwilling to recount his

or her ordeal." *Id.* The court recognized that the blanket rule enacted by the Legislature would

inevitably sweep in some for whom the term "sex offender" was "unmerited," *id.* at 69, but

concluded that the "administrative burden" of identifying those individuals, together with "the risk

that some dangerous sex offenders would escape registration," justified "a hard and fast rule, with

no exceptions," particularly since "defendants are suffering no worse injustice than being called

'sex offenders' instead of 'child predators,'" which would arguably be accurate. *Id.* The Illinois

and Wisconsin courts articulated similar rationales for their own states' "hard and fast" registration

rules. *See Johnson*, 225 Ill. 2d at 586 (citing the same 2002 study and reasoning that "[o]ur General

Assembly, like New York's legislature, recognized that aggravated kidnapping can be a precursor

to sex offenses"); *Smith*, 323 Wis. 2d at 402 (citing *Johnson* and reasoning that the legislature

could have "rationally concluded that child abductions are often precursors to sexual offenses").

In *Robinson*, however, the Florida high court rejected a virtually identical argument,[28]

explaining that the statistical linkage between child kidnapping and sex offending might satisfy

---

[27] *See* David Finkelhor *et al.*, *Nonfamily Abducted Children: National Estimates and Characteristics* at 10 (Crimes Against Children Research Center 2002), available at https://scholars.unh.edu/cgi/viewcontent.cgi?referer=https://scholar.google.com/&httpsredir=1& article=1016&context=ccrc. (last visited June 29, 2018).

[28] "The State argues that the Act meets rational-basis review because the Legislature rationally could have concluded that the inclusion of all defendants convicted of kidnapping or false imprisonment of a minor not their child is justified given that a high percentage of such crimes are committed for some sexual purpose. The State also argues that the Legislature rationally could have concluded that the difficulty in confirming whether an abducted child has been sexually exploited or whether the perpetrator had a sexual motive justifies the inclusion of all persons convicted of kidnapping or false imprisonment of a minor not their child. The State notes that

the rational basis test in a facial challenge to the law but could not defeat an as-applied challenge

brought by a plaintiff whose crime, though serious,[29] was concededly non-sexual:

> [W]e assume, without deciding, that the Act's designation of child kidnappers as
> sexual predators is rationally related to the legislative purpose of protecting children
> from sexual predators. Although the Legislature's concern for protecting our
> children from sexual predators may be reasonable, however, the application of this
> statute to a defendant whom the State concedes did not commit a sexual offense is
> not. Robinson's designation as a sexual predator can fulfill none of the statute's
> purposes. The State conceded he did not commit a sexual offense, and he left the
> infant child at a doctor's office a few blocks from where he and his companion
> appropriated the car. Thus, no question remains about whether Robinson possibly
> could have committed a sexual act on the child. No rational relationship exists
> between the statute's purpose of protecting the public from known sexual predators
> and Robinson's designation as one.

*Robinson*, 873 So. 2d at 1215. Yunus, like Robinson, does not claim that that SORA is

unconstitutional on its face, nor even as applied to kidnappers whose convictions rest on

ambiguous facts. Rather, he makes the "narrow" argument, *see id.* at 1217, that SORA is

unconstitutional as applied to a person "who has received a judicial finding that he never has and

near certainly never will commit a sexual offense."  Pl. Prelim. Inj. Mem. at 12.

Plaintiff also argues, with some force, that the *Knox* court failed to appreciate the costs of

sex offender registration, particularly when it dismissed as relatively trivial the "injustice" of being

inaccurately called a "sex offender" as opposed to some other, more accurate label. *See* Pl. Prelim.

Inj. Mem. at 14 ("this reasoning ignores the power of the term 'sex offender'"). The Supreme

Court has recognized that even rational basis review must take into account the "countervailing

costs" to the targets of the challenged statute. *Plyler v. Doe*, 457 U.S. 202, 223-24 (1982) (striking

---

because of a child victim's trauma, fear, or infancy, the child may be unwilling or unable to confirm
whether sexual exploitation occurred. Further, the State urges that the very nature of the crimes of
kidnapping and false imprisonment makes it difficult to prove sexual exploitation or motivation
because the child is removed from public view." *Robinson*, 873 So. 2d at 1215.

[29] Robinson was convicted of carjacking and kidnapping after he stole a car with a baby in the
back seat. 873 So. 2d at 1208.

Texas statute that effectively barred undocumented alien children from public schools, even though no fundamental right or suspect class could be identified, in part due to the "lifetime hardship" and "stigma of illiteracy" that would "mark them for the rest of their lives"). The Court has also recognized that forced registration as a sex offender is a particularly harsh consequence of a criminal conviction, characterizing it as "state-sponsored condemnation" of selected criminal conduct, *Lawrence v. Texas*, 539 U.S. 558, 575-76 (2003), which in turn has a "consequential" impact on the designated offender's liberty interests. *Id.* at 576-77 (holding Texas sodomy statute unconstitutional after noting, among other things, that a person convicted under the statute would be required to register as a sex offender, and thus that the "stigma" of the conviction "is not trivial"). *See also Robinson*, 873 So. 2d at 1213 ("the Act imposes more than a stigma"); *ACLU of New Mexico*, 139 N.M. at 772, 137 P.3d at 1226 (invalidating "no exceptions" sex offender registration requirement because, among other things, "the hardship imposed on an offender convicted of kidnaping or false imprisonment to be labeled a sex offender, absent any evidence of a sexual motivation for the crime, is great"); *Diaz*, 150 A.D.3d at 66, 50 N.Y.S. 3d at 392 (implicitly critiquing *Knox* for downplaying "the harm caused to the individual who is forced to register," particularly where "he or she has committed a crime that has no sexual component").

Not only do registered sex offenders face the profound stigma of the label itself, as discussed in Part V(C)(1) of this Report, *supra*; even if they are no longer on parole or supervised release, registration subjects them to a long list of filing requirements,[30] employment prohibitions,

---

[30] After their initial registration, level one sex offenders must verify by mail every year, CL §§ 168-f(1), 168-f(2)(a), and appear in person every three years to be photographed. CL § 168-f(2)(b-3). In addition, they must update their registration (and pay a fee) within ten days of any change in address, internet identifiers or accounts, or enrollment, attendance, employment or residence at any institution of higher education. CL § 168-f(4). If a registered sex offender leaves New York to reside, work, or attend school in another jurisdiction, he is required by federal law (and in all likelihood by state law as well) to register, and "keep his registration current" in each

both *de jure* and *de facto*,[31] residency restrictions,[32] and other civil disabilities.[33] In addition, sex

offender registration triggers a host of expanded criminal risks, including state and federal felony

penalties for failure to register, *see* CL § 168-t (making failure to register a Class E felony for the

first offense and a Class D felony for a second or subsequent offense); 18 U.S.C. § 2250(a)

(mandating a federal prison term of up to ten years for a knowing failure to register as required

such jurisdiction. 34 U.S.C. § 20913(a). He is also required to keep his registration current in New York. *See Doe v. O'Donnell*, 86 A.D.3d 238, 924 N.Y.S.2d 684 (2011) (holding that petitioner, originally registered as a level two offender in New York, remained subject to its lifetime registration requirement after moving to Virginia, registering there, and successfully petitioning a Virginia court for deregistration); *see also* Samantha R. Millar, *Doe v. O'Donnell and New York's Sex Offender Registration Act: The Problem of Continued Registration Under SORA after Leaving the State*, 38 Cardozo L. Rev. 337 (2016).

[31] *See*, *e.g.*, EL § 168-v (registered sex offenders may not work on ice cream trucks); *Woe v. Spitzer*, 571 F. Supp. 2d 382, 388 (E.D.N.Y. 2008) ("it is not a great leap" to assume that certain employers "consult the SORA registry" before making hiring decisions and thereafter decline to hire registered sex offenders).

[32] In *Diack*, 24 N.Y.3d at 686-87, the New York Court of Appeals invalidated Nassau County's Local Law 4, which prohibited all registered sex offenders (even if no longer on parole or post-release supervision) from residing within 1,000 feet of a school. The court based its decision on supremacy grounds, holding that "the State's comprehensive and detailed statutory and regulatory framework for the identification, regulation and monitoring of registered sex offenders prohibits the enactment of a residency restriction law such as Local Law 4." *Id.* at 677. Within New York, similar city, county and town laws (of which there were many, *see*, *e.g.*, *Wallace v. State of New York*, 40 F. Supp. 3d 278 (E.D.N.Y. 2014)) presumably may no longer be enforced. Outside of New York, however, comparable statutes and ordinances "remain on the books across the country," presenting a registered sex offender with a bewildering array of overlapping and sometimes inconsistent restrictions on where he may live, work, and travel. *See* Lori McPherson, *The Sex Offender Registration and Notification Act (SORNA) at 10 Years: History, Implementation, and the Future*, 64 Drake L. Rev. 741, 786 nn. 257, 262 (2016).

[33] Although level one offenders are not included in New York's statewide online registry, certain counties and municipalities continue to place the names, photographs, and license plate numbers of level one offenders on the internet. *See*, *e.g.*, Orange County, New York, *Sex Offender Listing*, https://www.orangecountygov.com/977/Sex-Offender-Listing (last visited June 29, 2018). Other states put the names and photographs of all registered offenders online – which in turn makes them searchable nationwide through the federal National Sex Offender Public Website. *See* 34 U.S.C. § 20922; https://www.nsopw.gov/en-US/Home/About (last visited June 29, 2018). Thus, once a level one offender leaves New York City to reside, work, or attend school, he may lose the relative anonymity of his level one status.

under state law), and enhanced federal penalties for certain offenses committed while on a sex offender registry. *See, e.g.*, 18 U.S.C. § 2260A (prescribing a mandatory minimum of ten years in prison for defendants who commit certain crimes against minors while "being required by Federal or other law to register as a sex offender").

Given the potentially devastating consequences of compelled sex offender registration, I cannot conclude that due process is satisfied by a statistical showing that 46% of the kidnappers placed on the sex offender registry – a group which does not include the plaintiff at bar – deserve to be there. *See City of Cleburne*, 473 U.S. at 446-47 (even under rational basis test, state may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational"); *Diaz*, 150 A.D.3d at 65-66, 50 N.Y.S.3d at 392 (the relationship between murder and sex offending was "too attenuated" to require a child murderer whose crime concededly had no sexual component to register under SORA). Nor can I conclude that the "administrative burden" of determining which kidnappers are sex offenders, *Knox*, 12 N.Y.3d at 69, makes it rational for the State of New York to subject plaintiff Yunus to 20 years of public opprobrium, housing and employment barriers, exacting filing requirements, and heightened criminal risk after *conceding* that – for him – the term is "unmerited." *Id. See Winston*, 887 F.3d at 565 (city cannot "rationally" compel tenants to pay their landlords' water bills). I therefore conclude that plaintiff has plausibly alleged a violation of his substantive due process rights and recommend, respectfully, that defendants' motion to dismiss be denied as to the Second Claim for Relief.[34] Since there is no dispute as to the non-sexual nature of plaintiff's underlying crimes, I

---

[34] Defendants' claim that plaintiff cannot prevail on his substantive due process claim without a determination "that both the New York State Legislature and the United States Congress acted irrationally," Def. MTD Mem. at 10, is considerably overstated. As the Court of Appeals noted in *Knox*, the federal Jacob Wetterling Act required states to include "kidnapping and unlawful imprisonment of children by nonparents as among the crimes requiring registration," on pain of

also conclude that plaintiff has demonstrated "a clear or substantial likelihood of success on the merits," *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d at 294, requiring me to consider (in Part V(I) of this Report, *infra*) whether preliminary injunctive relief is warranted.

