Ia3WyunO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   EQUAN YUNUS, SR.,

4                   Plaintiff,

5              v.                          17 Civ. 5839 (AJN)

6   J. LEWIS-ROBINSON, *et al.*,
                                          Oral Argument
7                   Defendants.

8   ------------------------------x
                                          New York, N.Y.
9                                         October 3, 2018
                                          3:00 p.m.
10
    Before:
11
                       HON. ALISON J. NATHAN,
12
                                          District Judge
13

14                        APPEARANCES

15  EMERY CELLI BRINCKERHOFF & ABADY, LLP
          Attorneys for Plaintiff
16  BY:  ANDREW G. CELLI
         DAVID B. BERMAN
17

18  BARBARA D. UNDERWOOD
          Acting Attorney General of the State of New York
19        Attorney for Defendant State of New York
    BY:  KACIE A. LALLY
20       DANIEL A. SCHULZE
         Assistants Attorney General
21

22

23

24

25

Ia3WyunO

```
 1              (Case called)

 2              THE COURT:  Good afternoon.  Please be seated.

 3              I'll take appearances from counsel, starting with

 4    counsel for plaintiff.

 5              MR. CELLI:  Good afternoon, your Honor.  I'm Andrew

 6    Celli with the law firm of Emery Celli Brinckerhoff & Abady.

 7    I'm here today with my colleague David Berman and our client,

 8    Equan Yunus.

 9              THE COURT:  Good afternoon to the three of you.

10              I would ask counsel when you're speaking if you could

11    pull up the microphone.  The room is beautiful on the eye but

12    not on the ear.

13              For the defendants.

14              MS. LALLY:  Kacie Lally, from the Attorney General's

15    office, for the state defendants.  I'm here with my colleague

16    Daniel Schulze.

17              THE COURT:  Good afternoon to both of you.

18              We're here for oral argument.  Based on the motion to

19    dismiss and the motion for preliminary injunction, I did refer

20    this to the magistrate judge for an R&R, and I have objections.

21    I put out an order raising a supplemental issue with respect to

22    preclusion that I was banging my head against as I was working

23    my way through this.

24              There are obviously a lot of issues in the case.  We

25    don't have time for all of it, necessarily.  I think what I'd
```

1    like to do is give each side 30 minutes.  I'll ask plaintiff's

2    counsel to go first, and you may reserve some time if you like

3    for rebuttal.  I would ask that you begin with the preclusion

4    discussion.  Then after that, I'll leave it to you to

5    prioritize on the substantive issues and objections.  I'll have

6    questions as we go, but I am focused, at least in the

7    immediate, on the preclusion issues and will ask you to begin

8    there.

9              If I take you overtime with my questions, I'll make

10   sure that we even out the time at the end, if we go over the

11   time allotted.  But I think if we start with a 30-minute goal,

12   we can be done by the time that I need to be done.

13             With that, Mr. Celli.

14             MR. CELLI:  Yes.  Mr. Berman will handle the

15   preclusion issues, your Honor.

16             THE COURT:  OK.  That's fine.

17             Mr. Berman.

18             MR. BERMAN:  Thank you, your Honor.

19             THE COURT:  It's probably easiest to hear you if

20   you're at the podium.

21             Thank you.

22             MR. BERMAN:  Good afternoon, your Honor.

23             THE COURT:  Good afternoon.

24             MR. BERMAN:  As discussed, I will cover the preclusion

25   issues.

Ia3WyunO

1          THE COURT:  Let me ask, do you want to reserve some

2     time for rebuttal?

3          MR. BERMAN:  Yes, five minutes.

4          THE COURT:  Five minutes, so you've got 25 minutes

5     now.

6          Thank you.

7          MR. BERMAN:  And your Honor, if it's all right, in

8     those 25 minutes, I was going to cover this and Mr. Celli was

9     going to cover the merits of our substantive due process claim,

10    so at some point in those 25 minutes, we'll switch.

11         THE COURT:  That's fine.

12         Thank you.

13         MR. BERMAN:  Your Honor, with respect to the

14    preclusion, there are two elements in the collateral estoppel

15    here.  The first is that the issue is not either actually or

16    necessarily decided in the alternative, and the second is that

17    the party the preclusion is being asserted against have a full

18    and fair opportunity to litigate.

19          The first part of that, the "actually" or "necessarily

20    decided," is not satisfied here, and the reason is, first, it

21    wasn't actually decided because while there was a lot of

22    discussion of the *Knox* case at Mr. Yunus's SORA hearing, the

23    discussion was all in the context of his risk-level

24    classification.

25          THE COURT:  Is it fair to say, Mr. Berman, that the

 1   arguments you're making here with respect to the collateral

 2   estoppel issue of preclusion track very much the arguments that

 3   were raised and discussed and ruled on by Magistrate Judge

 4   Jones in the *Rooker-Feldman* context?

 5          There's a dispute.  Was it really argued?  Was it

 6   really decided?  It's essentially the same set of arguments for

 7   collateral estoppel as it was for *Rooker-Feldman*.

 8          MR. BERMAN:  Yes, your Honor.

 9          I would agree with that, that the issue as to whether

10   or not it was actually decided greatly overlaps with

11   *Rooker-Feldman*, and the "necessarily decided" aspect of it

12   largely overlaps with the inextricably intertwined argument

13   that the state made with respect to *Rooker-Feldman*.

14          THE COURT:  OK.  I have the substance of the arguments

15   there.

16          Let's turn, then, to claim preclusion, or *res*

17   *judicata*.