###### E.   Third Claim - Vagueness

In his Third Claim for Relief, asserted against all defendants, Plaintiff contends that three of his parole conditions are unconstitutionally vague. SAC ¶¶ 152-58; *see also* Pl. Prelim. Inj. Mem. at 15-19. Special Condition No. 4, which excludes plaintiff from "school grounds" – defined to include public areas within 1,000 feet of the school – is unenforceable, according to plaintiff, because EL § 259-c(14), which mandates this condition, "provides little explanation as to how 1,000 feet should be measured," making it "nearly impossible for even the most resourceful parolee to accurately assess his limitations without more guidance as to what falls within a restricted area." *Id.* at 17. Similarly, plaintiff argues that Special Condition No. 17, which prohibits him from being "within 300 yards of places where children congregate," is unconstitutionally vague as written and is not saved by the list of examples provided ("toy stores, parks, pet stores, schools, playgrounds, video galleries, malls, bike trails, skating rinks, amusement parks, bowling parks, bowling alleys, pool halls, etc."), because the list contains so many "dissimilar" establishments that "it is impossible to discern what threshold of child attendance constitutes a place where children 'congregate.'" Pl. Prelim. Inj. Mem. at 18-19. Finally, plaintiff objects to Special Condition No. 24, which directs him to notify his parole officer and make certain disclosures when he "establish[es] a relationship with a consenting adult," because "it is impossible to know what is meant" by the word "relationship." Pl. Prelim. Inj. Mem. at 24, 25.

---

losing federal funding, but "does not require attaching the label 'sex offender' to the perpetrators of these crimes. That was the New York Legislature's choice." 12 N.Y.3d at 68.

Plaintiff has persuaded me that the first two conditions are unconstitutionally vague. Defendants have persuaded me that the third condition is not.

"A special condition of parole that is so vague that a person of common knowledge must guess at its meaning will be struck down as void for vagueness." *LoFranco v. U.S. Parole Comm'n*, 986 F. Supp. 796, 808 (S.D.N.Y. 1997), *aff'd*, 175 F.3d 1008 (2d Cir. 1999). Parole conditions must be "sufficiently clear to inform [the defendant] of what conduct will result in his being returned to prison." *Id.* (internal quotation marks omitted). This is the same standard used to determine whether criminal statutes are unconstitutionally vague. *See Copeland v. Vance*, ___ F.3d ___, 2018 WL 3076907, at *3 (2d Cir. June 22, 2018) ("In any vagueness case . . . the challenger can prevail by showing that the statute either 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or 'authorizes or even encourages arbitrary and discriminatory enforcement.'") (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "Simply stated, parolees must know what actions a special condition prohibits in order to avoid due process violations." *LoFranco*, 986 F. Supp. at 808, 811 (upholding a prohibition on associating with the Hell's Angels but striking, as unduly vague, a prohibition on associating with other "outlaw motorcycle gangs").

### 1.     The 1,000-Foot Rule

Plaintiff relies heavily on *Doe v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015), which invalidated a portion of Michigan's Sex Offender Registration Act making it a crime for registered sex offenders to work, "loiter," or reside within a "school safety zone," defined as "the area that lies 1,000 feet or less from school property." *Id.* at 682. The Michigan statute provided "no guidance as to whether the 1,000 feet distance should be measured 'point to point' or 'property-line to property line' nor whether it should be measured 'as the crow flies or as people actually travel.'" *Id.* at 683. Moreover, although the Michigan State Police were developing a software

program "to precisely determine the geographic exclusion zones," it was not yet operational; consequently, "neither the registrants nor law enforcement have the necessary data to determine the zones even if there were a consensus about how they should be measured." *Id*. at 684. "Accordingly, due to SORA's vagueness, registrants are forced to choose between limiting where they reside, work, and loiter to a greater extent than is required by law or risk violating SORA." *Id*. at 684-85. *See also Doe v. Strange*, 2016 WL 1079153, at *2 (M.D. Ala. Mar. 18, 2016) (enjoining enforcement of an Alabama statute barring registered sex offenders from establishing or maintaining a residence "or other living accommodation" within 2,000 feet of a school, childcare facility, or resident camp).[35]

New York's 1,000-foot rule does not suffer from the same infirmities as the Michigan statute at issue in *Doe v. Snyder*. Special Condition No. 4 uses the term "school grounds" as defined in PL § 220.00(14), which in turn specifies that "school grounds" include a 1,000-foot buffer zone measured from "the real property boundary line comprising any such school." Just as clearly, the New York courts have held that the 1,000-foot distance is to be measured "by a straight-line or 'as the crow flies' method, and not as measured along the route a pedestrian would be required to travel, including detours around obstructions." *People v. Robbins*, 10 A.D.3d 570, 571, 782 N.Y.S.2d 80, 81 (1st Dep't 2004), *aff'd*, 5 N.Y.3d 556, 807 N.Y.S.2d 7 (2005). Moreover, unlike the Michigan State Police, New York parole officers not only agree on how to measure the distance but use the CIRIS software program, which allows them to "precisely determine" whether a proposed residence is SARA-compliant. *See* Lewis-Robinson Decl. ¶¶ 8-13 & Exs. A-B.

---

[35] The primary problem with the Alabama statute was the definition of "residence." *See Strange*, 2016 WL 1079153, at *9 ("ASORCNA defines 'residence' in a circular manner, failing to specifically identify the point at which a sex offender 'resides' within a zone of exclusion such that he is subject to prosecution."). Plaintiff here raises no comparable challenge.

It is no doubt inconvenient for plaintiff – and for other parolees seeking SARA-compliant housing – that Google Maps and other publicly-available programs do not provide the same level of precision as CIRIS. The problem is compounded by the fact that "[i]n dense urban areas like New York City, a vast proportion of the housing stock is located within 1,000 feet of a school." *Floyd Y.*, 56 Misc. 3d 271 at 274, 50 N.Y.S.3d at 850; *see also Williams*, 136 A.D.3d at 150, 24 N.Y.S.3d at 21 ("most of Manhattan" is within 1,000 feet of a school); *Devine v. Annucci*, 45 Misc. 3d 1001, 1006 (Sup. Ct. Kings Co. 2014) ("large swaths of New York City," including a "very substantial portion of Brooklyn," are within 1,000 feet of a school), *rev'd*, 150 A.D.3d 1104, 56 N.Y.S.3d 149 (2d Dep't 2017). But this does not make Special Condition No. 4 unconstitutionally vague – at least not if it merely constitutes a "residency restriction," which is how defendants describe it. *See* Def. MTD Mem. at 11; Def. Prelim Inj. Opp. Mem. at 17.

Like many other parolees (whether or not designated sex offenders), plaintiff must "reside at the address [his] PO has on record for [him]' and "discuss any proposed changes in [his] residence . . . with [his] Parole Officer" *before* he moves. *See* Yunus Decl. Ex. B, at ECF page 4, ¶ 2 & Ex. C, at ECF page 2, ¶ 3. Thus, unlike the plaintiffs in *Doe v. Snyder* – who were all "Tier III" offenders, no longer on parole but required to stay out of "school safety zones" for life, 101 F. Supp. 3d at 678 – plaintiff is in no danger of inadvertently moving into a non-compliant residence. *Cf. LoFranco*, 986 F. Supp. at 808 ("The 'essential purpose of the "void for vagueness" doctrine is to warn individuals of the criminal consequences of their conduct.'") (quoting *Jordan v. De George,* 341 U.S. 223, 230 (1951)). Moreover, he will be free from Special Condition No. 4 once he is no longer subject to parole supervision. For these reasons, if New York's 1,000-foot rule merely restricted where a parolee could reside, it would not be unconstitutionally vague. By the same token, the Parole Officer Defendants cannot be made liable in damages for their past conduct

49

in relation to the 1,000-foot rule. Since the rule was mandated by statute for registered sex offenders whose victims were minors, they had no choice but to impose it upon plaintiff. Nor did they violate his due process rights by refusing to permit him to reside in an apartment that they objectively determined to be within the proscribed buffer zone.

But this does not end the inquiry, because Special Condition No. 4 is not simply a residency restriction, and plaintiff seeks prospective injunctive relief against its enforcement. "That a statute was lawfully applied to one set of facts does not necessarily prove that it may lawfully be applied to a different set of facts." *Copeland*, 2018 WL 3076907, at *5 (explaining that a plaintiff bringing a "prospective, as-applied challenge" on vagueness grounds need not show that prior enforcement actions were invalid). As mandated by EL § 259-c(14), the challenged condition prohibits plaintiff from "knowingly enter[ing] into or upon school grounds," defined to include all publicly-accessible areas within 1,000 feet of the school's property line, at least "while one or more . . . persons under the age of 18 are present." By its terms, this condition puts plaintiff at risk of parole revocation for working, shopping, or even walking down the sidewalk if he knows there is a preschool, elementary school, middle school, or high school in session within 1,000 feet of his route. *See Williams*, 136 A.D.3d at 149, 24 N.Y.S.3d at 20 (SARA "prohibits sex offender parolees from residing *or traveling* near schools") (emphasis added).[36] Moreover, "the fact that there are schools and childcare facilities throughout New York City is something everyone . . . knows." *Floyd Y.*, 56 Misc. 3d at 273, 50 N.Y.S.3d at 849.[37] Thus, Special Condition No. 4 presents both

---

[36] *Williams* upheld the 1,000-foot rule against an *ex post facto* and substantive due process challenge. Neither *Williams* nor any other New York case cited by the parties considered whether the rule is unconstitutionally vague.

[37] By way of example only, the public entrance of the Daniel Patrick Moynihan United States Courthouse, where plaintiff Yunus has been required to appear several times in connection with this action, is within 1,000 feet of at least two elementary schools.

of the risks that trigger the vagueness doctrine: making it difficult if not impossible for a parolee to know what conduct is prohibited, *see LoFranco*, 986 F. Supp. at 808,[38] and encouraging "arbitrary and discriminatory application," *id*. at 810 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)), by "defin[ing] as a rule violator any respondent who happens to be present on most sidewalks, streets, restaurants, stores, parking lots, parked vehicles and parks in New York City during school hours." *Floyd Y*., 56 Misc. 3d at 276, 50 N.Y.S.3d at 851.

It is tempting, in a case like this, to construe the restriction narrowly, in order to avoid constitutional doubt. That is what the Eighth Circuit did in *Weems v. Little Rock Police Dep't*, 453 F.3d 1010 (8th Cir. 2006), when faced with a challenge to an Arkansas law that made it a crime for certain sex offenders to "reside within two thousand feet (2,000') of the property" on which any school or daycare facility is located. 453 F.3d at 1013. The court rejected the suggestion that the term "reside" also prohibited offenders from "working or studying within 2000 feet of a school or daycare center," and upheld the constitutionality of the 2,000-foot rule as so limited. *Id.* at 1016 ("[W]e see no good reason to create more difficult constitutional questions by adopting a broad construction that the State itself eschews.").