18          MR. BERMAN:  Certainly, your Honor.

19          I think the issue of *res judicata* here is that he,

20   Mr. Yunus, at his SORA hearing never had any opportunity to

21   make any sort of affirmative claim.  It's hard to imagine that

22   there could be a circumstance of claim preclusion in a hearing

23   that's really -- while the C.P.L.R. and things like that apply,

24   really, a quasi-criminal proceeding, where he's still in the

25   defense posture; he can't assert any claims.

1          THE COURT:  How is the posture that Mr. Yunus faced

2     different than the posture that the defendant in the *Knox* case

3     faced?

4          MR. BERMAN:  What the defendant in the *Knox* case did,

5     the defendant in the *Knox* case asserted, Look, this whole

6     proceeding that I'm being subjected to is unconstitutional.

7     And while Mr. Yunus, I suppose, could theoretically have done

8     that, I don't think -- if the *Knox* plaintiff had done exactly

9     what Mr. Yunus did, I don't think he would be barred by *res*

10    *judicata* had he never raised those arguments.

11         Once he decided to, rather than protest the state

12    court hearing as a violation of his constitutional rights just

13    for forcing him to participate, once he decided, had he just

14    gone through the hearing, done the risk-level classification

15    and then gone to federal court, I think that would have been

16    fine.

17         That hearing does not delineate any opportunity to

18    challenge the risk-level designation.  Yes, one could always

19    say --

20         THE COURT:  Do you think the defendant in *Knox* could,

21    after losing there, squarely, come into federal court and seek

22    relitigation of those issues in a 1983 action?

23         MR. BERMAN:  No, I don't, your Honor.

24         THE COURT:  So that's collateral estoppel --

25         MR. BERMAN:  Yes, exactly.

1          THE COURT:  -- with respect to the issues decided.

2   And it's claim preclusion, in part, except to the extent that

3   if the law is not only matters litigated but matters that could

4   have been litigated; it seems like you're talking your way out

5   of that.

6          Let me just start with some background principles.

7          I apply New York law of claim preclusion here,

8   correct?

9          MR. BERMAN:  Yes, I agree with that.

10          THE COURT:  And does New York law on claim preclusion,

11   and let's focus specifically on *res judicata*, require no

12   relitigation not only of claims that were litigated but that

13   could have or should have been raised in a prior proceeding?

14          MR. BERMAN:  Just sort of in the abstract?

15          THE COURT:  Does it matter?  Just to make sure we

16   agree on claim preclusion.

17          MR. BERMAN:  Yes.  As a matter of doctrine, yes.

18          THE COURT:  What aspects of that doctrine aren't here?

19          MR. BERMAN:  Your Honor, I'd say there are two things.

20          I'd say, first, he did not -- *res judicata* is more of

21   a technical doctrine in that it's, Did you have the opportunity

22   to assert the claim that you're now asserting?  And yes, he

23   could've made that defensive argument.  He could make an

24   argument, "I shouldn't have to be part of the proceeding" as a

25   matter of a defense to his risk assessment hearing, but he

1    couldn't assert any affirmative claims.

2             THE COURT:  I do want to make sure I understand that

3    argument.  You're saying there's something about an affirmative

4    claim; there is no procedural mechanism.

5             MR. BERMAN:  Exactly.  There was no procedural

6    mechanism for him to seek, for him to move for what he's moving

7    for now, a preliminary injunction under 1983.  It doesn't have

8    to be identical, but he didn't have any opportunity to even

9    assert what would be the equivalent of an affirmative defense

10   in a civil case or a counterclaim.

11            All he could do was make arguments to try to fend off

12   the state's attack on him, so to speak.  There was no

13   opportunity to assert any sort of affirmative claim that take

14   away his rights under civil law.

15            THE COURT:  I hate to ask the same question, but I do

16   want to make sure I have your answer in mind.  The distinction

17   between the posture here and the posture in *Knox* is what?

18            MR. BERMAN:  I would say -- I wouldn't say there's any

19   distinction in the posture.  I would just say that what the

20   *Knox* plaintiff chose to do wasn't really within the scope of

21   what that hearing is supposed to be.  It's supposed to be a

22   very narrow, technical hearing that's about, What is your risk

23   assessment?  Are you a sexual predator?

24            There were certain enhancements that aren't at issue

25   in this case they were supposed to be deciding there.  It's not

1    supposed to be, Are you appropriately designated as sex

2    offender?

3              The plaintiff in *Knox* just went outside the scope of

4    that and said, Well, I'm just challenging the constitutionality

5    of this whole proceeding, which I guess you can do in any court

6    proceeding, but the fact that our client chose not to do that I

7    don't think should be a basis for claim preclusion.

8              THE COURT:  I guess maybe specifically after *Knox*; I

9    gather what you're saying is that the procedural pattern *Knox*

10   chose was not an obvious one.

11             MR. BERMAN:  Correct.

12             THE COURT:  Maybe you're even saying it was an

13   incorrect one.

14             MR. BERMAN:  I would say it's not within the purpose

15   of this narrow statutorily defined proceeding.  I don't think

16   the court was wrong.

17             THE COURT:  But no chain in the *Knox* line, in New

18   York, either in the SORA hearing itself or on appeal, and tell

19   me if I'm wrong about this, ever questioned the purview of the

20   court to consider the constitutional challenge.

21             MR. BERMAN:  No, they did not, and I'm not saying that

22   the court was necessarily wrong from a jurisdictional

23   perspective to entertain it as much as I'm saying that the

24   right to challenge or sort of force participation in a court,

25   in a statutorily defined proceeding as unconstitutional I don't

Ia3WyunO

 1    think can have a *res judicata* effect on an affirmative civil

 2    rights case.