In New York, however, the statute does not even use the term "reside." Instead, employing unmistakably broad language, it instructs the Board of Parole to "require, as a mandatory condition of [the offender's release on parole], that such sentenced offender shall refrain from knowingly *entering into or upon* any school grounds." EL § 259-c(14) (emphasis added). The Supreme Court recently reminded the lower federal courts that the doctrine of constitutional avoidance, under

---

[38] While a parolee may be required to seek permission from his PO before moving his residence – thus giving the officer an opportunity to research the proposed location via CIRIS – it would be absurd to expect a parolee to submit his daily route to his PO for this purpose, and equally absurd to ask an officer with a caseload of 25 to 30 sex offenders, *see* Lewis-Robinson Decl. ¶ 6, to pre-authorize every step taken by every offender to ensure their compliance with the 1,000-foot rule.

which "a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems," has no application unless the statute "is found to be susceptible of more than one construction." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836, 842 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). If an interpretation that would avoid constitutional doubt is "implausible," the court may not rely upon it to sidestep the difficulty. *Jennings*, 138 S. Ct. at 842-43 ("That is not how the canon of constitutional avoidance works. Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to 'choos[e] between competing *plausible* interpretations of a statutory text.'") (quoting *Clark*, 543 U.S. at 381) (emphasis added). *See also Grayned*, 408 U.S. at 110 (noting, in the context of a vagueness challenge, that "it is not within our power to construe and narrow state laws"). Consequently, this Court cannot rewrite EL § 259-c(14), nor interpret Special Condition No. 4 as nothing more than a residency restriction.

Having determined that Special Condition No. 4 is too vague to enforce as written, and is not susceptible of a plausible competing interpretation that would cure the deficiency, I also conclude that plaintiff has demonstrated a clear or substantial likelihood of success on the merits as to that claim. I therefore recommend, respectfully, that defendants' motion to dismiss the Third Claim for Relief be denied insofar as plaintiff seeks injunctive relief against the prohibition on "entering" any publically-accessible area within 1,000 feet of a school's property line.[39]

### 2.     The 300-Yard Rule

Special Condition No. 17, which is not mandated by any statute, is even more problematic. First, it too goes well beyond regulating where plaintiff may reside, expressly prohibiting plaintiff

---

[39] Plaintiff does not seek damages from the Parole Officer Defendants in connection with the 1,000-foot rule. *See* Pl. MTD Opp. Mem. (Dkt. No. 69) at 23-24 (acknowledging that "qualified immunity would apply to mandatory conditions tied to" his sex offender designation).

from "enter[ing]" or "be[ing]" within 300 yards of "places where children congregate" unless he has the prior approval of his PO. Second, the rule provides no guidance as to how, or from what point, the distance should be measured. Nor does it reveal whether the no-go rule is in effect at all times, or only when children are in fact "congregating" in a qualifying "place." Fourth, and most significantly, the 300-yard rule applies not only to schools and childcare facilities but also to other places "where children congregate," making it extraordinarily difficult for a parolee, a parole officer, or any other "person of ordinary intelligence," *Copeland*, 2018 WL 3076907, at *3, to identify the "places" to which the parolee must give a 300-yard berth.

Significantly, Special Condition No. 17 is not limited to places where children are "likely" to congregate, *cf. United States v. MacMillen*, 544 F.3d 71, 74 (2d Cir. 2008), or even places "primarily" used by children, *cf. United States v. Dupes*, 513 F.3d 338, 342 (2d Cir. 2008). Any place where children might conceivably congregate could be deemed off-limits, along with a 300-yard buffer zone on all sides. The examples given exacerbate rather than alleviate this difficulty: they include places designed for children (such as "toy stores" and "playgrounds"), places that attract both adults and children (such as "parks" and "malls"), and places that the hypothetical "person of common knowledge," *LoFranco*, 986 F. Supp. at 808, might think of as decidedly adult-oriented (such as "pool halls"). Unsurprisingly, given these uncertainties, defendants do not claim to have any software that will tell them whether a given location is or is not compliant with Special Condition No. 17. *See* Lewis-Robinson Decl. ¶ 9 (CIRIS draws a straight line "from the proposed residence to the property line at the edge of the parcel of any schools within 1,000 feet").

The parole condition at issue here is therefore distinguishable from the restriction upheld in *MacMillen*, where the sentencing judge prohibited a defendant from entering places "where children are *likely* to congregate" 544 F.3d at 74 (emphasis added), and provided a set of relatively

consistent examples ("schools, daycare facilities, playgrounds, theme parks, arcades, recreational facilities, and recreation parks"), all of which actually were places where children were likely to congregate. *Id.* It is also distinguishable from the condition at issue in *Dupes*, which required the defendant to stay more than one hundred feet from places "*primarily* used by children," such as "schoolyards, playgrounds and arcades." 513 F.3d at 342 (emphasis added).

In *United States v. Peterson*, 248 F.3d 79, 86 (2d Cir. 2001), the Second Circuit rejected a condition prohibiting the defendant from "being on any school grounds, child care center, playground, park, recreational facility or in any area in which children are likely to congregate." This language, the court noted, left it unclear whether defendant would be barred from "visiting Yellowstone National Park or joining an adult gym." *Id.* The 300-yard rule at issue here is, in my view, even less clear. Moreover, the depth of the buffer zone imposed by Special Condition No. 17 (900 feet, compared to 100 feet in *Dupes* and no buffer zone at all in *MacMillen* or *Peterson*), combined with the wide range of public and private establishments that might trigger the rule and the inability of either a parolee or his PO to accurately measure the edge of the 300-yard no-go zone, make it virtually impossible for a parolee in New York City to go anywhere at all without risking re-incarceration for a parole violation.[40]

For these reasons, I conclude that plaintiff has plausibly alleged that Special Condition No. 17 is unconstitutionally vague and that he has demonstrated a clear or substantial likelihood of success on the merits as to that claim. I therefore recommend, respectfully, that defendants' motion to dismiss the Third Claim for Relief be denied insofar as plaintiff seeks prospective injunctive

---

[40] By way of example only, the Daniel Patrick Moynihan United States Courthouse is within 300 yards of Columbus Park, where children frequently congregate to play. Plaintiff also notes that the Willow Avenue shelter, where he and other registered sex offenders are housed, is directly across the street from a family shelter at which young children congregate. *See* Yunus Decl. ¶ 28.

relief against the 300-yard rule. However, plaintiff does not allege that this rule has been enforced against him in the past. Nor, in light of *MacMillen* and *Dupes*, can he plausibly allege that this condition violated "clearly established" legal rights "of which a reasonable person" supervising his parole would have known. *Christian*, 2018 WL 1441401, at *2. The motion to dismiss should therefore be granted insofar as plaintiff seeks damages from any of the Parole Officer Defendants in connection with Special Condition No. 17.

### 3.     The Relationship Rule

In *United States v. Reeves*, the Second Circuit considered a condition of supervised release that required the releasee to "notify the Probation Department when he establishes a significant romantic relationship and . . . inform the other party of his prior criminal history concerning his sex offenses." 591 F.3d 77, 80 (2d Cir. 2010). The court concluded that the condition was too vague to be enforced because "people of common intelligence (or, for that matter, of high intelligence) would find it impossible to agree on the proper application of a release condition triggered by entry into a 'significant romantic relationship.'" *Id.* at 81. The court criticized both limiting terms, noting that "[w]hat makes a relationship 'romantic,' let alone 'significant' in its romantic depth, can be the subject of endless debate that varies across generations, regions, and genders." *Id.* Therefore, the court explained, "the supervised release condition has no objective baseline." The court agreed that Reeves's "continued freedom during supervised release should not hinge on the accuracy of his prediction of whether a given probation officer, prosecutor, or judge would conclude that a relationship was significant or romantic." *Id.*; *accord United States v. Orozco*, 371 F. App'x 188, 189 (2d Cir. 2010).

Plaintiff argues that Special Condition No. 24 is even more amorphous in its description of what triggers the reporting requirement: "a relationship" with "a consenting adult." Since the word "relationship" is not limited in any way, plaintiff contends, no "objective baseline" is provided to

assist him in determining what type of human interaction requires disclosure. Defendants counter that the required objectivity is found in the phrase "consenting adult," which makes it clear that a reportable relationship is a sexual relationship, and that since plaintiff has already disclosed his relationship with his fiancée, he "clearly understood the type of relationship the special condition targeted." *See* Def. MTD Mem. at 12-13 (noting that the dictionary definition of "consenting adult" is "[a]n adult who willing agrees to engage in a sexual act.").[41]

I agree. A parolee of ordinary intelligence reading Special Condition No. 24 (particularly in context, among other conditions "for sex offenders") would no doubt conclude, as Yunus did, that the reporting requirement extended to his fiancée but not to the various non-sexual relationships in his life. *See State v. Maddox*, 2011 WL 4979925, at *2 (Vt. Jan. 27, 2011) (distinguishing *Reeves* and holding that a condition requiring a probationer to report "a dating or romantic relationship" was not unconstitutionally vague). I therefore recommend, respectfully, that defendants' motion to dismiss the Third Claim for Relief be granted as to the relationship rule.

## F.    Fourth Claim - First Amendment

In his Fourth Claim for Relief, asserted against all defendants, plaintiff challenges the various special parole conditions that restrict his access to computers, cellphones, and social media. He principally contends that Special Condition No. 48, which is a "mandatory parole condition that he not access 'any commercial social networking site,'" violates the First Amendment. SAC ¶ 161. He also alleges that he is prohibited from possessing a smartphone or a computer, *id.* ¶ 162, which exacerbates the deprivation of his constitutional rights because "a cell phone and computer are the only means by which [he] can access social media." *Id.* Plaintiff seeks preliminary and

---

[41] *See also* Merriam-Webster Online Dictionary, *Consenting Adult*, https://www.merriam-webster.com/dictionary/consenting%20adult (last visited June 29, 2018) (defining term as "an adult who has consented to have sex").

permanent injunctive relief lifting all of his cellphone, computer, and internet restrictions, arguing that they are "unconstitutional abridgements of Mr. Yunus's First Amendment rights and, in any event, are baseless in light of his prior conduct."  Pl. Prelim. Inj. Mem. at 20.

Last year, in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the Supreme Court held that registered sex offenders cannot be routinely or categorically barred from social media, even where – as in the North Carolina statute at issue there – the prohibition extends only to websites that could be used by minors. *Id*. at 1734. The Court began its analysis by acknowledging that online social networking is both a ubiquitous feature of modern civil society, *id*. at 1735 ("[s]even in ten American adults use at least one internet social networking service") and the modern equivalent of the town square. *Id*. at 1737 (such services are, for many citizens, "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge"). Because North Carolina's ban was "content neutral," the Court applied "intermediate scrutiny," under which a law that burdens speech must be 'narrowly tailored to serve a significant governmental interest'" and "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id*. at 1736 (quoting *McCullen v. Coakley,* 134 S. Ct. 2518, 2534 (2014)). Under this test, a state may "enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." *Packingham*, 137 S. Ct. at 1737. The state may not, however, "suppress lawful speech as the means to suppress unlawful speech," which was "what North Carolina has done here." *Id*. at 1738 (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002)).