 3             THE COURT:  Any authority for that?

 4             MR. BERMAN:  Your Honor, I'd say it's more implicit.

 5    For example, if you look at the difference between a case like

 6    *Allen v. McCurry*, in the Supreme Court, versus a case like

 7    *Haring v. Prosise*, *Allen v. McCurry* was a case where someone

 8    was convicted of some sort of drug offense –– I don't remember

 9    what it was –– in state court.  They made a motion to suppress.

10             THE COURT:  That's the problem.  *Haring* was about the

11    application of Virginia law of preclusion, which is why I just

12    want to make sure we're on the same page.

13             The question is what does New York preclusion law

14    require, and does it apply to me?  And the answer to that,

15    we've agreed, was yes.  I don't see how *Haring* helps the

16    argument you're making, because what the court said there was

17    that Virginia law wouldn't treat it as precluded, therefore

18    it's not precluded.

19             MR. BERMAN:  Your Honor, I guess, then, I would just

20    say I have not –– I've certainly looked and did not locate a

21    New York case where someone was in that analogous posture, that

22    they were convicted of something in New York State court and

23    then brought a federal 1983.  But from reading that, the *Haring*

24    case, I don't think there was any ––

25             THE COURT:  I mean, it's not a common thing, I think,

Ia3WyunO

1   is part of the problem, since the '80s.  Right?

2          MR. BERMAN:  I'm sorry.

3          THE COURT:  Since *Allen*, since *Migra v. Warren*, we

4   just know it's the case that there are preclusive effects from

5   state court proceedings where constitutional claims could have

6   been litigated.

7          MR. BERMAN:  I guess what I'd say in response about

8   the *Haring* case specifically is while I agree with you, I'm not

9   disputing your explanation of the court's holding as much as

10  I'm saying there was nothing about Virginia law, at least as

11  explained in that case.  I can't say I know all the nooks and

12  crannies of Virginia law in the '80s, but at least as explained

13  in that case, it seemed particularly usual.  It seemed like it

14  would be sort of general things, what New York law is now,

15  raised or could have been raised.  There was no sort of oddity

16  of Virginia law that made that case different than sort of the

17  run-of-the-mill *res judicata* issue that you're saying largely

18  doesn't come up.

19         THE COURT:  I think you may be wrong about *Haring*.  I

20  don't understand or read it to stand for a carve-out from the

21  basic principle, established first in *Allen* with respect to

22  collateral estoppel and then in *Migra* with respect to *res*

23  *judicata*, that the state law of preclusion applies, and if that

24  would hold a claim or an issue precluded, so it is.

25         MR. BERMAN:  I don't view it as creating -- I guess I

1    just wouldn't read *Migra* to apply to a case like this, where

2    there wasn't -- I guess where the nub of the issue is, whether

3    or not this was really, is whether or not there's a difference

4    between a defensive argument that one could make in a criminal

5    proceeding, even a case like *Haring* or *Allen*, that's a motion

6    to suppress.  There's still an opportunity to make your case

7    there.

8         This, there's no opportunity for any sort of

9    affirmative motion practice.  Just argue a level 1, 2 or 3

10    offender, make your best argument you are, make your best

11    argument you're not, and ruling.  There's no opportunity for

12    any sort of affirmative claim that should, I think, be able to

13    preclude his rights under 1983.

14         And also just as a more general point, after *Knox* --

15         THE COURT:  I do want to make sure, when you say an

16    opportunity, that you be heard on that.  I want to make sure I

17    understand.

18         Again, because it's after *Knox*, it's hard to say there

19    was no opportunity to do it.  There was an existing precedent

20    in which the exact issue was raised in that context, so I

21    wonder if you're trying to refine what it means to say an

22    opportunity to raise it in some way.

23         MR. BERMAN:  I think there's a difference between

24    being able to raise a defensive argument and being able to

25    raise an affirmative claim under 1983.  The doctrine's called

Ia3WyunO

1    claim preclusion.  I think that does have a literal meaning,

2    that it means that you assert it or had an opportunity to

3    assert the same claim, whether it be in an affirmative posture

4    or at the very least in a defensive posture, where you are able

5    to make some sort of affirmative case as opposed to a SORA

6    hearing where the state puts on an affirmative case, you defend

7    yourself, and that's that.

8         There's no opportunity for a defendant to make any

9    sort of affirmative motion, request, anything.  In the *Knox*

10   case, they made an argument that then got appealed and went up.

11        THE COURT:  Right, but it suggests some idea that the

12   courts in New York are sort of engaged in considering and

13   resolving issues that are not somehow properly before it.

14   Again, I think maybe you're suggesting that there has to be

15   some readily available procedural mechanism by which to bring

16   the particular challenge.

17        MR. BERMAN:  Yes, I would argue that.

18        I think that *res judicata* is a much more technical

19   doctrine while collateral estoppel is a little bit more

20   substantive.  This is about, Was the technical opportunity to

21   present the claim as a procedural matter there in some form?

22        Most of these cases are about, Oh, should they have

23   raised this as an affirmative defense; should they have raised

24   it as a counterclaim?

25        THE COURT:  Most of which cases?

1          MR. BERMAN:  I'm saying most of sort of general New

2     York cases.  In my read of them, most cases where *res judicata*

3     comes up are cases where the question is, What happened in

4     state court?  Is there some other litigation they say, Should

5     we have asserted this as a counterclaim, or should this have

6     been a defense instead of an affirmative litigation, or a

7     counterclaim?

8          Those are still all procedural mechanisms to make the

9     same, to bring the same point forward, while this is not really

10    that.

11         THE COURT:  Do you know, and maybe you don't, and

12    that's fine, but do you know, sort of aside from this context,

13    whether constitutional challenges of the kind that generally

14    are being made in SORA proceedings, when SORA was first passed,

15    were there constitutional challenges to it that matched that in

16    the SORA hearing itself?