Even before *Packingham*, courts in this Circuit looked with disfavor on broad cellphone, computer, and internet restrictions for sex offenders on parole or supervised release, generally requiring an individualized showing that a particular restriction "relates to [the offender's] prior conduct." *Singleton*, 210 F. Supp. 3d at 376.[42] Following *Packingham*, state and federal cases around the country have invalidated a variety of broad-based internet or social media restrictions imposed on sex offenders simply because they are sex offenders. To survive a constitutional challenge, any such restriction must be narrowly tailored to the history or known proclivities of the individual parolee, supervised releasee, or registered offender. *See*, *e.g.*, *Doe v. Kentucky*, 283 F. Supp. 3d 608, 613 (E.D. Ky. 2017) (holding that statute prohibiting registered sex offender from accessing all social media websites that could be used by minors was not sufficiently "tailored" to pass constitutional muster, notwithstanding Doe's conviction for possessing child pornography, and enjoining defendants from enforcing the statute "not only against Mr. Doe, but altogether"); *Mutter v. Ross*, 240 W.Va. 336, 811 S.E.2d 866, 873 (2018) (noting that "*Packingham* made no

---

[42] The plaintiff in *Singleton* was a "discretionary sex offender" who challenged, among other things, the same ban on camera-equipped cellphones that was imposed on plaintiff Yunus as Special Condition No. 35. 210 F. Supp. 3d at 376. The court denied defendants' motion to dismiss that challenge, noting that plaintiff's prior sexual misconduct did not involve cellphones or cameras and concluding that the condition improperly "functions as an overbroad ban on an item simply because Plaintiff *could* use its functions to commit a future lewd act." *Id.* (emphasis added). *See also United States v. Peterson*, 248 F.3d at 82-83 (rejecting government's argument that "a computer with Internet access offers the *possibility* of abusive use for illegitimate purposes" and striking "broad restrictions on Peterson's computer ownership and internet access" that were not "reasonably related" to his actual criminal history) (emphasis added) (quoting 18 U.S.C. § 3563(b)); *United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002) (quoting *Peterson,* 248 F.3d at 83) ("We appreciate the Government's point that permitting Sofsky access to a computer and the Internet after serving his ten-year sentence can facilitate continuation of his electronic receipt of child pornography, but we are more persuaded by the observation in *Peterson* that '[a]lthough a defendant might use the telephone to commit fraud, this would not justify a condition of probation that includes an absolute bar on the use of telephones.'"); *Cf. United States v. Johnson*, 446 F.3d 272, 274-75 (2d Cir. 2006) (upholding broad ban on internet access as a condition of supervised release for a convicted sex offender who "used the Internet to conduct sexually-explicit conversations with minors, and to lure several of them to meetings").

exception for parolees" and invalidating special condition of parole preventing sex offender from accessing the internet where he had no "history of using the internet to engage in criminal behavior"). *Cf. United States v. Rock*, 863 F.3d 827, 830-32 (D.C. Cir. 2017) (upholding supervised release condition prohibiting sex offender from possessing a computer or going online without prior approval because Rock pleaded guilty to "distributing" child pornography "over the internet," such that as to him the restriction was "narrowly tailored" and not "arbitrary").

Plaintiff Yunus has never been charged with any internet-related criminal conduct, sexual or otherwise. Yet Special Conditions No. 12 (no participation in "any online computer service that involves the exchange of electronic messages"), No. 35 (no beeper, scanner, or cellphone without PO permission, and no "video or photo-capable" phone), No. 39 (no computer, laptop, or "computer related materials," no "services that provide access to the internet," and no "public or private computer network" without PO permission), and No. 48 (no "commercial social networking"), which all appear to be standard in New York for "sex offenders," significantly restrict his ability to possess, use, or access a computer, a cellphone, any other device capable of connecting to the internet, and largely block him not only from social networking sites but from the internet itself. Moreover, the prohibition on accessing any "commercial social networking website" is made mandatory for all covered parolees by EL § 259-c(15). That is presumably why Special Condition No. 48, as written, is absolute, admitting no exceptions.

EL § 259-c(15) also defines the term "commercial social networking website" broadly,[43] to include not only child- or teen-oriented sites but also mainstream adult sites such as Facebook

---

[43] "As used in this subdivision, a 'commercial social networking website' shall mean any business, organization or other entity operating a website that permits persons under eighteen years of age to be registered users for the purpose of establishing personal relationships with other users, where such persons under eighteen years of age may: (i) create web pages or profiles that provide information about themselves where such web pages or profiles are available to the public or to

(2.2 billion active users), YouTube (1.8 billion), Instagram (800 million), Twitter (336 million), and LinkedIn (106 million).[44] As a result, plaintiff and other covered parolees are forbidden from logging in to the public Facebook page maintained by DOCCS (@NYSDOCCS) or from following the official Twitter account maintained by the President of the United States (@realDonaldTrump). *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 2018 WL 2327290, at *1, * 15, *20 (S.D.N.Y. May 23, 2018) (holding, among other things, that "the President's tweets from @realDonaldTrump . . . are official records," that Twitter "is a designated public forum," and that "the blocking of the plaintiffs [from the President's Twitter account] based on their political speech constitutes viewpoint discrimination that violates the First Amendment").

For the reasons explained in Part V(E)(1) of this Report, *supra*, I am not free to ignore the mandatory language of EL § 259-c(15) and Special Condition No. 48. Yet defendants do just that, arguing that "there is no such blanket prohibition," Def. Prelim. Inj. Opp. Mem. at 20, because plaintiff "has sought, and received permission to use the social media site LinkedIn" and "has not requested to use any other social media." Def. MTD Reply Mem. at 6. Defendants also note that

---

other users; (ii) engage in direct or real time communication with other users, such as a chat room or instant messenger; and (iii) communicate with persons over eighteen years of age." EL § 259-c(15). A proviso explains that, "for purposes of this subdivision, a commercial social networking website shall not include a website that permits users to engage in such other activities as are not enumerated herein." *Id*. It is not clear whether this proviso exempts otherwise-qualifying websites from the categorical ban simply because they also permit their users to engage in non-enumerated activities, such as (for example) posting photos or videos.

[44] *See* Priit Kallas, *Top 15 Most Popular Social Networking Sites and Apps [May 2018]*, Dreamgrow (May 22, 2018) https://www.dreamgrow.com/top-15-most-popular-social-networking-sites/ (last visited June 29, 2018). In percentage terms, 73% of all American adults now use YouTube, followed by Facebook (68%), Instagram (35%), LinkedIn (25%) and Twitter (24%). *See* Aaron Smith & Monica Anderson, *Social Media Use in 2018*, Pew Research Center, http://www.pewinternet.org/2018/03/01/social-media-use-in-2018/ (last visited June 29, 2018). "The typical (median) American reports that they use three of the eight major platforms that the Center measured in this survey." *Id*.

plaintiff "has access to a computer and social media for academic purposes," and assert that he "is allowed to possess a cellular phone as long as it does not have video or picture capabilities." *Id*.

Defendants overstate the facts. Plaintiff has never been permitted to possess a computer or laptop of his own for any purpose. He has been intermittently permitted to possess a cellphone, but at various times (including the present) he has been told that he may not have a "smart phone," that is, an ordinary modern phone capable of connecting to the internet. *See* Yunus Decl. ¶ 29; Yunus Reply Decl. ¶¶ 14-19 & Ex. A (Dkt. No. 71-1) (notice confirming that plaintiff's "previous authorization to possess a smart phone has been rescinded"). If plaintiff violates any of these conditions he can be returned to prison. This has already occurred once: as PO Lewis-Robinson attests, plaintiff was found guilty of a parole violation and re-incarcerated for several months in 2017 (prior to *Packingham*) because he was "found to be in possession of an unapproved smart phone and personal laptop." Lewis-Robinson Reply Decl. ¶¶ 12-13.

To be sure, plaintiff is allowed to use the computers at BMCC (when he is on campus), but only "for academic purposes" and to communicate with his lawyers. Yunus Decl. ¶ 30; Lewis-Robinson Decl. ¶ 23. He was also permitted to access LinkedIn (notwithstanding the mandatory nature of the social networking prohibition), but only "as part of a project for a marketing class" at BMCC. Yunus Reply Decl. ¶ 18. Plaintiff remains barred from accessing any other social media site, *id*. ¶¶ 17, 19, and now that he has no smart phone he is unable to connect to the internet at all, except during the limited time he spends on the BMCC campus (and then only for limited purposes). Yunus Decl. ¶ 31. The record thus reveals that while defendants have not barred plaintiff entirely from the internet, they have significantly restricted his online access through a variety of overlapping parole conditions, and but for a single exception – a LinkedIn account

created for a college course – have barred him completely from social media in accordance with the mandate of EL § 259-c(15). That mandate, in my view, cannot survive *Packingham*.[45]

Moreover, defendants make no effort to link *any* of the cellphone, computer, camera, social media, or other internet restrictions at issue here to plaintiff's criminal history, and consequently fail to demonstrate that they are "narrowly tailored," as the Constitution requires, to combat any identifiable danger that plaintiff would present if permitted to step into the modern equivalent of the town square. *Packingham*, 137 S. Ct. at 1737. That is because the record discloses no such danger. Plaintiff did not use the internet (or a camera) to commit his crimes. Nor has he engaged in any other internet-enabled misconduct.  To the contrary: plaintiff asserts – and defendants do not contest – that he has never been accused of sexual misconduct of any sort, online or otherwise. He thus presents none of the risks that led the Legislature to prescribe the social media ban in 2008. *See* 2008 N.Y. Sess. Laws ch. 67, § 1 (effective April 28, 2008) (enacting mandatory social media ban for certain sex offenders on parole in order to protect children against "sexual predators" who stalk the internet anonymously "while attempting to engage children in illicit activity").

Since defendants have offered nothing but plaintiff's status as a sex offender to justify the sweeping restrictions they have imposed on his access to cellphones, computers, social media, and the internet generally – and since nothing in the record before me suggests that any better

---

[45] Even if EC § 259-c(15) permitted individual parole officers to make case-by-case exceptions on request, that would not save an "otherwise overly broad restriction" on plaintiff's First Amendment rights. *United States v. Maxson*, 281 F. Supp. 3d 594, 600 (D. Md. 2017) ("the fact that Defendant may use the Internet if he obtains prior written approval from his probation officer cannot salvage this otherwise overly broad restriction"); *see also Mutter v. Ross*, 811 S.E.2d at 873 n.38 (rejecting defendants' argument that "the special condition of Mr. Ross's parole does not run afoul of *Packingham* because it allowed Mr. Ross to access the internet *after* obtaining permission from his parole officer") (emphasis in the original); *United States v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) ("When a total ban on Internet access cannot be justified . . . a proviso for probation-officer approval does not cure the problem.").

justification exists – I conclude not only that plaintiff has plausibly alleged a violation of his First Amendment rights but also that he has demonstrated a clear and substantial right to relief. I therefore recommend, respectfully, that defendants' motion to dismiss the Fourth Claim for Relief be denied insofar as it seeks prospective injunctive relief.