17         MR. BERMAN:  The big example, the only example I know

18    of is the *Doe v. Pataki* one, where they went through the SORA

19    hearings and then brought federal 1983 actions before Judge

20    Chin.  And the only issue there was *Rooker-Feldman*, that was

21    raised was *Rooker-Feldman*, and Judge Chin essentially said:

22    Look, they went through those proceedings, but these cases

23    aren't barred because I'm not addressing what happened in those

24    proceedings; I'm just addressing the underlying process and

25    whether that was constitutional.

Ia3WyunO

1          THE COURT:  I gather that, like the early posture

2     here, as far as you could tell, collateral estoppel and *res*

3     *judicata* weren't raised.

4          MR. BERMAN:  I believe that is correct, your Honor.

5     Judge Chin made no mention of either preclusion doctrine, just

6     *Rooker-Feldman*.

7          And along those lines, can I transition to waiver?

8          THE COURT:  You may.

9          MR. BERMAN:  Your Honor, along those lines, I really

10    just don't think that this issue should be heard here.

11         This motion for preliminary injunction was referred

12    six months ago.  The state submitted an opposition to the

13    preliminary injunction.  They submitted, then, an affirmative

14    motion to dismiss, never raised this issue.  And the majority

15    of circuits to reach that issue as to whether something was

16    referred and wasn't raised is waived to come out or has some

17    form of waiver.  I don't mean "waived" in the technical sense.

18         THE COURT:  Do you agree that if the motion to dismiss

19    is denied they can assert it as an affirmative defense in the

20    answer and it will be litigated down the road?

21         MR. BERMAN:  Depending on how it's handled in this

22    proceeding, there may be law of the case, but as a Federal Rule

23    of Civil Procedure matter, yes.  I would agree, your Honor.

24         THE COURT:  But just to spin out what you're

25    suggesting, waiver in the sense of what's been briefed is what

Ia3WyunO

1   should be dealt with here up to this point, so if I conclude

2   that it's waived for purposes of the PI and the motion to

3   dismiss, they can assert it in the answer.

4           MR. BERMAN:  Yes.

5           THE COURT:  And we'll deal, down the road, with the

6   question of whether preclusion stops me from considering it.

7           MR. BERMAN:  I think that's correct.

8           I mean, I think just as a technical sort of procedural

9   mechanism, that's true.  But I still think the process works

10  the way it works for a reason.  This case was referred, and

11  there's more than ample opportunity to brief it in front of the

12  magistrate, and the issue can be addressed down the road.

13          For it to come up for the first time at this posture

14  is not fair to my client.  It defeats the whole purpose of the

15  Magistrates Act.  And I'll add that these cases I'm talking

16  about that have reached that conclusion are all cases where the

17  party at least raised the issue in their objections.

18          Here, the state didn't even raise the issue in the

19  objections.  They had a one-sentence throwaway:  In the

20  alternative, it's barred by res judicata.

21          The law is clear on that.  The standard of review is

22  clear error.  I think, at most, the only question that should

23  be asked for purposes of these motions is whether or not Judge

24  Moses committed clear error for not dismissing the claim, for

25  not dismissing plaintiff's substantive due process claim on the

Ia3WyunO

1    basis of an unraised collateral estoppel or *res judicata*

2    defense.  I think the answer to that is undoubtedly no.

3                THE COURT:  OK.

4                MR. BERMAN:  Unless you have further questions on

5    this --

6                THE COURT:  Actually, why don't we do this.  I'm going

7    to change course.

8                Let's get the state's argument on the preclusion

9    issues.  I'll give the state equal time on that, and then I'll

10   let Mr. Celli come in and make the substantive arguments.

11               MS. LALLY:  Would your Honor prefer me to start with

12   the issue of *res judicata* or start with *Rooker-Feldman*?  Do you

13   have a preference?

14               THE COURT:  I'd like to start with *res judicata*.

15               MS. LALLY:  OK.

16               THE COURT:  It's Ms. Lally, correct?

17               MS. LALLY:  Yes.

18               THE COURT:  Let me just get a time check.  I want to

19   give you equal time.

20               It's been 20 minutes, so we'll give you 20 minutes and

21   then we'll turn to the other issues.

22               MS. LALLY:  As your Honor's aware, *res judicata* gives

23   binding effect to a judgment in a court of competent

24   jurisdiction, prevents parties and their privities from

25   relitigating questions that were or should have been raised in

Ia3WyunO

1    a prior proceeding.

2             As your Honor alluded to, when determining the effect

3    of a state court judgment, federal courts apply the preclusion

4    law of the requisite state; here, that's New York.  That is

5    important because, in New York, the transactional approach to

6    *res judicata* is applied, so once a claim is brought to a final

7    conclusion, all other claims arising out of the same

8    transaction or series of transactions are barred, even if based

9    upon different theories or seeking a different remedy.  And I

10   pulled that language from the *Hevireaux* case, which was decided

11   by your Honor.

12            Now, plaintiff here admits that Mr. Yunus could have

13   raised these arguments before the state court.

14            THE COURT:  Well, not really.  I mean, he could have

15   in some broad, theoretical sense, because *Knox* did; I think

16   they have to admit the reality of that.  But there is a version

17   of the argument or a view of the argument, which is that maybe

18   *Knox* was wrong.  Maybe the SORA court in *Knox* was wrong to

19   consider it.  There's no obvious procedural mechanism to bring,

20   they say, a challenge like this.  Is there?

21            I mean, you're probably in a better position to

22   answer.  Are sort of broad constitutional challenges to either

23   the sort of facial constitutional challenges or as-applied

24   constitutional challenges brought in SORA hearings?