Insofar as the Fourth Claim seeks damages against the Parole Officer Defendants in their individual capacities, I must consider (a) whether plaintiff has plausibly alleged that they personally participated in the alleged deprivation of his constitutional rights, and (b) if so, whether they are nonetheless entitled to qualified immunity. *See Christian*, 2018 WL 1441401, at *2. Plaintiff alleges generally that all three of his POs – Smith, Vasquez and Lewis-Robinson – imposed the Sex Offender Conditions on him without regard to the specifics of his case. *See* SAC ¶¶ 41-42 (Smith), 45-46 (Vasquez), 51-53 (Lewis-Robinson). However, he does not allege that he ever discussed the social media ban or related restrictions with Smith or Vasquez (or their supervisors), much less that he asked any of them for a computer, a smart phone, internet access, or access to social media. Moreover, as noted above, Condition No. 48 is required by statute. Thus, plaintiff has failed to plausibly allege that these defendants are liable to him in their individual capacities for violating his First Amendment rights.

PO Lewis-Robinson was personally involved in the alleged deprivation. Plaintiff alleges that it is Lewis-Robinson who has permitted him to use a cellphone "only for his education and to communicate with counsel," *id*. ¶¶ 85-86; who has not allowed him to use any computers other than those at BMCC – also for limited purposes, *id*. ¶¶ 87-89; and who has forbidden any "non-academic use of the internet or social media." *Id*. ¶ 88. Moreover, it is undisputed that (after the SAC was filed) Lewis-Robinson rescinded her previous authorization for plaintiff to use a smart phone, Yunus Reply Decl. ¶¶ 14-16 & Ex. A; Lewis-Robinson Reply Decl. ¶ 29, and that she has

never allowed plaintiff to access any social media other than LinkedIn, which she permitted during the spring 2016 and fall 2017 semesters as part of a class project. Yunus Reply Decl. ¶¶18-19.

Notwithstanding her hands-on involvement in the challenged parole restrictions, I conclude that Lewis-Robinson cannot be made personally liable for any First Amendment deprivations that plaintiff suffered at her hands prior to June 19, 2017, when *Packingham* was decided. "The doctrine of qualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Prior to *Packingham*, it was not "clearly established" that a social media ban would violate the constitutional rights of parolees such as plaintiff – who implicitly concedes as much, arguing only that "[t]he Supreme Court's unmistakable holding [in *Packingham*] made it unreasonable for the Defendants to rely on this state's statutory requirement when prescribing conditions of parole." Pl. MTD Opp. Mem. at 24. I therefore recommend, respectfully, that insofar as the Fourth Claim seeks damages from the Parole Officer Defendants, it be dismissed except as to defendant Lewis-Robinson's conduct after June 19, 2017.

### G.    Fifth Claim – Interference with Familial Relations

As noted above, Special Condition No. 15 prohibits plaintiff from having any contact with children under the age of 18 without the prior approval of his PO. Plaintiff does not challenge this condition on its face. Instead, he alleges that defendants Lewis-Robinson, Young, and Jones violated his "right to come together with members of his family" by refusing to make any exceptions to the no-contact-with-minors rule, even for holiday gatherings at which plaintiff's

minor nieces and cousins were present along with multiple adults. SAC ¶¶ 166-67.[46] Plaintiff argues that he has a fundamental right to contact with extended family members; that parole conditions that "interfere with these protected family relationships must satisfy strict scrutiny," Pl. Prelim. Inj. Mem. at 22-23; and that a "blanket ban on contact with minors" cannot satisfy that test because it would have been "crystal clear to any fair-minded viewer that Mr. Yunus poses no threat to minors within his own family." *Id.* at 23. Defendants counter that plaintiff has no "fundamental" right to contact with extended family members who are not his own children and with whom he has never had a custodial relationship. *See* Def. Prelim. Inj. Opp. Mem. at 20.

Defendants are correct. "It is well established that a *parent's* interest in maintaining a relationship with *his or her child* is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005) (emphasis added) (citing *Wilkinson v. Russell*, 182 F.3d 89, 103-04 (2d Cir. 1999); *see also United States v. McGeoch*, 546 F. App'x 44, 48 (2d Cir. 2013) (summary order) ("A condition of supervised release that prevents a father from seeing his children outside the presence of an approved monitor is a severe one subject to careful scrutiny."). But even among biological parents, the degree of protection varies in accordance with the nature of the parent-child bond. As the Second Circuit explained in *Myers*, "[s]ome measure of due process protection" extends to a non-custodial parent who has demonstrated a "commitment to the responsibilities of parenthood." 426 F.3d at 128 (quoting *Lehr v. Robertson*, 463 U.S. 248, 261 (1983) (internal quotation marks omitted)). However, the *Myers* court stopped short of extending the same solicitude to a supervised releasee who wished to see his son but had never been the boy's custodian and presented "no evidence" in support of his claim

---

[46] In addition to his nieces and cousins, plaintiff has a son of his own who is an adult. Neither Special Condition No. 15 nor any of plaintiff's other parole conditions bar him from contact with his son. *See* Oral Arg. Tr. at 23:18-23.

that he played "an active role in the life of his son" before he was incarcerated. *Myers*, 426 F.3d. at 128 (remanding for additional fact-finding). *Cf. Lima*, 270 F. Supp. 3d at 701-03 (applying strict scrutiny where state parole officers expelled sex offender parolee from his marital home after his wife gave birth to a son, without conducting any individualized inquiry into whether parolee was a danger to the infant).

Outside of the context of parole or supervised release, the courts have extended due process protection (both substantively and procedurally) to quasi-parental custodial relationships beyond the nuclear family. *See, e.g., Moore v. City of E. Cleveland*, 431 U.S. 494 (1977) (invalidating housing ordinance making it a crime for a grandmother to live in the same dwelling unit with two grandsons who were cousins rather than brothers); *Rivera v. Marcus*, 696 F.2d 1016, 1024-25 (2d Cir. 1982) (holding that a half-sister who had been raising her younger half-siblings as a foster parent had a compelling liberty interest in "preserving the integrity and stability of her family," such that Connecticut could not remove the children from her home without an adequate pre-deprivation hearing); *Bellet v. City of Buffalo*, 2009 WL 2930464, at *4-5 (W.D.N.Y. Sept. 11, 2009) (holding that a grandfather who "was his grandson's primary caregiver for approximately seven years" raised a triable issue of fact as to "whether he possessed a protected liberty interest" in "preserving the family unit he established with the grandson"). But these cases are of limited assistance to plaintiff Yunus, who has never had a custodial or other quasi-parental relationship with his minor nieces and cousins. Nor does he cite any authority for the proposition that he has a fundamental right to visit them simply because he is related to them.[47] Moreover, while the no-

---

[47] At oral argument, plaintiff pointed out that he had no ability to establish a close pre-parole relationship with his nieces and cousins. *See* Oral Arg. Tr. at 23:15-24:11 ("He's been in jail since 2002 and hasn't been allowed to [see his minor nieces and cousins] since he's come out."). This assertion, while no doubt accurate, is not particularly relevant to the due process analysis, which – except in cases involving parents and their own children – turns on the actual relationship

contact-with-minors rule undoubtedly burdens plaintiff's relationship with their parents – his sisters and uncle – it does not bar him from seeing his adult relatives, nor prevent them from "com[ing] together" with plaintiff "for mutual sustenance." *Moore*, 431 U.S. at 505. I therefore cannot find that defendants interfered with a fundamental right when they refused to make any exceptions to Special Condition No. 15.

This does not necessarily end the inquiry. The Due Process Clause requires that the parole conditions imposed by the State of New York or its agents be "reasonably related to [the parolee's] prior conduct or to the government's interest in his rehabilitation." *Singleton*, 210 F. Supp. 3d at 374. Because parolees indisputably "possess fewer constitutional rights" than ordinary citizens, *United States v. Polito*, 583 F.2d 48, 54 (2d Cir. 1978), including "diminished due process rights." *Robinson v. New York*, 2010 WL 11507493, at *6 (N.D.N.Y. Mar. 26, 2010) (quoting *United States v. Cabot*, 325 F.3d 384, 385 (2d Cir. 2003), this standard is highly deferential, particularly in the absence of any identifiable fundamental right. *See Walker v. Mattingly*, 2012 WL 1160772, at *6 (W.D.N.Y. Apr. 5, 2012) (the decision of a state parole board or parole office "is not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner") (quoting *Pena v. Travis*, 2002 WL 31886175, at *9 (S.D.N.Y. Dec. 27, 2002)); *Robinson v. New York*, 2010 WL 11507493, at *3 (N.D.N.Y. Mar. 26, 2010) ("the imposition of conditions – whether imposed prior to or subsequent to release, by the parole board

---

between the extended family members, not the relationship that the plaintiff wishes to develop. Moreover, both the parent-child cases and the extended-family cases frequently stress the interests of the children themselves in maintaining the stability of established custodial arrangements or emotional bonds. *See*, *e.g.*, *Rivera*, 696 F.2d at 1026 ("The Ross children surely possess a liberty interest in maintaining . . . the family environment that they have known since birth."); *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) ("children have a . . . constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily [family] association.") (alteration in the original) (internal quotation marks and citations omitted). Plaintiff's minor nieces and cousins have no comparable interests at stake.

or a field parole officer – must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses."). Nonetheless, a parolee may seek judicial intervention – including "tailoring or invalidation" – where "the condition is not related to the parolee's criminal history or to the State's interests." *Robinson*, 2010 WL 11507493, at *6. This "limited due process right," which entitles a parolee to "conditions of parole that are reasonably related to his prior conduct or to the government's interest in his rehabilitation," *Singleton*, 210 F. Supp. 3d at 374, may be enforced in federal court.[48]

As recently noted by the Hon. Paul A. Engelmayer when reviewing the same parole condition at issue here, Special Condition No. 15 "expressly authorized parole authorities to give written permission" for plaintiff to have contact with minors, and thus "anticipated" that requests for such contact could be made and would be considered rationally rather than denied capriciously. *Lima*, 270 F. Supp. 3d at 703. In this case, it appears that no such rational consideration took place when plaintiff requested permission to attend his uncle's Thanksgiving dinner in 2017. Plaintiff alleges that PO Lewis-Robinson told him "he would go to prison if there were children there." SAC ¶ 104. *See also* Yunus Decl. ¶ 39 (Lewis-Robinson told plaintiff that he would be "'locked

---

[48] Defendants suggest otherwise, arguing that challenges to state-imposed parole conditions should be brought in state court. *See*, *e.g.*, Def. MTD Mem. at 16 ("[T]his Court should not supplant the jurisdiction of state courts which provide the proper avenue of relief to challenge state parole conditions,"). In support of that contention, defendants cite *Maldonado v. Fischer*, 2013 WL 5487429 (W.D.N.Y. Sept. 30, 2013), which (they say) "directed plaintiff to file an Article 78 proceeding if he wishes to contest his special condition." Def. MTD Mem. at 16-17. In fact, *Maldonado* reaffirmed the availability of a federal forum for claims such as these. After dismissing Maldonado's challenges to various parole conditions as moot (because his parole had been revoked following a new felony conviction) the court advised him that should he once again be granted parole, "and should parole officials impose similar conditions, plaintiff may seek review of those conditions through an article 78 petition *or another action in this Court*." *Maldonado*, 2018 WL 5497429 at *4 (emphasis added).

up' if there were any children there"). Defendant Lewis-Robinson does not deny these events. Nor does she assert that she gave any thought to whether plaintiff's request to attend his uncle's Thanksgiving dinner presented any risks to the minor children expected to be present there.[49]

Given the modest nature of the proposal and the extremely low-risk setting – a single family dinner with multiple adults present – I conclude that plaintiff has raised a plausible (if narrow) claim that his current parole officer, acting in her individual capacity, abused her discretion and violated his due process rights by refusing even to consider his request to attend his uncle's Thanksgiving dinner in 2017. Because plaintiff is entitled to "all reasonable inferences from the facts alleged," including "those that defeat the immunity defense," *Doe v. Annucci*, 2015 WL 4393012, at *12, I do not recommend that the claim against Lewis-Robinson be dismissed, at this stage, on qualified immunity grounds. I therefore recommend, respectfully, that insofar as the Fifth Claim for Relief seeks damages, it be dismissed as to all defendants except PO Lewis-Robinson.