25            MS. LALLY:  Well, as your Honor alluded to, the fact

Ia3WyunO

remains that it did happen in *Knox*, so it can happen.  And

respectfully, I would submit that any time someone is appearing

before the court and thinks the court is doing something

unconstitutional, they're able to say, and the plaintiff even

conceded you're able to say:  "This is not constitutional as

applied to me; this should not happen."

Then the mechanism for raising that is to preserve

that issue for appeal.  Even if, maybe, you don't necessarily

know if it is properly done in that proceeding, you have

preserved it for appeal and can take the next step.  If you

don't preserve it for appeal, then when you show up at the

appellate court, they're going to say:  "I'm sorry; we have

nothing to work with."

Here, the course that should properly have been taken

and was, in fact, taken by the plaintiff in *Knox* was to say, at

the SORA hearing, "Respectfully, we don't think that this

applies to us at all."

THE COURT:  How did they do it in *Knox*?  Was there a

motion of some kind brought?

MS. LALLY:  Your Honor, I'm not sure about that.

Really, the language was just taken from the

underlying cases, which say that the plaintiffs objected to

their designation as sex offenders at the SORA hearing.  I

don't have the transcript or anything that I can cite to

specifically.

1        As I mentioned, plaintiff admits that Mr. Yunus could

2   have raised the arguments, and this, respectfully, should end

3   the inquiry.  Even if the claims are based on different legal

4   theories and seeking different legal remedies, they're, in

5   fact, barred by New York's law of *res judicata*.

6        Your Honor pointed out that the *Haring* case that

7   plaintiff cites to is quite different because the Virginia law

8   of preclusion applies.

9        Now, in Virginia, *res judicata* says that *res judicata*

10  does not apply unless the issue was actually litigated and

11  determined.  That is quite different than the New York

12  transactional approach, which says issues that were or should

13  have been based on the same transaction or series of

14  transactions.

15       Respectfully, we're saying here that plaintiff could

16  have challenged his sex offender designation, and he's not

17  entitled now to run to the state court and reframe his

18  arguments as some sort of federal 1983 claim.

19       THE COURT:  Well, I mean, they're federal claims,

20  right?  It's that the state court could have adjudicated the

21  federal claims.

22       MS. LALLY:  Yes, that's correct.  They are

23  constitutional claims that the state court could have

24  adjudicated.

25       THE COURT:  And to be specific, and then we'll turn to

Ia3WyunO

 1   waiver, is your argument that claim preclusion applies to

 2   plaintiff's substantive due process claim?

 3             MS. LALLY:  That's correct.

 4             THE COURT:  What about the procedural due process

 5   claim?

 6             MS. LALLY:  We would say that, yes, it applies to both

 7   the substantive and procedural due process claims.

 8             THE COURT:  What about the other claims in this case?

 9             MS. LALLY:  No, your Honor.  We're not saying it

10   applies to all of those.

11             THE COURT:  That's reasonable.

12             Let's turn to waiver.

13             MS. LALLY:  Sure.

14             THE COURT:  Let's just start with making sure I've got

15   the background facts right.

16             You didn't raise either collateral estoppel or *res*

17   *judicata* as bases to either dismiss the due process claims or

18   oppose the preliminary injunction.

19             MS. LALLY:  That is correct, your Honor.

20             THE COURT:  And despite Judge Moses's footnoted

21   discussion about collateral estoppel, you didn't raise any --

22   and tell me if this is right -- objection to the failure to

23   consider or appropriately consider or get right collateral

24   estoppel or *res judicata*.

25             MS. LALLY:  In the objections to the R&R, we did

1   briefly address the fact that, in our view, the claims could be

2   barred by *res judicata* for many of the same reasons as

3   *Rooker-Feldman*.

4           THE COURT:  I think that's what Mr. Berman referred to

5   as your throwaway line.

6           MS. LALLY:  It was admittedly brief.

7           THE COURT:  OK.

8           MS. LALLY:  But it was an objection.

9           THE COURT:  In that case, your objections to the

10  R&R -- do you happen to have a page cite for that?

11          MR. SCHULZE:  I believe that I can get it for you.

12          THE COURT:  Thank you.

13          MS. LALLY:  We'll pull that for you.

14          THE COURT:  Take waiver.

15          MS. LALLY:  I would say that the key issue is that

16  considering matters of efficiency, it doesn't make sense to

17  consider this issue now.  I don't think that there's any

18  dispute that the affirmative defenses of *res judicata* and

19  collateral estoppel haven't been waived for purposes of the

20  case.  We still have the opportunity to include those in our

21  answer, so it really does not make sense to make a

22  determination now that would likely have to be revisited again

23  during the case in chief.

24          It's inefficient and clearly an inappropriate outcome.

25          THE COURT:  What do you mean "inappropriate"?  In

1    other words, if I say for purposes of the PI and the motion to

2    dismiss, you've waived, I presume you would answer at that

3    point and you would include it.  If I conclude waiver, I don't

4    decide at this point the outcome on preclusion grounds.

5    Inconsistent holding is possible, although with PIs, it's a

6    preliminary likelihood of success, etc., but I think if I were

7    to decide on waiver, then it would be put off to another day.

8            What's inappropriate about that?

9            MS. LALLY:  I take your Honor's point.

10           There's always a possibility of some sort of

11   inconsistent judgment, but I will say that the main issue would

12   be efficiency and the fact that, frankly, your Honor, we now

13   have had the opportunity to brief the issue and to raise the

14   issue and litigate it fully before your Honor.  It's not a

15   situation where it's now going to be a surprise to anyone that

16   this would be considered on the record.  I would submit that

17   between the efficiencies of considering the case in chief and

18   the fact that here we are today discussing it, we've had an

19   opportunity to consider the issues and brief them before your

20   Honor, it does make sense to consider those issues now.

21           THE COURT:  All right.  Thank you.

22           MS. LALLY:  Apologies, your Honor.

23           In defendants' objections to the R&R, the page that

24   refers to *res judicata* is page 9.