Similarly, insofar as the Fifth Claim seeks injunctive relief, it should not be dismissed on the pleadings, because plaintiff has plausibly alleged facts suggesting that – notwithstanding the permissive language of Condition No. 15 – his POs view it as an absolute bar and will never permit him to see his minor relatives. However, there is no *evidence* that plaintiff specifically requested permission to see his minor nieces and cousins more than once. Thus, I cannot conclude that plaintiff has demonstrated a clear and substantial right to relief as to his Fifth Claim, which must await further factual development before any consideration of the remedies, if any, to which plaintiff may be entitled.

---

[49] To the contrary: in her declaration, PO Lewis-Robinson asserts flatly that plaintiff "is not permitted to visit with members of his family who are minors – most specifically, his nieces, nephews, and cousins." Lewis-Robinson Decl. ¶ 21.

### H.      Sixth Claim – Arbitrary and Capricious

In his Sixth Claim for Relief, plaintiff alleges that the Parole Officer Defendants acted arbitrarily and capriciously when they "refused to consider alternative proposed residences in good faith," thereby effectively "creating a condition of parole that Mr. Yunus must live at a DOCCS-designated homeless shelter." SAC ¶ 172. In addition, plaintiff uses his Sixth Claim to challenge a number of his parole conditions as arbitrary and capricious, including Special Condition No. 24, governing his relationships with consenting adults; Nos. 31 and 32, which prohibit him from owning, operating, or being a passenger in a motor vehicle without the permission of his PO; No. 14, which prohibits him from purchasing or possessing sexually explicit materials; No. 19, which prevents him from owning a pet; and No. 37, which prohibits him from renting a post office box without his PO's prior approval. SAC ¶ 173.[50] In his preliminary injunction motion, however, plaintiff requests equitable relief only as to the "relationship" restriction, arguing that it is "wholly unrelated" to his prior criminal conduct, Pl. Prelim. Inj. Mem. at 25, and the automobile restriction, arguing that it should be "invalidated or tailored" because "his single bad act using a motor vehicle" cannot justify a broad rule "preventing him from setting foot in a motor vehicle." *Id*. I address each component of the Sixth Claim for Relief in turn.

### 1.      Alternative Proposed Residences

Plaintiff requested permission to move out of the Willow Avenue Men's Shelter three times. The first two addresses he proposed were within 1,000 feet of at least one school, and for that reason were not SARA-compliant. At the time he proposed those addresses, plaintiff was a registered sex offender and therefore subject to EL § 259-c(14), which in turn made Special

---

[50] Additionally, the Sixth Claim for Relief challenges the restrictions on plaintiff's cellphone, computer, camera, and internet access as arbitrary and capricious. SAC ¶ 173(i)-(ii). Since I considered the same issues in Part V(F) of this Report (in the context of plaintiff's First Amendment challenge), I will not repeat that analysis here.

Condition No. 4 (the 1,000-foot rule) mandatory. Since the statute gave the Parole Officer Defendants no discretion to exercise, they cannot be held individually liable for "refusing to consider" those proposed residences "in good faith." SAC ¶ 172. I therefore recommend, respectfully, that the Sixth Claim for Relief be dismissed to the extent it seeks damages stemming from the Parole Officer Defendants' denial of plaintiff's first two requests to move.

The third address that plaintiff proposed – Ms. Blake's apartment – was SARA-compliant, but PO Lewis-Robinson nonetheless denied him permission to move on the ground that Ms. Blake was "uncooperative." SAC ¶ 77. In fact, plaintiff alleges, this was pretext; the real reason for the denial was simply that it was more convenient for his PO to keep all of her parolees together in the shelter. SAC ¶¶ 72-78. The Sixth Claim for Relief therefore raises the question whether PO Lewis-Robinson acted so arbitrarily as to violate plaintiff's rights under the Due Process Clause. Defendants' moving brief in support of their motion to dismiss does not discuss this portion of the Sixth Claim for Relief. *See* Def. MTD Mem. at 16-17. Because I find that the well-pleaded facts set out in the SAC plausibly make out the elements of a cognizable damages claim against defendant Lewis-Robinson (the only named defendant personally involved in the discretionary denial of plaintiff's third request to move out of a homeless shelter), I recommend, respectfully, that defendants' motion to dismiss be denied as to this aspect of plaintiff's Sixth Claim for Relief. It should also be denied insofar as plaintiff seeks prospective injunctive relief against what he describes as a de facto parole condition requiring him to remain in a DOCCS-designated homeless shelter for the convenience of his parole officers.

I now turn to the evidence relevant to plaintiff's request for preliminary injunctive relief. Citing PO Lewis-Robinson's two declarations, defendants argue vigorously that plaintiff's proposal to move in with Ms. Blake was "properly rejected" because "neither plaintiff nor Ms.

Blake have been willing to provide the most basic details about the housing arrangement." Def. Prelim Inj. Opp. Mem. at 19; *see also* Def. MTD Reply Mem. at 6 (arguing that Lewis-Robinson took appropriate steps to consider plaintiff's request to move until Blake "became uncooperative and the address was rejected on September 16, 2017"). The declarations themselves, however, fail to substantiate defendants' position.

After initially submitting an incorrect address for Ms. Blake's apartment – which defendants do not characterize as anything more than an innocent mistake – plaintiff complied with all of his PO's requests, including obtaining two letters from Ms. Blake confirming her offer and outlining the financial terms of his proposed tenancy. This is undisputed. *See* Lewis-Robinson Reply Decl. ¶¶ 5-9, 15-16; Blake Decl. ¶¶ 4-6. In addition, the parties agree that either plaintiff or Ms. Blake provided DOCCS with a copy of her lease. *See* Lewis-Robinson Reply Decl. ¶ 19 (attesting that plaintiff gave the lease to PO Morillo); Blake Decl. ¶ 13 (attesting that Ms. Blake provided the lease to PO Lewis-Robinson). Moreover, PO Lewis-Robinson's broad assertion that Ms. Blake "refused to permit a site inspection of the property," Lewis-Robinson Decl. ¶ 18, is undercut by the more detailed account that Ms. Blake provides in her reply declaration. PO Lewis-Robinson concedes that Ms. Blake agreed to meet for an interview on Wednesday, September 20, 2017, at "the Bronx II area office." Lewis-Robinson Reply Decl. ¶ 21. Four days before the appointment – on Saturday evening, September 16 – plaintiff's PO telephoned Ms. Blake to see "if she was available the following evening," that is, Sunday evening, September 17. *Id.* ¶ 26. Ms. Blake objected to moving the interview forward on short notice, speaking in "an aggressive tone" and stating, "You're calling me 24 hours in advance to set up an interview for tomorrow, I'm not even home." *Id.* ¶¶ 26-27. Ms. Blake did not cancel the originally-scheduled date on September 20 (just three days later). She did not refuse to permit a site inspection. There is no evidence that

PO Lewis-Robinson ever asked her (or plaintiff) for additional "details about the housing arrangement," Def. Prelim Inj. Opp. Mem. at 19, much less that they refused to provide any requested information.

Nonetheless, after the Saturday evening telephone call, Lewis-Robinson spoke to her supervisor, Senior PO Medina, who "rejected the proposed residence" based on "the uncooperative nature of Ms. Blake and my inability to confirm the information provided by Plaintiff about the housing arrangements." Lewis-Robinson Decl. ¶ 28. Thereafter, PO Lewis-Robinson (not Ms. Blake) cancelled the September 20 appointment. *See* Blake Decl. ¶ 10. Moreover, Ms. Blake attests – and PO Robinson does not deny – that she made phone calls and sent text messages in an effort to reschedule the appointment, but never heard another word from plaintiff's PO. *Id.* ¶ 12.

The parties' declarations thus tend to support plaintiff's allegation that PO Lewis-Robinson and her supervisor, Senior PO Medina (who is not a defendant herein) were looking for a reason to say no to plaintiff's third request to move out of the shelter system. Had the homeowner actually refused to permit a site visit – or otherwise refused to cooperate with reasonable requests for information – that could well furnish a rational reason to reject her apartment as a residence for a parolee.[52] In this case, however, the evidence shows that Ms. Blake provided all of the information requested, and stood ready and willing to meet with PO Lewis-Robinson on September 20, 2017, as they had agreed.  At worst (and assuming the truth of PO Lewis-Robinson's reply declaration),

---

[52] Similarly, a PO could rationally reject an apartment that the parolee could not possibly afford. In this case, Ms. Blake originally proposed to charge plaintiff $400 per month in rent. Blake Decl. ¶ 5; Lewis-Robinson Decl. ¶ 16. However, when Ms. Blake learned that plaintiff did not have a full-time job she offered to permit him to reside in her apartment "free of charge." Blake Decl. ¶ 6; Lewis-Robinson Decl. ¶ 17. There is nothing inherently suspicious in such an offer, particularly when made by a relative of plaintiff's fiancée. Moreover, although Lewis-Robinson states that she "inquired as to why he was permitted to live at the property rent-free," Lewis-Robinson Decl. ¶ 17, she does not allege that she received an unsatisfactory answer. The no-rent offer therefore cannot have furnished a rational reason to refuse plaintiff's request.

Ms. Blake was guilty of reacting impolitely, during a single phone conversation on a Saturday evening, when she was asked on short notice to move that appointment up to the following Sunday evening. In my view, it would be arbitrary and capricious for a parole officer to refuse a parolee's request to move into otherwise-appropriate, SARA-compliant housing on this basis alone.

That said, plaintiff has only made one request to move into SARA-compliant housing, and Ms. Blake's declaration is silent as to whether she is still willing to have plaintiff reside in her apartment. I am reluctant to conclude, on the basis of a single incident, that PO Lewis-Robinson (or any other defendant) has effectively imposed an unwritten rule confining plaintiff to a DOCCS-approved homeless shelter. Moreover, the relief he seeks with respect to this aspect of the Sixth Claim for relief – that his POs "be enjoined to perform a good faith assessment of any proposed residency Mr. Yunus submits going forward," Pl. Prelim. Inj. Mem. at 20 – would itself be vague to the point of unenforceability. *See* Fed. R. Civ. P. 65(d)(1) (injunction  must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"). I therefore cannot conclude that plaintiff has demonstrated a clear and substantial likelihood of success on this issue.

## 2.      Relationships

I have previously concluded that Special Condition No. 24, requiring plaintiff to disclose sexual relationships to his PO – and disclose his supposed history of "sexual abuse" to his partners, in his PO's presence – is not unconstitutionally vague. As applied to a parolee who has no history of sexual abuse, however, the rule (which by its terms is absolute, admitting no exceptions) is not "reasonably related to his prior conduct or to the government's interest in his rehabilitation," *Singleton*, 210 F. Supp. 3d at 374, and for this reason is arbitrary and capricious. I therefore recommend, respectfully, that defendants' motion to dismiss the Sixth Claim for Relief be denied insofar as it seeks prospective injunctive relief against Special Condition No. 24.