25           THE COURT:  Thank you.

Ia3WyunO

1           Mr. Celli.  Mr. Berman.

2           MR. BERMAN:  Quick rebuttal.

3           THE COURT:  Quickly.  Go ahead.

4           MR. BERMAN:  Very quickly.

5           First, with respect to waiver, like you said, if it's

6   not in the R&R, there's no substance to it beyond *res judicata*,

7   it should be applied in the alternative.  That's not a specific

8   objection, as courts have held is necessary to warrant *de novo*

9   review.

10          With respect to *Haring*, I just want to say the

11  Virginia courts that it actually had to be litigated in for

12  collateral estoppel, in footnote 9 of *Haring* right now, with

13  regard to *res judicata*, it says:

14          "Like the federal courts, the courts of Virginia apply

15  different rules of preclusion to matters arising in a suit

16  between the same parties and based upon the same causes of

17  action as those involved in the previous proceeding."

18          THE COURT:  You have to slow down.

19          MR. BERMAN:  Sorry.

20          In footnote 9 of *Haring*, it says:

21          "Under the doctrine of *res judicata*, 'the judgment in

22  the former action is conclusive of the latter, not only as to

23  every question which was decided," and the quote goes on, and

24  then says, right after that, "the doctrine does not apply,

25  however, to a later action between different parties or a later

Ia3WyunO

1    action between the same parties with a different claim or

2    demand."

3             To me, that is clear that Virginia law has the same

4    could-have-litigated standard, and they just viewed the federal

5    civil rights claim as a, quote/unquote, different claim or

6    demand as the state criminal adjudication.

7             THE COURT:  Thank you.

8             Mr. Celli.

9             MR. CELLI:  Good afternoon, your Honor.

10            THE COURT:  Good afternoon.

11            Why don't we plan here 20 a side.

12            Go ahead.

13            MR. CELLI:  Thank you, Judge.

14            It's good that we've cleared out some of the

15   underbrush here, because where we really are in this case is an

16   application for a preliminary injunction on behalf of Equan

17   Yunus to lift the designation -- the stigmatizing

18   designation -- of him as a sex offender, because the

19   application of New York Corrections Law 168 is unconstitutional

20   in this case.

21            THE COURT:  You're not making a facial challenge.

22            MR. CELLI:  That's right.

23            What I would like to start with are the three, I

24   think, critical and undisputed facts in the case.  Two of them

25   are real facts, and the third is a legal fact.

1          The first is that Mr. Yunus's crime had nothing to do

2   with sex, nothing to do with sex.

3          THE COURT:  No dispute.

4          MR. CELLI:  No dispute, and there were no background

5   facts with respect to sex.

6          This was not a situation where Mr. Yunus kidnapped

7   somebody and they couldn't prove that there was a sexual

8   motive, but there was evidence of it.  This was a kidnapping --

9   horrible, terrible crime, which he acknowledges -- about money.

10  It wasn't about sex.  That's the first undisputed and very

11  important fact.

12         The second is that there's actually been a factual

13  finding by a state court judge, having heard from the

14  government and from Mr. Yunus's criminal defense lawyer, that

15  he is unlikely ever to commit a sexual offense of any kind.

16  And if it helps the Court to acknowledge, there was no sexual

17  misconduct by Mr. Yunus in the 15 years that he spent behind

18  bars, so sex is not really part of this case as to Mr. Yunus.

19         And then the third fact, which really is sort of a

20  legal fact, is that every court that has looked at the sex

21  offender designation rules -- every one of them -- has found it

22  to be constitutionally suspect, at the least, to mislabel

23  somebody, to say that somebody who has not committed a sexual

24  crime, who is not likely to commit a sexual crime is a sex

25  offender.  That's a problem, and in fact, even the government,

Ia3WyunO

1    the state in this case, does not contest that there is a

2    constitutional liberty interest at stake under the due process

3    clause.

4            The only question here, for substantive due process,

5    the second cause of action, all comes down to one question,

6    which is whether it is rational, in light of the legislature's

7    stated goals for this statute, Section 168 of the Corrections

8    Law, to affix the label of sex offender to this person, this

9    specific person.

10           THE COURT:  Can I also ask, as a preliminary fact, if

11   it's also uncontested that the New York State legislature, in

12   its wisdom, did apply the Sex Offender Registration Act to

13   someone in Mr. Yunus's set of circumstances?

14           MR. CELLI:  It did.

15           I mean, it's interesting what's happening if you look

16   nationally at this issue.  There was this thing called the

17   Jacob Wetterling Act, which essentially encouraged states from

18   the federal level to have registries of this sort, and a number

19   of states decided to have two kinds of registries, a sex

20   offender registry and a violent felons or sometimes a criminal

21   predators-type registry, a separate registry.  And that, I

22   think, acknowledges that in some states, the legislatures

23   decided that the stigma of the sex offender label is so strong

24   that people who don't commit sex crimes shouldn't be listed as

25   that.

1          New York didn't do that.

2          THE COURT:  That policy argument did not prevail on

3   the New York legislative body.

4          MR. CELLI:  Yes, exactly.

5          But if we're going to take the legislature seriously,

6   and I agree that we should, we should also take seriously what

7   they said they were trying to accomplish.

8          What they said was they wanted to protect the public

9   from sex offenders, people who commit sexual violence, because

10   the conduct is repetitive and compulsive and there's likely to

11   be recidivism of that particular kind of crime.  This is not a

12   general registry for people who are really dangerous.