Defendants do not dispute any of the facts relevant to this challenge, and do not make any effort to tie the relationship rule to plaintiff's criminal history or conduct. Instead, PO Lewis-Robinson suggests that she has never enforced the rule, *see* Lewis-Robinson Decl. ¶ 30, and defendants' argument goes straight to irreparable harm, insisting that plaintiff has suffered none because "he has already informed his fiancée of his 'sex offender' status." Def. Prelim. Inj. Opp. Mem. at 22. I therefore conclude that plaintiff has demonstrated a clear and substantial likelihood of success on the merits as to the unconstitutionality of Special Condition No. 24 as applied to him.

Insofar as plaintiff seeks money damages for the imposition of Special Condition No. 24, however, I reach a different conclusion. Plaintiff's injury allegations are thin at best, *see* SAC ¶ 121 (alleging that when plaintiff disclosed his sex offender status to his fiancée it caused a "strain on his relationship"), as is the causal connection between those injuries and any specific condition of his parole.[54] Nor can I conclude, on the sparse facts alleged, either that Condition No. 24 violated "clearly established" constitutional rights or that that a reasonable parole officer assigned to supervise plaintiff would have understood its infirmity. *Gonzalez*, 728 F.3d at 154. I therefore recommend, respectfully, that the Sixth Claim be dismissed insofar as it seeks money damages against any of the Parole Officer Defendants named therein.

### 3.    Motor Vehicles

As plaintiff concedes, he used a motor vehicle to commit the kidnappings to which he pleaded guilty in 2002. *See* Pl. Prelim. Inj. Mem. at 25; *see also* SORA Tr. at 8:20-9:2; *Vincent v. Smith*, 2010 WL 23324, at *3. Consequently, there is a rational connection – wholly independent of his designation as a sex offender – between plaintiff's criminal history and Special Conditions

---

[54] It is implausible that a recently-released parolee, who is required to register as a sex offender, would have kept that fact from his fiancée in the absence of Special Condition No. 24.

No. 31 and 32, which prevent him from obtaining a driver's license or owning, driving, or being a passenger in a motor vehicle without the permission of his PO.

Moreover, these conditions are not absolute, and it is undisputed that PO Lewis-Robinson has permitted plaintiff to be a passenger in cars, including his fiancée's car. *See* Lewis-Robinson Decl. ¶ 30; Def. MTD Opp. Mem. at 21 (conceding that plaintiff "has sometimes been allowed to ride in vehicles"). Plaintiff does not allege that he ever asked for permission to engage in any of the other activities regulated by Special Conditions No. 31 and 32, much less that such requests were denied in an arbitrary or capricious manner. I therefore conclude that the Parole Officer Defendants did not act arbitrarily and capriciously in imposing these conditions, nor in administering them, and have not threatened arbitrary or capricious enforcement in the future. For these reasons, I respectfully recommend that the Sixth Claim for Relief be dismissed to the extent it seeks either damages or injunctive relief in connection with Special Conditions No. 31 and 32.

### 4. Pornography, Pets, Post Office Boxes

Defendants make no effort to connect Special Condition No. 14 (no sexually explicit materials), No. 19 (no pets) or No. 37 (no post office boxes) to plaintiff's "past conduct and future chances of recidivism." *See* Def. MTD Mem. at 16. Nor do they argue that these conditions are "designed to deter recidivism and prevent further offenses." *Robinson*, 2010 WL 11507493, at *5. Instead, they insist that it is plaintiff's burden to prove the opposite; that is, that he must establish the *lack* of a rational relationship between these parole conditions and his criminal history by "describ[ing] in detail the facts underlying his crime of conviction as found at trial" and "explain[ing] why the parole conditions are unreasonable or unnecessary despite the actions for which he was convicted." *Id*. at 17 (quoting *Trisvan v. Annucci*, 284 F. Supp. 3d 288, 304 (E.D.N.Y. 2018)).

I disagree. In this case, unlike *Trisvan*, plaintiff did not stand trial and thus could not describe the facts "found at trial." More fundamentally, there is no heightened pleading standard applicable to § 1983 actions challenging parole conditions. This case is governed by Fed. R. Civ. P. 8(a)(3), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," and by *Iqbal*, which requires the plaintiff to "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Thus, while a plaintiff who claims that his parole conditions are arbitrary and capricious must provide enough information concerning his underlying crimes to plausibly allege that those conditions are not "reasonably related to his prior conduct," *Singleton*, 210 F. Supp. 3d at 374; *accord Robinson*, 2010 WL 11507493, at *5, he need not ordinarily provide the degree of "detail" demanded by the *Trisvan* court.[55] Nor is the pleader required to anticipate and refute all conceivable penalogical purposes for a given condition.

---

[55] *Trisvan* was an unusual case. Plaintiff was convicted of manslaughter after a trial at which he was identified as the "second shooter" in a gang-related killing. 284 F. Supp. 3d at 294; *see also Trisvan v. Ercole*, 2015 WL 419685, at *2-3 (E.D.N.Y. Jan. 30, 2015) (recounting crime in detail and dismissing Trisvan's petition for habeas corpus). Years later, proceeding *pro se*, he challenged virtually all of his parole conditions as unconstitutional (including standard conditions such as those prohibiting him from possessing firearms and associating with felons) without making any effort to explain why – if at all – those conditions were unreasonable or unnecessary in his case. *Trisvan*, 284 F. Supp. 3d at 294. After being given two opportunities to amend his pleading for this purpose, *id*. 295, plaintiff filed a Third Amended Complaint which once again "fail[ed] to present any factual allegations explaining how or why the release conditions are not reasonably or necessarily related to legitimate state interests in light of the crime and conduct underlying his conviction." *Id*. at 297. Instead, plaintiff "continue[d] to argue that any condition that abridges a constitutional right is *per se* unreasonable." *Id*. Against this backdrop, the court gave Trisvan "one last opportunity" to amend, *id*. at 304, instructing him to "describe in detail the facts underlying his crime of conviction as found at trial and also, more importantly, explain why the parole conditions are unreasonable or unnecessary despite the actions for which he was convicted." *Id*. In context, the *Trisvan* court's admonition is properly read not as an announcement of a new pleading requirement for cases challenging parole conditions but rather as an effort to assist a particular *pro se* plaintiff in focusing on – and pleading facts relevant to – the arbitrary and capricious standard governing his challenge.

Plaintiff Yunus has adequately disclosed his criminal past, for pleading purposes, by naming the crimes to which he pled guilty, SAC ¶¶ 22-24, and by attaching the complete transcript of his SORA hearing, during which the district attorney described the kidnappings in detail (based on the "grand jury minutes and the plea minutes") and summarized plaintiff's prior criminal record. SORA Tr. at 8:17-10:8. Plaintiff has also adequately explained why (in his view) Special Conditions No. 14, 19, and 37 are not reasonably related to his prior conduct: his crimes had no "sexual component," SAC ¶ 23, making the ban on sexually explicit materials arbitrary, and he has never been charged with any crimes "related to" pornography, pets, or post office boxes. SAC ¶ 173. In my view, nothing more is required.

However, plaintiff has alleged no injury whatsoever – past or prospective – in connection with these conditions, which insofar as the record reflects have had no impact on his life. He does not allege, for example, that he ever wanted a pet.  Nor does he allege – must less establish through competent evidence – that he ever asked for a pet, much less that his PO unreasonably denied such request in reliance on Special Condition No. 19. The same is true with respect to Nos. 14 and 37. This Court does not sit to decide abstract questions concerning arguably irrational parole conditions that have produced no identifiable injury and do not threaten to produce such injury in the future. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (a plaintiff seeking prospective injunctive relief must have suffered an "injury in fact").  I therefore recommend, respectfully, that defendants' motion to dismiss be granted with respect to the portion of the Sixth Claim for Relief challenging Special Conditions No. 14, 19, and 37.

## I.      Preliminary Injunctive Relief

Having found that plaintiff has shown a clear or substantial likelihood of success on the merits as to his substantive due process claim, I must now consider whether he has also shown (a) irreparable harm, and (b) that a preliminary injunction – in this case, a preliminary injunction

directing that his designation as a sex offender be set aside and that he no longer be required to comply with SORA or with the special parole conditions imposed as a result of his sex offender status – is in the public interest. *N. Am. Soccer League*, 883 F.3d at 37. I must then repeat the same analysis for the individual parole conditions as to which he has met the heightened merits standard required for mandatory injunctive relief.[56]

### 1.    Registration under SORA

Proof of "irreparable harm" requires "an injury that is not remote or speculative but actual [or] imminent and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks and citation omitted). Plaintiff bears the burden of showing that "irreparable harm is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008).

Ordinarily, as plaintiff notes, *see* Pl. Prelim. Inj. Mem. at 26, and as defendants concede, *see* Def. Prelim Inj. Opp. Mem. at 8, the ongoing deprivation of a constitutional right is proof enough of irreparable harm. *See*, *e.g.*, *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("it is the alleged violation of a constitutional right that triggers a finding of irreparable harm"). Moreover, there is no question here but that plaintiff's designation as a sex offender has already caused him to suffer harm for which money damages cannot compensate, and will continue to do so as long as is he is designated a "sex offender" under SORA. In addition to the registration requirements themselves, plaintiff has suffered and will continue to suffer from the attendant civil disabilities and criminal risks discussed in Part V(D) of this Report, together with the profound reputational injury flowing from being publicly labeled as a sex offender. *See*, *e.g.*, Yunus Decl. ¶ 13 (plaintiff

---

[56] Those conditions are: No. 4 (the 1,000-foot rule), to the extent it is more than a residency restriction; No. 17 (the 300-yard rule); Nos. 12, 22, 39, and 48 (the cellphone, computer, camera, and internet restrictions), to the extent they bar plaintiff from the "modern town square"; and No. 24 (the "consenting adult" rule).

was stigmatized after PO Vasquez told "everyone I came into contact with, including other persons at the shelter and administrators at my college, that I am a sex offender").