13          THE COURT:  It's interesting.  That form of argument

14   is typically made in a construction context, right?  Construe

15   the statute the following way because this kind of person is

16   not at all what the legislature had in mind, but you just said

17   a moment ago the legislature, whether they had Mr. Yunus in

18   mind, I think you agree, captured him in the act.

19          MR. CELLI:  Yes.

20          THE COURT:  What do I do analytically with the

21   legislative-purpose argument that you're making?

22          MR. CELLI:  Under the substantive due process law of

23   jurisprudence, it's pretty clear that it's appropriate to focus

24   on what the legislature says it intends to capture.

25          Now, it's true that there's intention there; that is

Ia3WyunO

1    to say, on the one hand, they say they're talking about sex and

2    people who are compulsive and engage in repetitive behavior,

3    that are likely to be recidivists because they commit sex

4    crimes.  And on the other hand, they added a category of people

5    that don't have, potentially don't have any sexual element to

6    their crimes.

7            But here, since we have an as-applied application

8    before the Court, it's appropriate doctrinally to look at their

9    reasoning for passing the statute and then apply it to this

10   person very specifically, a person who never committed a sexual

11   crime, who's not likely to commit a sexual crime and, in fact,

12   for which there was not even a sexual element or motive in the

13   crime that he pled guilty to.  There's a disconnect between

14   what the legislature said it was trying to accomplish and what

15   its purposes were -- that's the due process, one prong of due

16   process argument -- and the person to whom it's being applied

17   in this particular case.

18           In *Robinson*, which is the Florida Supreme Court case,

19   they had exactly this case in front of them.  It's like the

20   other side of New York in *Knox* and *Robinson* in Florida.  And

21   they said on an as-applied basis, we're going to look at the

22   purpose, apply it to the person, and we're also going to factor

23   in, very importantly, the impact that this mislabeling has on

24   this person.

25           It's the most extreme stigma that we have in our

society, to call somebody a sex offender.  It's worse -- I

think far worse, and the courts acknowledge this -- than even a

child predator.  The registration and notification requirements

under Section 168 and the Executive Law are onerous.  Mr. Yunus

is going to be subject to this label and need to register and

give photographs and have people notified of the status until

the year 2036.  It's a very long time.

And of course, he will be restricted in his employment

in various ways and subject to more harsh penalties if he ever

were to get into trouble again, which I doubt, as a result of

being a sex offender in a context where there's no sex in the

case.

Put another way, there's a mismatch between the label

and the person, and many courts have held, several courts have

held that that's a violation of the due process clause.  We

have Florida in *State v. Robinson*.  We have New Mexico in 2006,

the *City of Albuquerque* case, and we have two intermediate

courts of appeal in Ohio, *State v. Reine* and *State v. Small*.

There's a discussion in *Robinson* that I think is worth

returning to just for a moment, which is where they talk about

sort of general factors that the legislature is allowed to and

could consider; for example, what *Knox* said about 46 percent of

kidnappings have a sexual element to them.  *Knox*, basically,

says there can be a little bit of give in the joints when we're

looking at a statute facially.

1          What *Robinson* says, very clearly, is you cannot do

2    that when you are applying this to a particular person

3    essentially where there's been a fact finding -- a fact

4    finding -- with respect to this person that he has no sexual

5    misconduct in his past and is unlikely to ever have in his

6    future.

7          That's beginning, middle and end of the case from our

8    point of view on substantive due process.  We meet the test

9    with respect to an injunction.  It's in the public interest to

10   enforce the Constitution.  There's no issue about irreparable

11   harm.  And we would ask that the Court adopt Magistrate Judge

12   Moses's findings with respect to the second cause of action and

13   issue the injunction that lifts this stigmatizing designation.

14          THE COURT:  Thank you.

15          MR. CELLI:  Thank you, your Honor.

16          THE COURT:  Ms. Lally.

17          MS. LALLY:  Your Honor, it's undisputed here that the

18   rational-basis test applies, so what we need to consider is

19   whether the statute is rationally related to a legitimate

20   government interest.  Obviously, that is a highly deferential

21   standard, and here, it's more than met.

22          THE COURT:  Mr. Celli laid out a set of undisputed

23   facts, including sort of litigation facts.  Do you disagree

24   with any of those?

25          MS. LALLY:  With respect to plaintiff's time in

Ia3WyunO

1   incarceration?

2          THE COURT:  Yes.

3          Mr. Celli, could you just say them one at a time.

4          MR. CELLI:  Sure.

5          THE COURT:  Basically, no sex in this case.

6          MR. CELLI:  No sex in this case, a factual finding.

7          THE COURT:  Ms. Lally, do you agree?

8          MS. LALLY:  For purposes of this motion, we will

9   concede it, but there has been no discovery, so we're not

10  necessarily able to say that there's been no sexual component

11  to any of the crimes.

12         My understanding is, at least, not only did plaintiff

13  plead guilty to abducting a 14-year-old at gunpoint, but there

14  was also an additional victim that was abducted as well.  I,

15  again, to the best of my knowledge, for purposes of this

16  motion, would say I agree, no sex.  I don't know that I could

17  say that for the full case.

18         THE COURT:  And then there was a finding.

19         MR. CELLI:  There's a finding of no likelihood of

20  sexual misconduct in the future.  Justice Obus found that in

21  the SORA hearing.

22         MS. LALLY:  Yes, that's correct, that with respect to

23  the finding in the SORA hearing, the court did say no

24  likelihood of sexual misconduct in the future.

25         THE COURT:  To circle back, are you going to attempt

1    to relitigate that here?