Moreover, it is plaintiff's sex offender designation that triggered EL § 259-c(15), subjecting him to a mandatory parole condition that would not otherwise burden a parolee with his criminal history. The evidence also supports plaintiff's contention that the discretionary parole conditions at issue in this action were imposed upon him by the Parole Officer Defendants as a direct result of his designation as a sex offender under SORA. *See id*. ¶ 9 (PO Smith "informed me that he gives all sex offenders the same restrictions"); *id*. ¶ 11 (POs Vasquez and Lewis-Robinson also told plaintiff that "all sex offenders are given the same prohibitive restrictions"); Ex. C at ECF pages 4-10 (6-page, 48-item list of special conditions "for Sex Offenders"). [57]

---

[57] Defendants' reliance on a 2007 district court decision from Connecticut for the proposition that "the classification alone does not constitute irreparable harm for the purposes of a preliminary injunction," *see* Def. Prelim. Opp. Mem. at 8 (quoting *Vega v. Lantz*, 2007 WL 3025285, at *3 (D. Conn. Oct. 16, 2007)) is misplaced. Vega was serving a 60-year prison sentence when he filed suit to challenge his internal prison classification as a sex offender. He was not required to register under SORA, did not bear the civil consequences and criminal risks flowing from the registration requirement, and was not (nor ever likely to be) subject to mandatory "sex offender" parole conditions. Moreover, the district court's irreparable harm analysis rested directly on its conclusion that case law in our Circuit – as of 2007 – did not establish that a prison inmate had any protectable liberty interest in "the classification of inmates by the Connecticut DOC." *Vega*, 2007 WL 3025285, at *2. As discussed in detail in Part V(C)(1) of this Report, *supra*, it is now beyond dispute in this Circuit that a parolee has a protectable liberty interest in not being designated a sex offender under SORA. *See Doe v. Pataki*, 3 F. Supp. 2d at 468 (holding that a class of parolees and probationers had "a protected liberty interest that entitled them to procedural due process"); *Dep't of Pub. Safety*, 271 F.3d at 49 (holding that a convicted sex offender had a cognizable liberty interest at stake, notwithstanding his conviction, because the registry "implies that each person listed is more likely than the average person to be currently dangerous," which "stigmatizes every person listed on the registry"). Even as to prison inmates, the Second Circuit has now confirmed – in an appeal from a later decision by the same trial court – that "wrongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest." *Vega v. Lantz*, 596 F.3d at 81-82. Similarly, defendants' contention that "the alleged harm is caused by the already publicly available information concerning the criminal conviction, not the need to register as a sex offender," Def. Prelim Inj. Opp. Mem. at 8, is demonstrably untrue. The publicly-available information concerning plaintiff's conviction for kidnapping in the second degree does not brand him as a sex offender, restrict his job and housing choices, put him at risk whenever he

Defendants urge the Court to reject plaintiff's irreparable harm showing on the ground that his "one and a half year delay" in seeking a preliminary injunction is "all-but conclusive evidence that there is no irreparable harm warranting the extraordinary relief sought." Def. Prelim. Inj. Opp. Mem. at 9 (citing *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)). I decline the invitation.

In non-constitutional cases, a delay in seeking injunctive relief "undermines" the claim that the harm alleged is irreparable, and may be grounds for denying such relief on an emergency basis. *See, e.g.*, *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 1521060, at *4 (S.D.N.Y. Apr. 30, 2012) (denying preliminary injunction to remedy alleged bullying and harassment of child at school where child's parents "affirmatively rejected a number of options offered by the school district to remedy the violation, thus rendering the alleged harm to be speculative," and "delayed bringing their action for injunctive relief for nearly 6 months, thus negating the existence of imminent harm"). However, delay alone is rarely (if ever) fatal where a parolee or supervised releasee mounts a constitutional challenge to the conditions imposed on him. As explained in *Hardy v. Fischer*, "Ongoing unlawful deprivations of liberty and the threat of unlawful detention and reimprisonment would violate plaintiffs' constitutional rights and therefore constitute quintessential irreparable harm." 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010). *Hardy* rejected the same delay argument that defendants make here, holding that former prisoners challenging their conditions of post-release supervision (PRS) adequately demonstrated irreparable harm notwithstanding their delay in bringing that challenge:

> The possibility that plaintiffs already have suffered injuries by being subjected to allegedly illegal PRS does not eliminate the irreparable nature of any injuries that they will suffer in the future without injunctive relief, and the Court does not find

---

walks within a few blocks of a school, or prevent him from following the President of the United States on Twitter.

> that any delay in filing this lawsuit justifies the denial of interim relief from an
> ongoing alleged constitutional violation.

*Id*. For the same reasons, I conclude that plaintiff's failure to file this action the moment he was

paroled does not negative the requisite irreparable injury. I also note that plaintiff never simply

ignored the harm of which he now complains. Rather, he made repeated efforts to obtain relief

from the Sex Offender Conditions from his POs and their supervisors before turning to litigation,

which he originally filed *pro se*. *See* Yunus Decl. ¶¶ 12, 14, 32; Yunus Reply Decl. ¶¶ 20-22.

Finally, I conclude that the injunction sought is in the public interest. Plaintiff is

concededly a sex offender in name only.  But for the "administrative burden" of sorting ordinary

kidnappers from "dangerous sex offenders," *Knox*, 12 N.Y.3d at 69, he would never have been

swept in by the "blanket rule" for kidnappers contained within CL § 168-a(2)(a)(i). *Id*. Defendants'

argument that "SORA and the challenged parole conditions" are designed to "protect[ ] the public,

and particularly children, from violent criminals such as plaintiff," Def. Prelim. Inj. Opp. Mem. at

10, misses the point: SORA is unconstitutional, as to plaintiff, because he indisputably does *not*

present the *sexual* risks that sex offender registration, and the Sex Offender Conditions, are

designed to combat. To be sure, he presents significant risks, but they are the ordinary risks arising

from paroling a prisoner with a (non-sexual) history of violent crime. These risks can and will be

addressed through the ordinary parole conditions assigned to similar parolees.[58] Defendants' fears

for "the potential harm to innocent children and the public," *id*., thus do not require plaintiff to

remain registered as a sex offender under SORA or subject to parole conditions designed to

ameliorate the risk of future sex offending, which, insofar as the record discloses, is simply not

among the risks presented by this plaintiff.  *See* SORA Tr. at 22:14-16 ("Under the circumstances

---

[58] Plaintiff does not seek to be free of parole altogether, nor to be relieved from parole conditions
that do not presuppose that he is a "sex offender."

presented here, I am satisfied that there is virtually no likelihood that [plaintiff] will commit a sex crime ever.").

### 2. Individual Parole Conditions

For substantially the same reasons discussed above, I conclude that plaintiff has adequately demonstrated that he faces continuing irreparable harm so long as he is at risk of parole revocation for simply entering or being within 1,000 feet of a school (Special Condition No. 4) or within 300 yards of "places where children congregate" (Special Condition No. 17), and so long as he is barred from the "modern town square" of social media by a constellation of parole conditions (Special Conditions No. 12, 35, 39, and 48) which not only prohibit him from accessing social networking sites like Facebook and Twitter, but make it difficult for him to go online at all — or to use smart phones, home computers, email, or the other ordinary tools of modern communication. Because plaintiff has no history of sexual misconduct (with children or adults), much less a history of electronic stalking, distribution of pornography, or other internet-enabled sex offenses, he does not fall into the very narrow class of offenders for whom the public interest demands that the First Amendment take a back seat to public safety.

However, I cannot conclude that plaintiff is suffering or will suffer irreparable harm as a result of Special Condition No. 24. He has already introduced his fiancée to his parole officer and has told his fiancée about his criminal history, and he does not allege that he has formed or anticipates forming new sexual relationships during the remaining term of his parole supervision. Thus, even though Condition No. 24 (like many of the Sex Offender Conditions) bears no obvious relationship to plaintiff's individual history and characteristics, once it is properly understood to apply only to sexual relationships, it poses only a theoretical possibility of harm to plaintiff.

## VI.    CONCLUSION

For the reasons set forth above, I respectfully RECOMMEND that Your Honor GRANT defendants' motion to dismiss the Second Amended Complaint IN PART, and dismiss the following Claims for Relief pursuant to Rule 12(b)(6):

The First Claim, in its entirety;

The Third Claim, to the extent it alleges that Special Condition No. 24 (the "consenting adult" rule) is void for vagueness;

The Third Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past enforcement of any of the parole conditions challenged in that claim as void for vagueness;

The Fourth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of the cellphone, computer, and social media restrictions contained in Special Conditions No. 12, 22, 35, 39, and 48;

The Fourth Claim, to the extent it seeks damages against PO Lewis-Robinson arising from her conduct prior to the decision in *Packingham*;

The Fifth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of Special Condition No. 15 (no contact with minors);

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past conduct in denying plaintiffs' requests to move in with his fiancée and his uncle;

The Sixth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson in connection with the denial of plaintiffs' request to move in with Ms. Blake;

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past enforcement of Special Condition No. 24;

The Sixth Claim, to the extent it seeks either damages or injunctive relief in connection with Special Conditions No. 31 and 32 (motor vehicles), No. 14 (sexually explicit materials), No. 19 (pets) or No. 37 (Post Office boxes).

If Your Honor agrees with my recommendations as to the motion to dismiss, only one of the Parole Officer Defendants – PO Lewis-Robinson – will remain in the case, and only as to the Fourth, Fifth and Sixth Claims for Relief.

Because plaintiff has already amended his complaint twice (the second time with the assistance of counsel, after reviewing defendants' initial motion to dismiss), and because he does not seek leave to replead, I FURTHER RECOMMEND that any dismissal be WITH PREJUDICE.

I FURTHER RECOMMEND that Your Honor GRANT plaintiff's preliminary injunction motion IN PART, and that defendants, together with their agents, employees, and all persons acting in concert with them:

> Be preliminarily enjoined, pending the final resolution of this action, from enforcing, as against plaintiff, the registration and notification provisions made applicable to designated sex offenders by SORA (CL §§ 168a-168w), or the mandatory conditions prescribed by EL §§ 259-c(14) and (15) for parolees sentenced for an offense for which registration as a sex offender is required; and

> Be directed to rescind the discretionary provisions of the Sex Offender Conditions (Yunus Decl. Ex. C, at ECF pages 4-10) except to the extent they deem those conditions appropriate for plaintiff in light of his *non-sexual* criminal history and characteristics.

If and to the extent Your Honor determines to dismiss the Second Claim for Relief, or determines for other reasons not to issue the preliminary restraints outlined above, I FURTHER RECOMMEND that defendants, together with their agents, employees, and all persons acting in concert with them be preliminarily enjoined, pending the final resolution of this action, from enforcing, as against plaintiff:

> Special Condition No. 4 (the 1,000-foot rule), to the extent it functions as more than a residency restriction;

> Special Condition No. 12 (prohibiting access to online computer services that "involve the exchange of electronic messages") to the extent it prohibits him from accessing email services or social media websites;

> Special Condition No. 17 (the 300-yard rule);

Special Condition No. 22 (prohibiting possession of photographic or video equipment), to the extent it prevents plaintiff from possessing an ordinary smartphone with camera function;

Special Condition No. 35 (restricting beepers, scanners, and cellphones, and prohibiting camera-equipped phones) to the extent it prevents plaintiff from possessing an ordinary smartphone with camera function;

Special Condition No. 39 (restricting computer ownership and usage), to the extent it requires prior PO approval to possess or use a computer, a computer network, or an internet browser); or

Special Condition No. 48 (prohibiting access to any "commercial social networking website") to the extent it prohibits plaintiff from accessing mainstream social media.[59]

_____

**BARBARA MOSES**
**United States Magistrate Judge**

Dated:    New York, New York
          June 29, 2018

---

[59] Nothing in this Report is intended to prevent plaintiff's parole officers from requiring plaintiff to disclose his phone, computer and internet passwords or otherwise monitoring his usage, if such restrictions are reasonably related to his past conduct and designed to deter recidivism and prevent further offenses. *See, e.g., Mutter*, 811 S.E. 2d at 873; *Maxson*, 281 F. Supp. 3d at 600-01.

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
## TO REPORT AND RECOMMENDATION

The parties shall have fourteen days from this date to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) to the Report and Recommendation contained in paragraph 2 of this Order. Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Alison J. Nathan at 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Nathan. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).