2           MS. LALLY:  Your Honor, I'm not trying to obfuscate or

3    be obstructionist.

4           My only concern is we do not have the full evidence on

5    plaintiff's crimes of incarceration and other things that might

6    have gone into his criminal conduct.  Right now, I take

7    plaintiff's counsel at his word when he says that during his

8    incarceration, there's been no accusation of sexual misconduct.

9    I don't independently know that to be true.

10          THE COURT:  OK.  That's to the first point.

11          On the second point.

12          MS. LALLY:  Yes.  Yes, I -- yes, your Honor.

13          THE COURT:  You see the irony.

14          MS. LALLY:  Your Honor, I do not at all dispute that

15   in the transcript before Judge Obus, the judge says what he

16   says.  I do not dispute that.

17          THE COURT:  All right.  Go ahead.  I didn't mean to

18   take you off track.

19          MS. LALLY:  Plaintiffs talked a lot about the problems

20   with potentially having an individual register as a sex

21   offender.

22          The New York legislature considered that.  They

23   specifically chose to include people who had kidnapped minors

24   that were not their relatives within the bounds of being a sex

25   offender.  And the legislature could rationally have considered

Ia3WyunO

things such as studies showing the high correlation between

kidnapping of minors and sexual assaults.  Just because

plaintiff disagrees with these studies does not mean that they

don't exist.

The legislature could have considered the potential

for the underreporting of sexual assault by those who kidnap

minors, because in some cases, the minors disappear or they are

killed or they can't or won't testify; the potential that the

offender intends sexual assault but is prevented by arrest or

escape; the interest in the fact that a child cut off from the

safety of his or her everyday surroundings is vulnerable to

sexual abuse.  The legislature could have reasonably determined

that, Look, the concern with trying to parse out who would have

been a sex offender but for some thing happening that prevented

the actual sex abuse to occur justifies this concern that

dangerous sex offenders would, in fact, escape registration,

would escape informing the public as to what their crime of

incarceration was.

Plaintiff alluded, and the R&R does as well, to the

claim that being a sex offender is stigmatizing.

Respectfully, that's something that the *Knox* court

specifically considered.  They held that the interest

defendants assert in not having their admittedly serious crimes

mischaracterized in a way that is arguably even more

stigmatizing than a correct designation would be, and concluded

Ia3WyunO

1    that that's not a fundamental right as the due process cases

2    use that term.

3            I note that plaintiff does not appear to contest, and

4    in fact, admits that he could potentially be termed a child

5    predator but argues that being called a child predator is

6    somehow less onerous or less scary to the public than sex

7    offender.

8            Respectfully, I think that that argument does not

9    carry a lot of water.  And I would note that the R&R

10   specifically talks about the fact that the administrative

11   burden in itself of trying to parse out who is a sex offender

12   and who isn't doesn't justify subjecting someone like plaintiff

13   to these requirements.  But respectfully, we submit that this

14   misses the mark.  It's not simply an administrative burden, and

15   the *Knox* court did not characterize it as such either.  It is

16   the risk that otherwise dangerous sex offenders would escape

17   registration.

18           Now, I know that plaintiff talked a lot about the

19   Florida and New Mexico courts.

20           I think it's worth noting that New York is joined by

21   other courts, such as those in Illinois and Wisconsin, in

22   determining that this scheme is constitutional, and indeed, I

23   believe that the R&R identified one federal case in the Western

24   District of Kentucky that also upheld the constitutional

25   scheme.

Ia3WyunO

1          We submit that plaintiff needs to demonstrate that

2     there's no rational connection between the challenged

3     legislation and its public policy purpose, and plaintiff here

4     just falls very short.

5          THE COURT:  All right.  Thank you.

6          Mr. Celli.

7          MR. CELLI:  Very quickly, your Honor.

8          I appreciate the difficult position that my colleague,

9     the state, is in.

10          THE COURT:  I thought you meant Mr. Berman there for a

11    second.

12          MR. CELLI:  Him?  No.  He's in great shape.

13          Seriously, I'm a veteran of the attorney general's

14    office.  I know that it can be difficult to be in that

15    position.

16          THE COURT:  As am I.

17          MR. CELLI:  I know, your Honor.

18          But to acknowledge, as they did, quite forthrightly,

19    that the facts are undisputed as we sit here today, I think, is

20    an extremely important acknowledgment.  I don't want to call it

21    a concession, because this part is not about winning; it's just

22    about being straight with the Court.  That's terribly

23    important, and I think that that should weigh heavily,

24    candidly, in the Court's thinking here.

25          Just a modest point, which is we are not here arguing

Ia3WyunO

1    that the studies that the legislature relied upon are wrong, or

2    that there's not some abstract and theoretical possibility in

3    some circumstances of underreporting or dead victims or

4    anything.

5         What we have here is a very tragic and horrible case

6    of two kidnappings.  One was of a 14-year-old child.  One was

7    of a 27-year-old man.  Neither of them had any element of sex

8    to them, and so whatever the legislature may have considered,

9    in its wisdom, in passing this legislation in the way that it

10   did, the Court is still obliged on an as-applied basis to

11   determine whether the purposes of the statute are rationally

12   related to this person, and that's the beginning, the middle

13   and the end of it for us, your Honor.

14        Thank you.

15        THE COURT:  Thank you.

16        My thanks to counsel for your briefing and arguments.

17   Very helpful.  The matter is submitted.  Recognizing that this

18   is in a preliminary injunction posture and that time has passed

19   in light of the referral, I will get resolution to you as

20   quickly as I possibly can.

21        Thank you.

22        We're adjourned.

23        MR. CELLI:  Thank you, your Honor.

24        (Adjourned)

25